No. 17-35105

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

————————————

STATE OF WASHINGTON, et al.,
Plaintiffs-Appellees,
v.

DONALD TRUMP, President of the United States, et al.
Defendants-Appellants.

————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

————————————

**EMERGENCY MOTION
UNDER CIRCUIT RULE 27-3 FOR ADMINISTRATIVE STAY
AND MOTION FOR STAY PENDING APPEAL**

————————————

NOEL J. FRANCISCO
*Acting Solicitor General*

CHAD A. READLER
*Acting Assistant Attorney
General*
AUGUST E. FLENTJE
*Special Counsel to the Assistant
Attorney General*
DOUGLAS N. LETTER
SHARON SWINGLE
H. THOMAS BYRON
LOWELL V. STURGILL JR.
CATHERINE DORSEY
*Attorneys, Appellate Staff
Civil Division, Room 7241
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, DC 20530*

# CIRCUIT RULE 27-3 CERTIFICATE

The undersigned counsel certifies that the following is the information

required by Circuit Rule 27-3:

**(1) Telephone numbers and addresses of the attorneys for the parties**

> *Counsel for Appellants Donald Trump, et al.*
> Noel J. Francisco
> Chad A. Readler (Chad.A.Readler@usdoj.gov)
> August E. Flentje
> Douglas N. Letter (Douglas.Letter@usdoj.gov)
> Sharon Swingle (Sharon.Swingle@usdoj.gov)
> H. Thomas Byron (H.Thomas.Byron@usdoj.gov)
> Lowell V. Sturgill Jr. (Lowell.Sturgill@usdoj.gov)
> Attorneys, Appellate Staff
> Civil Division, Room 7241
> U.S. Department of Justice
> 950 Pennsylvania Ave., NW
> Washington, DC 20530
> (202) 514-3427
>
> *Counsel for Appellees*
>
> *For State of Washington*:
> Colleen N. Melody (Coleenm1@atg.WA.Gov)
> Noah Guzzo Purcell (Noahp@atg.Wa.Gov)
> Anne Elizabeth Egeler (Annee1@atg.Wa.Gov)
> Patricio A. Marquez (Patriciom@atg.Wa.Gov)
> Marsha J. Chien (Marshac@atg.Wa.Gov)
> Office of the Attorney General
> 800 Fifth Avenue, Suite 2000
> Seattle, WA 98104
> (206) 464-7744

i

*For State of Minnesota*:
Jacob Campion (Jacob.Campion@ag.State.Mn.Us)
445 Minnesota Street, Suite 1100
St. Paul, MN 55101
(651) 757-1459

## (2) Facts showing the existence and nature of the emergency

As set forth more fully in the motion, the district court has entered a nationwide injunction barring enforcement of provisions of an Executive Order issued pursuant to constitutional and statutory authority to address national security concerns, which is imposing irreparable harm on the defendants and the general public. The injunction contravenes the constitutional separation of powers; harms the public by thwarting enforcement of an Executive Order issued by the nation's elected representative responsible for immigration matters and foreign affairs; and second-guesses the President's national security judgment about the quantum of risk posed by the admission of certain classes of aliens and the best means of minimizing that risk.

## (3) When and how counsel notified

The undersigned counsel notified counsel for the plaintiffs by email on February 4, 2017, of the defendants' intent to file this motion. Service will be effected by electronic service through the CM/ECF system.

**(4) Submissions to the district court**

     The defendants requested a stay from the district court on February 3, 2017, which the district court orally denied.

     <u>*Counsel to Defendants*</u>

NOEL J. FRANCISCO
/s/ Noel J. Francisco
 *Acting Solicitor General*

CHAD A. READLER
 *Acting Assistant Attorney*
  *General*
AUGUST E. FLENTJE
  *Special Counsel to the Assistant*
  *Attorney General*
DOUGLAS N. LETTER
SHARON SWINGLE
H. THOMAS BYRON
LOWELL V. STURGILL JR.
CATHERINE DORSEY
 *Attorneys, Appellate Staff*
 *Civil Division, Room 7241*
 *U.S. Department of Justice*
 *950 Pennsylvania Ave., NW*

## INTRODUCTION

The President of the United States has determined that "[d]eteriorating conditions in certain countries due to war, strife, disaster, and civil unrest increase the likelihood that terrorists will use any means possible to enter the United States," and that our Nation accordingly must take additional steps "to ensure that those approved for admission do not intend to harm Americans and that they have no ties to terrorism." Executive Order: Protecting the Nation from Foreign Terrorist Entry into the United States (Jan. 27, 2017) (Order) (Exhibit A).

Invoking his constitutional authority to control the entry of aliens into this country and congressionally delegated authority to "suspend the entry of * * * any class of aliens" whose entry "would be detrimental to the interests of the United States," the President has directed a temporary 90-day suspension of entry for individuals from seven countries previously identified as posing a heightened risk of terrorism by Congress or the Executive Branch; a temporary 120-day suspension of the U.S. Refugee Admissions Program; and a suspension of entry of Syrian nationals as refugees until the President determines that measures are in place "to ensure that admission of Syrian refugees is consistent with the national interest." Exec. Order §§ 3(c), (5)(a), (c).

As another district court recently concluded in a thorough, well-reasoned opinion, the Order is a lawful exercise of the political branches' plenary control over

1

the admission of aliens into the United States. *Louhghalam v. Trump*, Civ. No. 17-10154-NMG, Order 11 (D. Mass. Feb. 3, 2017) (Exhibit B).

The district court here nevertheless issued an immediate, nationwide injunction barring enforcement of the Order, accompanied by virtually no legal analysis. R 52 (Exhibit C).

The district court's sweeping injunction should be stayed pending appeal. It conflicts with the basic principle that "an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative." *Landon v. Plasencia*, 459 U.S. 21, 32 (1982). It also contravenes the considered judgment of Congress that the President should have the unreviewable authority to suspend the admission of any class of aliens. The district court did not confront those authorities; indeed, it gave no explanation why the State of Washington has a high likelihood of success on the merits of its claims. And it entered the injunction at the behest of a party that is not itself subject to the Executive Order; lacks Article III standing or any right to challenge the denial of entry or visas to third-party aliens; and brings a disfavored facial challenge. The injunction is also vastly overbroad—it is untethered to Washington's particular claims; extends even to aliens abroad who currently have no visas; and applies nationwide, effectively overriding the judgment

of another district court that sustained the Executive Order against parallel challenges.

The balance of harms weighs strongly in favor of a stay, as well as an immediate administrative stay pending consideration of the request for a full stay pending appeal. The injunction immediately harms the public by thwarting enforcement of an Executive Order issued by the President, based on his national security judgment. As the President acted well within both statutory and constitutional authorization, the relief irreparably harms our system of government by contravening the Constitution's separation of powers. The State, by comparison, has identified only speculative harms it would suffer from temporary suspension of the entry of aliens affected by the Order, and that harm could be minimized by expediting appeal.

## BACKGROUND

### A. The President's Authority

**1.** In the Immigration and Nationality Act of 1952 ("INA"), 8 U.S.C. §§ 1101 *et seq*., as amended, Congress established the framework for deciding which aliens may enter and remain in the United States. Congress expressly granted the President broad discretionary authority, whenever he "finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States," to "suspend the entry of all aliens or any class of aliens as immigrants

3

or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate * * *." 8 U.S.C. § 1182(f).

Numerous Presidents have invoked this authority,[1] including an order by President Reagan based on nationality, *i.e.*, a suspension of entry of certain Cuban nationals as immigrants into the United States. *See* 1986 WL 796773 (Aug. 22, 1986).

**2.** In addition to that statutory authority, the President has expansive constitutional authority under Article II over foreign affairs, national security, and immigration. "The exclusion of aliens is a fundamental act of sovereignty * * * inherent in the executive power to control the foreign affairs of the nation." *Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950).

### B. The President's Order

Invoking these constitutional and statutory authorities, the President issued the Order "to protect the American people from terrorist attacks by foreign nationals admitted to the United States." Order § 2.

---

[1] Presidential Proclamation 5517 (President Reagan); Exec. Order No. 12,324 (President Reagan); Exec. Order No. 12,807 (President George H.W. Bush); Presidential Proclamation 6958 (President Clinton); Presidential Proclamation 8342 (President George W. Bush); Presidential Proclamation 8693 (President Obama); Exec. Order No. 13,694 (President Obama); Exec. Order No. 13,726 (President Obama).

The Order directs a number of actions in the interests of national security.  *Id.* §§ 2-11.  The Secretary of Homeland Security is directed to conduct an immediate review to identify the "information needed from any country * * * to determine that [an] individual seeking [an immigration-related] benefit is who the individual claims to be and is not a security or public-safety threat." *Id.* § 3(a).  The Order also directs a process for requesting necessary information from foreign governments that do not supply such information, and consequences for countries not providing it.  *See id.* § 3(d)-(f).

While that review is ongoing, the Order suspends entry for 90 days of aliens from seven countries previously identified as being associated with a heightened risk of terrorism pursuant to 8 U.S.C. § 1187(a)(12).  *Id.* § 3(c).  Section 1187(a)(12), enacted in 2015, modifies the visa waiver program.  Pub. L. No. 114-113, 129 Stat. 2242, 2990 (2015).  That program allows nationals of certain countries to enter the United States without a visa.  *See* 8 U.S.C. § 1187.  Section 1187(a)(12) bars from the visa waiver program any individuals who are nationals of or have recently travelled to certain countries that raise terrorism-related concerns.  Congress itself identified Iraq and Syria as countries of concern, and also included countries that have been designated by the Secretary of State as sponsors of terrorism:  Iran, Sudan, and Syria.  *Id.* § 1187(a)(12)(A)(i)(I)-(II), (ii)(I)-(II).  In addition, Congress authorized the Executive Branch to designate additional "countries or areas of

concern" based on "whether the presence of an alien in the country or area increases the likelihood that the alien is a credible threat to the national security of the United States," "whether a foreign terrorist organization has a significant presence in the country or area," and "whether the country or area is a safe haven for terrorists." 8 U.S.C. § 1187(a)(12)(D)(ii). In February 2016, the Executive Branch exercised that authority to bar from the visa waiver program individuals who had recently travelled to Libya, Somalia, and Yemen, in an effort to ensure that the visa waiver program's "requirements are commensurate with the growing threat from foreign terrorist fighters." https://www.dhs.gov/news/2016/02/18/dhs-announces-further-travel-restrictions-visa-waiver-program.

Exceptions to the Order's suspension of the entry of aliens from the seven countries identified under § 1187(a)(12) can be made on a case-by-case basis. Order § 3(g). The suspension of entry does *not* apply to lawful permanent residents of the United States (*i.e.*, an immigrant admitted with the privilege of residing permanently in the United States, 8 U.S.C. § 1101(a)(20)). Feb. 1, 2017 Memorandum (Exhibit D).

The Order also suspends for 120 days the U.S. refugee program, which is independently committed to the discretion of the President under 8 U.S.C. § 1157(a), to permit a review of the "application and adjudication process to determine what additional procedures should be taken to ensure that those approved for refugee

6

admission do not pose a threat to the security and welfare of the United States."
Order § 5(a). Once the refugee program is resumed, the Secretary of State is directed
to "make changes, to the extent permitted by law, to prioritize refugee claims made
by individuals on the basis of religious-based persecution, provided that the religion
of the individual is a minority religion in the individual's country of nationality." *Id.*
§ 5(b). The Order contemplates the entry of a total of up to 50,000 refugees during
Fiscal Year 2017. *Id.* § 5(d).

Finally, the Order suspends entry of nationals of Syria as refugees under 8
U.S.C. § 1182(f) until the President determines that sufficient changes have been
made to the refugee program "that admission of Syrian refugees is consistent with
the national interest." *Id.* § 5(c).

### C. Procedural History

The State of Washington brought this action on January 30, 2017, asserting
constitutional and statutory claims against the United States, the President, and the
Secretaries of Homeland Security and State. Complaint, R1. On the same day,
Washington moved for a temporary restraining order. R3. Washington
subsequently amended its complaint to add Minnesota as a plaintiff. See R8.

Defendants opposed Washington's motion. R50. The district court held a
hearing on February 3, 2017. First orally, and then in a brief written order, the court
issued a nationwide injunction, effective immediately, barring enforcement of

7

sections 3(c), 5(a)-(c), and 5(e) of the Order. Transcript 48-49 (Exhibit E); R52. The court also denied defendants' motion for a stay. Transcript 50.

## ARGUMENT

An immediate stay pending appeal is appropriate in this case because defendants can establish (1) a strong likelihood of success on appeal; (2) a likelihood that it will be irreparably harmed absent a stay; (3) that plaintiffs will not be substantially harmed by a stay; and (4) public interest in a stay. *See Hilton v. Braunskill*, 481 U.S. 770, 776 (1987).

This Court has jurisdiction under 28 U.S.C. § 1292(a)(1). Although temporary restraining orders are ordinarily not appealable, this Court has jurisdiction over appeals from "interlocutory orders of the district courts pertaining to injunctions"; "the essence of the order, not its moniker," determines appealability. *Service Employees* v. *Nat'l Union of Healthcare*, 598 F.3d 1061, 1067 (9th Cir. 2010). Where, as here, the "district court holds an adversary hearing and the basis for the court's order was strongly challenged," and the length of the injunction (in this case, indefinite) "exceeds the ordinary duration" of temporary restraining orders, the order is properly treated as an appealable injunctive order. *Id.*

## A.  Defendants Are Likely to Succeed on Appeal.

The district court erred in concluding that Washington is likely to succeed on the merits.[2]  In fact, Washington lacks Article III standing, has no basis for challenging the denial of visas or entry to third-party aliens, and has not identified any legal defect in the Order—much less one that would justify the facial injunctive relief granted by the district court.

### 1.    Washington Lacks Article III Standing to Bring this Action.

The district court reasoned that the Washington has Article III standing because the Order "adversely affects the States' residents in areas of employment, education, business, family relations, and freedom to travel," and that these harms "extend to the States by virtue of their roles as *parens patriae* of the residents living within their borders."  R52, at 4-5.  But a State cannot bring a *parens patriae* action against federal defendants.  In dismissing Massachusetts' challenge to a federal statute designed to "protect the health of mothers and infants" in *Massachusetts v. Mellon*, the Supreme Court explained that "it is no part of [a State's] duty or power to enforce [its citizens'] rights in respect of their relations with the federal government."  262 U.S. 447, 478, 485-86 (1923); accord *South Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966).

---

[2] Because Minnesota, which was added as a plaintiff in the amended complaint, did not move for interim injunctive relief, we address only Washington's standing.  Regardless, the arguments apply equally to Minnesota.

The district court also reasoned that "the States themselves are harmed by virtue of the damage that implementation of the Order has inflicted upon the operations and missions of their public universities and other institutions of higher learning, as well as injury to the States' operations, tax bases, and public funds." R52, at.5. These attenuated and speculative alleged harms are neither concrete nor particularized.

With respect to Washington's public universities, most if not all of the students and faculty members the State identifies are not prohibited from entering the United States, and others' alleged difficulties are hypothetical or speculative.[3] That is particularly true given the Order's waiver authority. *See* Executive Order §§ 3(g), 5(e). Furthermore, any assertion of harm to the universities' reputations and ability to attract students is insufficiently concrete for standing. *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990). And although Washington suggested that the Order might affect its recruitment efforts and child welfare system, it conceded that it could not identify any currently affected state employees, nor any actual impact on its child welfare system. *See* Schumacher Decl. ¶ 7, R17-5; Strus Decl., R17-6.

---

[3] *See, e.g.*, Second Riedinger Decl. ¶¶ 3-7, R17-2 (allegations about lawful permanent residents, who are not impacted by the Executive Order); Boesenberg Decl. ¶ 6, R17-3 (same); Second Riedinger Decl. ¶ 8 (asserting that certain countries may "ban * * * U.S. travelers" in response to the Executive Order); Second Chaudhry Decl. ¶ 8, R17-4 (alleging one faculty member may be unable to return to the university in the future).

Washington's contentions regarding its tax base and public funds are equally flawed. *See Florida v. Mellon*, 273 U.S. 12, 17-18 (1927) (finding no standing based on Florida's allegation that challenged law would diminish tax base); *see also, e.g., Iowa ex rel. Miller v. Block*, 771 F.2d 347, 353 (8th Cir. 1985).[4]

Nor does Washington have any "legally protected interest," *Arizona Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 134 (2011), in the grant or denial of entry to an alien outside the United States. The INA's carefully reticulated scheme provides for judicial review only at the behest of an alien adversely affected, and even then only if the alien is subject to removal proceedings, *see* 8 U.S.C. § 1252. Under longstanding principles exemplified by the doctrine of consular nonreviewability, an alien abroad cannot obtain judicial review of the denial of a visa (or his failure to be admitted as a refugee). *Brownell v. Tom We Shung*, 352 U.S. 180, 184 n.3, 185 n.6 (1956). It follows that a third party, like Washington, has no "judicially cognizable interest," *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973), in such a denial. Or to put it in Administrative Procedure Act (APA) terms, review is precluded by the INA, the relevant determinations are committed to the

---

[4] Washington cited no case recognizing the standing of a State, which cannot suffer "spiritual or psychological harm" or hold "religious beliefs" that could be "stigmized," *Catholic League for Religious & Civil Rights v. City & Cty. of San Francisco*, 624 F.3d 1043, 1050-52 (9th Cir. 2010), to bring an Establishment Clause challenge.

Executive's discretion (indeed, to the President, who is not subject to the APA), and Washington lacks a cause of action. 5 U.S.C. §§ 701(a), (702).

### 2.    The Order Is a Valid Exercise of the Executive's Constitutional and Statutory Power

This express delegation from Congress in 8 U.S.C. § 1182(f), coupled with the President's own Article II powers over foreign affairs and national security, mean that the President's "authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2083-84 (2015); *see also, e.g., Harisiades v. Shaughnessy*, 342 U.S. 580, 588 (1952) (recognizing that control over immigration is an integral part of Article II authorities "in regard to the conduct of foreign relations [and] the war power").

In the immigration context specifically, "[t]he Supreme Court has 'long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'" *Cardenas v. United States*, 826 F.3d 1164, 1169 (9th Cir. 2016) (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)). "When Congress delegates this plenary power to the Executive, the Executive's decisions are likewise generally shielded from administrative or judicial review." *Cardenas*, 826 F.3d at 1169.

The Order falls squarely within Congress' delegation in 8 U.S.C. § 1182(f) of the "power to prevent the entry of any alien or groups of aliens into this country as

well as * * * to grant entry to such person or persons with any restriction on their entry as he may deem to be appropriate." *Mow Sun Wong v. Campbell*, 626 F.2d 739, 744 n.9 (9th Cir. 1980); *accord Haitian Refugee Ctr., Inc. v. Baker*, 953 F.2d 1498, 1507 (11th Cir. 1992). "Pursuant to, and without exceeding, that grant of discretionary authority, the President * * * suspended entry of aliens from the seven subject countries." *Louhghalam*, Order 17.

As noted above (at p. 4), prior Presidents have repeatedly invoked this authority to suspend entry of certain classes of aliens, including on the basis of nationality. In reviewing an Executive Order directing the interdiction and forcible repatriation of undocumented aliens outside the territorial waters of the United States, the Supreme Court found it "perfectly clear that 8 U.S.C. § 1182(f) * * * grants the President ample power to establish [by Executive Order] a naval blockade that would simply deny *illegal Haitian migrants* the ability to disembark on our shores." *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 187 (1993) (emphasis added). And courts have repeatedly affirmed that "[d]istinctions on the basis of nationality may be drawn in the immigration field by the Congress or the Executive." *Narenji v. Civiletti*, 617 F.2d 745, 747 (D.C. Cir. 1979); *see also, e.g., Jean v. Nelson*, 727 F.2d 957, 978 n.30 (11th Cir. 1984) (en banc), *aff'd*, 472 U.S. 846 (1985); *Rajah v. Mukasey*, 544 F.3d 427, 435 (2d Cir. 2008).

Washington argued in district court that the President's authority under § 1182(f) is limited by 8 U.S.C. § 1152(a)(1)(A), which provides, with certain exceptions, that "no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence." But this restriction does not address the President's authority under § 1182(f) to "suspend the entry" of aliens, which is an entirely different act under the immigration laws. An immigrant visa does not entitle an alien to admission to the United States, and even if an alien is issued a valid visa, he is subject to being denied admission to this country when he arrives at the border. *See, e.g., Khan v. Holder*, 608 F.3d 325, 330 (7th Cir. 2010). There is no inconsistency between § 1152(a)(1)(A) and the President's issuance of the Order under § 1182(f).

In any event, even if there were thought to be some potential inconsistency between § 1152(a)(1)(A) and § 1182(f) , 8 U.S.C. § 1152(a)(1)(B) makes clear that the statute does not "limit the authority of the Secretary of State to determine the procedures for the processing of immigrant visa applications * * *." This establishes that the Order is not covered by the restrictions of subsection (A), because the Order directs a review and revision of procedures for processing of visa applications and adopts procedures for a temporary suspension and then resumption of processing of certain visa applications following that review. *See, e.g.*, Order §§ 3(a), 5(a).

14

Furthermore, while the review is pending, the Secretaries of State and Homeland Security have discretion to grant visas on a case-by-case basis. *Id.* §§ 3(g), 5(e). Washington's interpretation of the two provisions, in contrast, would lead to the untenable result that the United States could not suspend entry of nationals of a country with which the United States is at war, which would raise a serious constitutional question about Congress's ability to restrict the President's Article II authority to ensure the nation's security.

### 3. The District Court Improperly Second-Guessed the President's National Security Determinations

By its plain terms, 8 U.S.C. § 1182(f) vests complete discretion in the President to determine whether "the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States," to suspend entry or impose such conditions of entry as the President "may deem appropriate" for such period as "he shall deem necessary." The President's exercise of this discretion "is not limited to circumstances defined in the statute," and "the statute provides no discernable standards" for reviewing his determination. *Haitian Refugee Ctr., Inc. v. Baker*, 789 F. Supp. 1552, 1575-76 (S.D. Fla. 1991); *see also Webster v. Doe*, 486 U.S. 592, 594, 600-01 (1988).

Judicial second-guessing of the President's determination that a temporary suspension of entry of certain classes of aliens was necessary at this time to protect national security would constitute an impermissible intrusion on the political

15

branches' plenary constitutional authority over foreign affairs, national security, and immigration. *See, e.g., Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952) ("[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government."). "[I]t is not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government to exclude a given alien." *Knauff*, 338 U.S. at 543; *see also INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999).

Courts are particularly ill-equipped to second-guess the President's prospective judgment about future risks, as decisions about how best to "confront evolving threats" are "an area where information can be difficult to obtain and the impact of certain conduct difficult to assess." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010). Unlike the President, courts do not have access to classified information about the threat posed by terrorist organizations operating in particular nations, the efforts of those organizations to infiltrate the United States, or gaps in the vetting process. *See, e.g., Al Haramain Islamic Found., Inc. v. Dep't of Treasury*, 686 F.3d 965, 980 (9th Cir. 2012).

Washington nevertheless argued that the district court should disregard the President's stated rationale for issuing the Executive Order because Washington believed it was prompted by religious animus toward Islam. That argument is

16

wrong, and it cannot be reconciled with *Kleindienst v. Mandel*, 408 US. 753, 770 (1972), which held that, "when the Executive exercises" immigration authority "on the basis of a facially legitimate and bona fide reason, the courts will [not] look behind the exercise of that discretion[.]" *Cf. Kerry v. Din*, 135 S. Ct. 2128, 2140 (2015) (Kennedy, J., concurring) (noting that *Mandel*'s "reasoning has particular force in the area of national security"). Here, as another district court has recognized, the Executive Order undeniably states a facially legitimate and bona fide reason— ensuring "the "proper review and maximum utilization of available resources for the screening of foreign nationals" and "that adequate standards are established to prevent infiltration by foreign terrorists." Order, §§ 3(c), 5(a), (c); *see Louhghalam*, Order 18-19. The Order does so in part by incorporating a list of seven countries that were identified by Congress—and by the Executive in 2016—as raising terrorism-related concerns. Accordingly, *Mandel* forecloses the State's challenge. *Louhghalam*, Order 18-19.

The more searching inquiry envisioned by the States would create substantial separation-of-powers problems, by permitting probing of the President's subjective motive in issuing the Order, *cf. United States v. O'Brien*, 391 U.S. 367, 383-84 (1968) (inquiry into the subjective motives of members of Congress is a "hazardous matter"), and here even seeking an injunction running against the President himself, *see Mississippi v. Johnson*, 71 U.S. 475, 501 (1867).

17

**4.    The State's Constitutional Challenges Are Without Merit**

Washington's equal protection and procedural due process challenges also fail.  *See Louhghalam*, Order 8-11, 13-16.  As an initial matter, "[t]he word 'person' in the context of the Due Process Clause of the Fifth Amendment cannot * * * be expanded to encompass the States of the Union."  *Katzenbach*, 383 U.S. at 323; *see also Premo v. Martin*, 119 F.3d 764, 771 (9th Cir. 1997).  Nor can Washington invoke the Fifth Amendment rights of its citizens against the federal government. *See Katzenbach*, 383 U.S. at 324.

Furthermore, the vast majority of the individuals that Washington claims are affected by the Executive Order are aliens outside the United States, but it is "clear" that "an unadmitted and nonresident alien" "had no constitutional right of entry to this country as a nonimmigrant or otherwise." *Mandel*, 408 U.S. at 762; *see Plasencia*, 459 U.S. at 32.  This is fatal to Washington's facial challenges, which require it to show that there is no constitutionally valid application of the Order.  Even if the State could show a constitutional violation with respect to some individuals—and it cannot—they plainly cannot establish such a violation as to non-resident aliens who are outside the United States and who have no prior connection to this country.

For the reasons explained in *Louhghalam*, moreover, the State cannot possibly make that showing.  Indeed, the State's claim of animus is irreconcilable with the

18

fact that the seven countries listed in Section 3(c) of the Order are the *same seven countries* that Congress and the Executive Branch identified in restricting the visa-waiver program in 2015 and 2016, precisely because those countries are hotbeds of terrorist activity.  See pp. 5-6, *supra*; see also 8 U.S.C. 1187(a)(12)(D)(iii).

Washington argued in district court that Section 5(b) of the Order violates the Establishment Clause by "giv[ing] preference to Christian refugees while disadvantaging Muslim refugees."  TRO Mot. at 7.  But Section 5(b) provides an accommodation for refugees from each country in the refugee program, not just those specified in sections 3(a) & (c).  As a result, it does not favor Christian refugees at the expense of Muslims, but rather is neutral with respect to religion.  *See Louhghalam*, Civ. No. 17-10154-NMG, Order 13 (Section 5(b) does not favor Christians over Muslims in violation of the Establishment Clause because it "could be invoked to give preferred refugee status to a Muslim individual in a country that is predominantly Christian").  Nor does it violate the Clause to recognize that religious minorities are more likely to face persecution than members of the dominant religion. *Cf. Cutter v. Wilkinson*, 544 U.S. 709, 713 (2005) (Establishment Clause permits accommodation of religion).  Washington's Establishment Clause challenge to Section 5(b) also is not ripe, since that section does not take effect for at least 120 days.

### 5. The District Court Improperly Issued a Nationwide Injunction.

An injunction should extend no further "than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). The district court's order violates this rule by extending beyond any immediate impact on the State's own institutions to include private persons and indeed all jurisdictions nationwide, including Massachusetts, where a court has upheld the Order against challenges similar to those presented here, *Louhghalam*, Order 18-19.

### B. The Balance of Harms Weighs Strongly in Favor of a Stay.

The balance of harms also clearly favors a stay pending this Court's expedited consideration of defendants' appeal.

First, the district court's order contravenes the considered national security judgment of the President that the admission of certain classes of aliens at this time to the United States, under the existing screening and visa-issuance procedures, is not in the national interest. "'[N]o governmental interest is more compelling than the security of the Nation.'" *Jifry v. FAA*, 370 F.3d 1174, 1183 (D.C. Cir. 2004) (quoting *Haig v. Agee*, 453 U.S. 280, 307 (1981)). "[T]he Government's interest in combating terrorism is an urgent objective of the highest order." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010).

This is particularly true as to predictive judgments about the potential national security threat posed by a class of aliens. A reviewing court would not be well-equipped to ascertain the quantum of risk, or what is a reasonable margin of error in assessing risk. *Cf. Oryszak v. Sullivan*, 576 F.3d 522, 525-26 (D.C. Cir. 2009) ("*Egan* teaches plainly that review of the breadth of [the margin of error acceptable in assessing the security risk posed by an individual] is outside the authority of a nonexpert body.") (alteration in original)). Judicial second-guessing of the President's national security determination in itself imposes substantial harm on the federal government and the nation at large.

Second, the injunction imposes irreparable harm by barring enforcement of the Executive Order in a manner that intrudes heavily on the constitutional separation of powers. Judicial intrusion on the political branches' exclusive authority over the admission of aliens, by violating the separation of powers, in itself constitutes irreparable injury. *See, e.g.*, *Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978) (vacating preliminary injunction that directed action by the Secretary of State in foreign affairs, which "deeply intrude[d] into the core concerns of the executive branch"). Stays of injunctions have repeatedly been granted to prevent a significant breach of inter-branch comity. *See, e.g., INS v. Legalization Assistance Project*, 510 U.S. 1301, 1306 (1993) (O'Connor, J., in chambers) (staying district court injunction interfering with the federal

21

government's execution of immigration statute, noting that injunction was "an improper intrusion by a federal court into the workings of a coordinate branch of the Government"); *Schweiker v. McClure*, 452 U.S. 1301, 1303 (1981) (Rehnquist, J., in chambers); *Committee on Judiciary of U.S. House of Representatives v. Miers*, 542 F.3d 909, 911 (D.C. Cir. 2008).

Furthermore, an order barring the Executive Branch from enforcing a Presidential Executive Order inherently imposes harm on the public, by thwarting the legal effect of the public's chosen representative. *Cf. New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."); *see also United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497 (2001) (recognizing that, in assessing the public interest, a court must heed "the judgment of Congress, deliberately expressed in legislation," and "the balance that Congress has struck").

Finally, enjoining operative provisions of the Order, which would require the Executive Branch to treat non-resident aliens' visas as valid and potentially would result in their admission into the United States, could cloud the clear legal and factual distinction between their present status as inadmissible aliens not

22

lawfully present in the United States, and their desired status as aliens who were lawfully admitted to this country.

In contrast, the State has not shown that it faces irreparable harm during the temporary suspension of entries pending the national security review contemplated by the Order. Furthermore, defendants' appeal could be significantly expedited in order to minimize any prejudice to the State.

Given the substantial harms posed by the district court's order, defendants also respectfully request that this Court enter an immediate administrative stay pending consideration of the merits of this motion.

## CONCLUSION

For the foregoing reasons, defendants respectfully request that the Court enter an immediate administrative stay pending consideration of this motion. Defendants also request that the Court enter a stay pending appeal of the district court's February 3, 2017, injunctive order.

Respectfully submitted,

NOEL J. FRANCISCO
/s/ Noel J. Francisco
 *Acting Solicitor General*

CHAD A. READLER
  *Acting Assistant Attorney*
  *General*
AUGUST E. FLENTJE
  *Special Counsel to the Assistant*
  *Attorney General*
DOUGLAS N. LETTER
SHARON SWINGLE
H. THOMAS BYRON
LOWELL V. STURGILL JR.
CATHERINE DORSEY
 *Attorneys, Appellate Staff*
 *Civil Division, Room 7241*
 *U.S. Department of Justice*
 *950 Pennsylvania Ave., NW*

## CERTIFICATE OF SERVICE

I hereby certify that on February 4, 2017, I filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.  All participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.


s/ Lowell V. Sturgill Jr.
Lowell V. Sturgill Jr.

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Motion complies with the type-volume limitation of Fed. R. App. P. 27 because it contains 5,074 words. This Motion complies with the typeface and the type style requirements of Fed. R. App. P. 27 because this brief has been prepared in a proportionally spaced typeface using Word 14-point Times New Roman typeface.

<u>s/ Lowell V. Sturgill Jr.</u>
Lowell V. Sturgill Jr.

# EXHIBIT A

## Executive Order: Protecting the Nation from Foreign Terrorist Entry into the United States (Jan. 27, 2017)

THE WHITE HOUSE

Office of the Press Secretary


For Immediate Release
January 27, 2017

EXECUTIVE ORDER

- - - - - - -

PROTECTING THE NATION FROM FOREIGN TERRORIST
ENTRY INTO THE UNITED STATES


By the authority vested in me as President by the Constitution and laws of the United States of America, including the Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.*, and section 301 of title 3, United States Code, and to protect the American people from terrorist attacks by foreign nationals admitted to the United States, it is hereby ordered as follows:

Section 1.  Purpose.  The visa-issuance process plays a crucial role in detecting individuals with terrorist ties and stopping them from entering the United States.  Perhaps in no instance was that more apparent than the terrorist attacks of September 11, 2001, when State Department policy prevented consular officers from properly scrutinizing the visa applications of several of the 19 foreign nationals who went on to murder nearly 3,000 Americans.  And while the visa-issuance process was reviewed and amended after the September 11 attacks to better detect would-be terrorists from receiving visas, these measures did not stop attacks by foreign nationals who were admitted to the United States.

Numerous foreign-born individuals have been convicted or implicated in terrorism-related crimes since September 11, 2001, including foreign nationals who entered the United States after receiving visitor, student, or employment visas, or who entered through the United States refugee resettlement program.  Deteriorating conditions in certain countries due to war, strife, disaster, and civil unrest increase the likelihood that terrorists will use any means possible to enter the United States.  The United States must be vigilant during the visa-

issuance process to ensure that those approved for admission do not intend to harm Americans and that they have no ties to terrorism.

In order to protect Americans, the United States must ensure that those admitted to this country do not bear hostile attitudes toward it and its founding principles. The United States cannot, and should not, admit those who do not support the Constitution, or those who would place violent ideologies over American law. In addition, the United States should not admit those who engage in acts of bigotry or hatred (including "honor" killings, other forms of violence against women, or the persecution of those who practice religions different from their own) or those who would oppress Americans of any race, gender, or sexual orientation.

Sec. 2. Policy. It is the policy of the United States to protect its citizens from foreign nationals who intend to commit terrorist attacks in the United States; and to prevent the admission of foreign nationals who intend to exploit United States immigration laws for malevolent purposes.

Sec. 3. Suspension of Issuance of Visas and Other Immigration Benefits to Nationals of Countries of Particular Concern. (a) The Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence, shall immediately conduct a review to determine the information needed from any country to adjudicate any visa, admission, or other benefit under the INA (adjudications) in order to determine that the individual seeking the benefit is who the individual claims to be and is not a security or public-safety threat.

(b) The Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence, shall submit to the President a report on the results of the review described in subsection (a) of this section, including the Secretary of Homeland Security's determination of the information needed for adjudications and a list of countries that do not provide adequate information, within 30 days of the date of this order. The Secretary of Homeland Security shall provide a copy of the report to the Secretary of State and the Director of National Intelligence.

(c) To temporarily reduce investigative burdens on relevant agencies during the review period described in subsection (a) of this section, to ensure the proper review and

maximum utilization of available resources for the screening of foreign nationals, and to ensure that adequate standards are established to prevent infiltration by foreign terrorists or criminals, pursuant to section 212(f) of the INA, 8 U.S.C. 1182(f), I hereby proclaim that the immigrant and nonimmigrant entry into the United States of aliens from countries referred to in section 217(a)(12) of the INA, 8 U.S.C. 1187(a)(12), would be detrimental to the interests of the United States, and I hereby suspend entry into the United States, as immigrants and nonimmigrants, of such persons for 90 days from the date of this order (excluding those foreign nationals traveling on diplomatic visas, North Atlantic Treaty Organization visas, C-2 visas for travel to the United Nations, and G-1, G-2, G-3, and G-4 visas).

(d)  Immediately upon receipt of the report described in subsection (b) of this section regarding the information needed for adjudications, the Secretary of State shall request all foreign governments that do not supply such information to start providing such information regarding their nationals within 60 days of notification.

(e)  After the 60-day period described in subsection (d) of this section expires, the Secretary of Homeland Security, in consultation with the Secretary of State, shall submit to the President a list of countries recommended for inclusion on a Presidential proclamation that would prohibit the entry of foreign nationals (excluding those foreign nationals traveling on diplomatic visas, North Atlantic Treaty Organization visas, C-2 visas for travel to the United Nations, and G-1, G-2, G-3, and G-4 visas) from countries that do not provide the information requested pursuant to subsection (d) of this section until compliance occurs.

(f)  At any point after submitting the list described in subsection (e) of this section, the Secretary of State or the Secretary of Homeland Security may submit to the President the names of any additional countries recommended for similar treatment.

(g)  Notwithstanding a suspension pursuant to subsection (c) of this section or pursuant to a Presidential proclamation described in subsection (e) of this section, the Secretaries of State and Homeland Security may, on a case-by-case basis, and when in the national interest, issue visas or other immigration benefits to nationals of countries for which visas and benefits are otherwise blocked.

(h)  The Secretaries of State and Homeland Security shall
submit to the President a joint report on the progress in
implementing this order within 30 days of the date of this
order, a second report within 60 days of the date of this order,
a third report within 90 days of the date of this order, and a
fourth report within 120 days of the date of this order.

Sec. 4.  Implementing Uniform Screening Standards for All
Immigration Programs.  (a)  The Secretary of State, the
Secretary of Homeland Security, the Director of National
Intelligence, and the Director of the Federal Bureau of
Investigation shall implement a program, as part of the
adjudication process for immigration benefits, to identify
individuals seeking to enter the United States on a fraudulent
basis with the intent to cause harm, or who are at risk of
causing harm subsequent to their admission. This program will
include the development of a uniform screening standard and
procedure, such as in-person interviews; a database of identity
documents proffered by applicants to ensure that duplicate
documents are not used by multiple applicants; amended
application forms that include questions aimed at identifying
fraudulent answers and malicious intent; a mechanism to ensure
that the applicant is who the applicant claims to be; a process
to evaluate the applicant's likelihood of becoming a positively
contributing member of society and the applicant's ability to
make contributions to the national interest; and a mechanism to
assess whether or not the applicant has the intent to commit
criminal or terrorist acts after entering the United States.

(b)  The Secretary of Homeland Security, in conjunction
with the Secretary of State, the Director of National
Intelligence, and the Director of the Federal Bureau of
Investigation, shall submit to the President an initial report
on the progress of this directive within 60 days of the date of
this order, a second report within 100 days of the date of this
order, and a third report within 200 days of the date of this
order.

Sec. 5.  Realignment of the U.S. Refugee Admissions Program
for Fiscal Year 2017.  (a)  The Secretary of State shall suspend
the U.S. Refugee Admissions Program (USRAP) for 120
days.  During the 120-day period, the Secretary of State, in
conjunction with the Secretary of Homeland Security and in
consultation with the Director of National Intelligence, shall
review the USRAP application and adjudication process to
determine what additional procedures should be taken to ensure
that those approved for refugee admission do not pose a threat

to the security and welfare of the United States, and shall
implement such additional procedures.  Refugee applicants who
are already in the USRAP process may be admitted upon the
initiation and completion of these revised procedures.  Upon the
date that is 120 days after the date of this order, the
Secretary of State shall resume USRAP admissions only for
nationals of countries for which the Secretary of State, the
Secretary of Homeland Security, and the Director of National
Intelligence have jointly determined that such additional
procedures are adequate to ensure the security and welfare of
the United States.

     (b)  Upon the resumption of USRAP admissions, the Secretary
of State, in consultation with the Secretary of Homeland
Security, is further directed to make changes, to the extent
permitted by law, to prioritize refugee claims made by
individuals on the basis of religious-based persecution,
provided that the religion of the individual is a minority
religion in the individual's country of nationality.  Where
necessary and appropriate, the Secretaries of State and Homeland
Security shall recommend legislation to the President that would
assist with such prioritization.

     (c)  Pursuant to section 212(f) of the INA, 8 U.S.C.
1182(f), I hereby proclaim that the entry of nationals of Syria
as refugees is detrimental to the interests of the United States
and thus suspend any such entry until such time as I have
determined that sufficient changes have been made to the USRAP
to ensure that admission of Syrian refugees is consistent with
the national interest.

     (d)  Pursuant to section 212(f) of the INA, 8 U.S.C.
1182(f), I hereby proclaim that the entry of more than 50,000
refugees in fiscal year 2017 would be detrimental to the
interests of the United States, and thus suspend any such entry
until such time as I determine that additional admissions would
be in the national interest.

     (e)  Notwithstanding the temporary suspension imposed
pursuant to subsection (a) of this section, the Secretaries of
State and Homeland Security may jointly determine to admit
individuals to the United States as refugees on a case-by-case
basis, in their discretion, but only so long as they determine
that the admission of such individuals as refugees is in the
national interest -- including when the person is a religious
minority in his country of nationality facing religious
persecution, when admitting the person would enable the United

States to conform its conduct to a preexisting international agreement, or when the person is already in transit and denying admission would cause undue hardship -- and it would not pose a risk to the security or welfare of the United States.

(f)  The Secretary of State shall submit to the President an initial report on the progress of the directive in subsection (b) of this section regarding prioritization of claims made by individuals on the basis of religious-based persecution within 100 days of the date of this order and shall submit a second report within 200 days of the date of this order.

(g)  It is the policy of the executive branch that, to the extent permitted by law and as practicable, State and local jurisdictions be granted a role in the process of determining the placement or settlement in their jurisdictions of aliens eligible to be admitted to the United States as refugees.  To that end, the Secretary of Homeland Security shall examine existing law to determine the extent to which, consistent with applicable law, State and local jurisdictions may have greater involvement in the process of determining the placement or resettlement of refugees in their jurisdictions, and shall devise a proposal to lawfully promote such involvement.

Sec. 6.  Rescission of Exercise of Authority Relating to the Terrorism Grounds of Inadmissibility.  The Secretaries of State and Homeland Security shall, in consultation with the Attorney General, consider rescinding the exercises of authority in section 212 of the INA, 8 U.S.C. 1182, relating to the terrorism grounds of inadmissibility, as well as any related implementing memoranda.

Sec. 7.  Expedited Completion of the Biometric Entry-Exit Tracking System.  (a)  The Secretary of Homeland Security shall expedite the completion and implementation of a biometric entry-exit tracking system for all travelers to the United States, as recommended by the National Commission on Terrorist Attacks Upon the United States.

(b)  The Secretary of Homeland Security shall submit to the President periodic reports on the progress of the directive contained in subsection (a) of this section.  The initial report shall be submitted within 100 days of the date of this order, a second report shall be submitted within 200 days of the date of this order, and a third report shall be submitted within 365 days of the date of this order.  Further, the Secretary shall submit a report every 180 days thereafter until the system is fully deployed and operational.

Sec. 8. Visa Interview Security. (a) The Secretary of State shall immediately suspend the Visa Interview Waiver Program and ensure compliance with section 222 of the INA, 8 U.S.C. 1222, which requires that all individuals seeking a nonimmigrant visa undergo an in-person interview, subject to specific statutory exceptions.

(b) To the extent permitted by law and subject to the availability of appropriations, the Secretary of State shall immediately expand the Consular Fellows Program, including by substantially increasing the number of Fellows, lengthening or making permanent the period of service, and making language training at the Foreign Service Institute available to Fellows for assignment to posts outside of their area of core linguistic ability, to ensure that non-immigrant visa-interview wait times are not unduly affected.

Sec. 9. Visa Validity Reciprocity. The Secretary of State shall review all nonimmigrant visa reciprocity agreements to ensure that they are, with respect to each visa classification, truly reciprocal insofar as practicable with respect to validity period and fees, as required by sections 221(c) and 281 of the INA, 8 U.S.C. 1201(c) and 1351, and other treatment. If a country does not treat United States nationals seeking nonimmigrant visas in a reciprocal manner, the Secretary of State shall adjust the visa validity period, fee schedule, or other treatment to match the treatment of United States nationals by the foreign country, to the extent practicable.

Sec. 10. Transparency and Data Collection. (a) To be more transparent with the American people, and to more effectively implement policies and practices that serve the national interest, the Secretary of Homeland Security, in consultation with the Attorney General, shall, consistent with applicable law and national security, collect and make publicly available within 180 days, and every 180 days thereafter:

(i) information regarding the number of foreign nationals in the United States who have been charged with terrorism-related offenses while in the United States; convicted of terrorism-related offenses while in the United States; or removed from the United States based on terrorism-related activity, affiliation, or material support to a terrorism-related organization, or any other national security

reasons since the date of this order or the last
reporting period, whichever is later;

(ii)   information regarding the number of foreign
nationals in the United States who have been
radicalized after entry into the United States and
engaged in terrorism-related acts, or who have
provided material support to terrorism-related
organizations in countries that pose a threat to the
United States, since the date of this order or the
last reporting period, whichever is later; and

(iii)  information regarding the number and types of
acts of gender-based violence against women, including
honor killings, in the United States by foreign
nationals, since the date of this order or the last
reporting period, whichever is later; and

(iv)   any other information relevant to public safety
and security as determined by the Secretary of
Homeland Security and the Attorney General, including
information on the immigration status of foreign
nationals charged with major offenses.

(b)   The Secretary of State shall, within one year of the
date of this order, provide a report on the estimated long-term
costs of the USRAP at the Federal, State, and local levels.

Sec. 11.  General Provisions.  (a)  Nothing in this order
shall be construed to impair or otherwise affect:

(i)   the authority granted by law to an executive
department or agency, or the head thereof; or

(ii)  the functions of the Director of the Office of
Management and Budget relating to budgetary,
administrative, or legislative proposals.

(b)   This order shall be implemented consistent with
applicable law and subject to the availability of
appropriations.

(c)   This order is not intended to, and does not, create
any right or benefit, substantive or procedural, enforceable at
law or in equity by any party against the United States, its
departments, agencies, or entities, its officers, employees, or
agents, or any other person.

DONALD J. TRUMP

THE WHITE HOUSE,
     January 27, 2017.

# # #

**EXHIBIT B**

*Louhghalam v. Trump*, Civ. 17-10154-NMG, Order
(Feb. 3, 2017)

# United States District Court
## District of Massachusetts

```
                                    )
Arghavan Louhghalam et al.          )
                                    )
         Plaintiffs,                )
                                    )
         v.                         )    Civil Action No.
                                    )    17-10154-NMG
Donald J. Trump, President of       )
the United States, et al.           )
                                    )
         Defendants.                )
                                    )
```

### MEMORANDUM & ORDER

**GORTON, J.**

This Court was initially asked 1) to issue a writ of habeas corpus on behalf of by Arghavan Louhghalam and Mazdak Pourabdollah Tootkaboni, lawful permanent residents who were detained at Boston Logan International Airport ("Logan") for several hours upon arrival from an academic conference outside the United States and 2) to declare unlawful Executive Order 13,769, promulgated by the President of the United States.

Late in the evening on January 28, 2017, United States District Judge Allison D. Burroughs and United States Magistrate Judge Judith G. Dein held a hearing on a motion of Louhghalam and Tootkaboni for a temporary restraining order. Following that hearing, Judge Burroughs and Magistrate Judge Dein entered a temporary restraining order ("TRO") that, inter alia, prohibits the detention and/or removal of individuals with

approved refugee applications who would be legally admitted to the United States in absence of the Executive Order.  That TRO is set to expire on Sunday, February 5, 2017.

Following entry of the TRO a flurry of activity has resulted in the filing of an amended complaint wherein five other Iranian nationals and Oxfam America, Inc. are named as additional plaintiffs and the allowance of a motion by the Commonwealth of Massachusetts and the University of Massachusetts to intervene as plaintiffs.  Now pending before this session is the informal motion of all of the plaintiffs to continue in force the subject TRO which defendant opposes.  Oral argument on that motion was heard earlier today.

## I.   **Background**

### A.   **The Parties**

Habeas petitioners Tootkaboni and Louhghalam are Iranian nationals, Muslim and lawful permanent residents of the United States.  Both are currently employed as Associate Professors at the University of Massachusetts-Dartmouth.  They were each detained for nearly four hours at Logan Airport on January 28, 2017, without access to counsel, after returning from an academic conference outside the country.

The five other individual plaintiffs are Iranian nationals and Muslim.  Three of them, Babak Yaghoubi Moghadam, his sister, Fatemeh Yaghoubi Moghadam, and Ali Sanie are also lawful

permanent residents.  Plaintiffs Zahrasadat Mirrazi Renani and
Leily Amirsardary are in the United States on valid F-1 student
visas.  Plaintiff Oxfam America Inc. is a subsidiary of a world-
wide non-profit organization that promotes policy reform in the
United States and abroad with respect to global poverty.

Defendants in this case are President of the United States,
Donald J. Trump, United States Customs and Border Protection
("CBP"), Kevin K. McAleen, the Acting Commissioner of the CBP,
William Mohalley, the Boston Field Director of the CPB, and the
Department of Homeland Security and its Secretary, John Kelly.
Each individual defendant is sued in his official capacity.

**B.    The Executive Order**

On January 27, 2017, the President of the United States
Donald J. Trump, issued Executive Order No. 13,769 entitled
"Protecting the Nation from Foreign Terrorist Entry into the
United States" ("EO").  The EO directs changes to the policy and
process of admitting non-citizens into the United States
purportedly to protect national security and to provide a period
of review for relevant agencies to evaluate current procedures
and to propose and implement new procedures.

The changes in immigration procedure relevant to this
action are as follows.  The EO suspends for 90 days entry of
immigrants and non-immigrants from seven countries:  Iraq, Iran,
Libya, Somalia, Sudan, Syria and Yemen. Exec. Order 13,769

-3-

§ 3(c).  The EO also suspends, for 120 days, the United States

Refugee Admission Program ("USRAP").  Id. § 5(b).  The order

directs, after the suspension on USRAP ends, that the Secretary

of State prioritize applicants on the basis of religious-based

persecution

> provided that the religion of the individual is a minority
> religion in the individual's country of nationality.

Id.

On February 1, 2017, White House counsel issued a

clarification to the Acting Secretary of State, the Attorney

General and the Secretary of Homeland Security that Sections

3(c) and 3(e) do not apply to lawful permanent residents.

**C.  The Immigration and Nationality Act**

The Immigration and Nationality Act ("INA"), 8 U.S.C.

§ 1101 et seq.,  was originally enacted in 1952 and has been

amended several times, including in 1996 by the Illegal

Immigration Reform and Immigrant Responsibility Act ("IIRIRA").

The INA governs immigration, naturalization, refugee assistance

and removal procedures and defines the circumstances that govern

the admission of aliens into the United States.

The relevant provision of the INA provides that:

> Whenever the President finds that the entry of any aliens
> or of any class of aliens into the United States would be
> detrimental to the interests of the United States, he may
> by proclamation, and for such period as he shall deem
> necessary, suspend the entry of all aliens or any class of
> aliens as immigrants or nonimmigrants, or impose on the

-4-

entry of aliens any restrictions he may deem to be
appropriate.

8 U.S.C. § 1182(f).

### D. Procedural History

As described above, petitioners Tootkaboni and Louhghalam
filed a writ of habeas corpus on January 28, 2017.  In the
middle of a weekend night, following a hearing, Judge Burroughs
and Magistrate Judge Dein, the assigned emergency district and
magistrate judges, respectively, entered a TRO preventing
individuals subject to the EO from being detained or removed
upon arrival at Logan.  The TRO also directed petitioners to
file an amended complaint and scheduled a hearing to occur prior
to the expiration of that order.  The matter was randomly
assigned to this judicial officer who, accordingly, scheduled a
hearing with respect to the continuance of the TRO.

## II. <u>Continuance of the TRO</u>

### A. Legal Standard

In order to obtain a preliminary injunction or temporary
restraining order, the moving party must establish 1) a
reasonable likelihood of success on the merits, 2) the potential
for irreparable harm if the injunction is withheld, 3) a
favorable balance of hardships and 4) the effect on the public
interest. <u>Jean</u> v. <u>Mass. State Police</u>, 492 F.3d 24, 26-27 (1st
Cir. 2007); <u>Quincy Cablesys., Inc.</u> v. <u>Sully's Bar, Inc.</u>, 640 F.

-5-

Supp. 1159, 1160 (D. Mass. 1986).  Of these factors, the
likelihood of success on the merits "normally weighs heaviest on
the decisional scales." Coquico, Inc. v. Rodriguez-Miranda, 562
F.3d 62, 66 (1st Cir. 2009).

　　　The Court may accept as true "well-pleaded allegations [in
the complaint] and uncontroverted affidavits." Rohm & Haas Elec.
Materials, LLC v. Elec. Circuits, 759 F. Supp. 2d 110, 114, n.2
(D. Mass. 2010) (quoting Elrod v. Burns, 427 U.S. 347, 350, n.1
(1976)). The Court may also rely on otherwise inadmissible
evidence, including hearsay. See Asseo v. Pan Am. Grain Co.,
Inc., 805 F.2d 23, 26 (1st Cir. 1986).  Ultimately, the issuance
of preliminary injunctive relief is "an extraordinary and
drastic remedy that is never awarded as of right." Peoples Fed.
Sav. Bank v. People's United Bank, 672 F.3d 1, 8-9 (1st Cir.
2012) (quoting Voice of the Arab World, Inc. v. MDTV Med. News
Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011)).

　　　The Court may extend temporary injunctive relief upon a
showing of good cause. Fed. R. Civ. P. 65(b)(2).

**B.　Application**

**　　　1.　The claims for injunctive relief by the lawful
　　　　　permanent residents**

On February 1, 2017, the White House distributed a
memorandum to the Acting Secretary of State, the Acting Attorney
General and the Secretary of Homeland Security clarifying that

-6-

Sections 3(c) and 3(e) of the EO do not apply to lawful permanent residents.

That memorandum comports with the language of the Section 3(c) which temporarily suspends "entry" of aliens from the seven subject countries. Upon returning to the United States, lawful permanent residents do not, however, typically "enter" the country for purposes of the INA.

Although "entry" is no longer defined in the INA, it has been replaced with the term "admission," which is defined as

the lawful <u>entry</u> of the alien into the United States after inspection and authorization by an immigration officer.

8 U.S.C. § 1101(a)(13)(A) (emphasis added); <u>see</u> <u>also</u> <u>Vartelas</u> v. <u>Holder</u>, 556 U.S. 257, 263 (2012) (explaining that Congress made "admission" the "key word" and removed the definition of "entry" from the statute).

Under the INA, lawful permanent residents are regarded as seeking admission, <u>i.e.</u> entry, into the United States only if they fall within six categories, including <u>inter</u> <u>alia</u>, being absent from the United States for 180 days or more. <u>See</u> <u>id.</u>; 8 U.S.C. § 1101(a)(13)(c).

Therefore, the use of the term "entry" in Section 3(c) indicates that the suspension was not intended to be applied to lawful permanent residents.

In light of the government's clarification that the EO will
not be applied to lawful permanent residents, the claims for
injunctive relief by plaintiffs Louhghalam, Tootkaboni, Sanie,
Fatemeh Moghadam and Babak Moghadam are moot.  With respect to
those individuals, there is "no ongoing conduct to enjoin". Town
of Portsmouth v. Lewis, 813 F.3d 54, 58 (1st Cir. 2016).  Thus,
any declaration with respect to the lawfulness of the EO would
be strictly advisory. See New Eng. Reg'l Council of Carpenters
v. Kinton, 284 F.3d 9, 18 (1st Cir. 2002) (remarking that it
would be "pointless" to declare the constitutionality of a
policy that had been revised during litigation).

Although the claims by the lawful permanent resident
plaintiffs for injunctive relief are moot, the claims for
injunctive relief by plaintiffs Renani and Amirsardary, holders
of F-1 visas, and Oxfam are not covered by that clarification
and thus the Court will address the merits of their claims for
injunctive relief.

> **2.  The claims for injunctive relief by the
> plaintiffs who hold F-1 Visas**

> **a.  Count I:  Equal Protection claim**

The Fifth Amendment protects aliens within the United
States from "invidious discrimination by the Federal
Government." Plyler v. Doe, 457 U.S. 202, 210 (1982) (quoting
Mathews v. Diaz, 426 U.S. 67, 77); see also Yick Wo v. Hopkins,

118 U.S. 356, 369, (1886) ("[Equal Protection is] universal in
[its] application, to all persons within the territorial
jurisdiction, without regard to any differences of race, of
color, or of nationality."). There is a distinction, however,
between the constitutional rights enjoyed by aliens who have
entered the United States and those who are outside of it. See
Zadvydas v. Davis, 533 U.S. 678, 693 (2001).

    The decision to prevent aliens from entering the country is
a "fundamental sovereign attribute" realized through the
legislative and executive branches that is "largely immune from
judicial control." Chi Thon Ngo v. I.N.S., 192 F.3d 390, 395 (3d
Cir. 1999), amended (Dec. 30, 1999) (quoting Shaughnessy v.
United States ex rel. Mezei, 345 U.S. 206, 210 (1953)).  Federal
classifications based on alien status are evaluated using
rational basis review. Mathews v. Diaz, 426 U.S. 67, 83 (1976)
(considering whether a law that made distinctions based on alien
status was "wholly irrational"); Ruiz-Diaz v. United States, 703
F.3d 483, 486-87 (9th Cir. 2012)(determining that a regulation
that treated immigrant religious workers differently than other
visa applicants would be evaluated using rational basis review);
Narenji v. Civiletti, 617 F.2d 745, 748 (D.C. Cir. 1979)
(upholding a regulation issued in response to the Iran hostage
crisis that required non-immigrant alien Iranian students to

provide information to Immigration and Naturalization Services
Offices).

Rational basis review examines whether the "classification
at issue bears some fair relationship to a legitimate public
purpose." Plyler, 457 U.S. at 216.  It is "not a license for
courts to judge the wisdom, fairness, or logic of legislative
choices." Heller v. Doe by Doe, 509 U.S. 312, 319-20 (1993)
(quoting FCC v. Beach Communications, Inc., 508 U.S. 307, 313
(1993)).  Under rational basis review, a classification is
permissible "if there is any reasonably conceivable state of
facts that could provide a rational basis." Id. (quoting Beach
Communications, 508 U.S. at 313).

Plaintiffs contend that the EO discriminates on the basis
of religion and was designed to exclude Muslims from the United
States.  They further allege that it singles out citizens of
seven different countries.  At oral argument, plaintiffs relied
on "astonishing evidence of intent" from President Trump which,
in their view, demonstrates that EO was "substantially motivated
by improper animus." See Hunter v. Underwood, 471 U.S. 222, 233
(1985) (holding that a provision in the Alabama Constitution
violated equal protection even through it was facially neutral
because it was motivated by animus).  Defendants responded that
the cases examining improper animus involve equal protection
claims against states, which may be reviewed with strict

scrutiny, while the federal government classification of non-resident aliens in this case is subject to rational basis review.

Because the EO involves federal government categorizations with respect to non-resident aliens, rational basis review applies.  According to the EO, its purpose is

> to ensure the proper review and maximum utilization of available resources for the screening of foreign nationals, and to ensure that adequate standards are established to prevent infiltration by foreign terrorists . . . .

Exec. Order 13,769 § 3(c).  The EO specifically asserts that permitting aliens from the countries identified in section 217(a) of the INA, 8 U.S.C. § 1187(a)(12), to enter "would be detrimental to the United States."  The order provides a

> reasonably conceivable state of facts [which concerns national security and] that could provide a rational basis

for the classification. Heller, 509 U.S. at 319–20. Accordingly, this Court declines to encroach upon the "delicate policy judgment" inherent in immigration decisions. Plyler, 457 U.S. at 225.

### b.  Count II:  Establishment Clause claim

With respect to Count II, plaintiffs allege that the Executive Order violates the Establishment Clause of the United States Constitution. See U.S. Const. amend. I ("Congress shall make no law respecting an establishment of religion . . . ."). Specifically, plaintiffs claim that the EO disfavors Islam and

favors Christianity.  The Court concludes, however, that the remaining plaintiffs lack standing to raise an Establishment Clause challenge.

The purported harmful disparate treatment of those two faiths arises from Section 5(b) of the EO in which the Secretary of State is directed, upon reinstatement of USRAP, to

> prioritize <u>refugee</u> claims made by individuals on the basis of religious-based persecution, provided that the religion of the individual is a minority religion in the individual's country of nationality (emphasis added).

To have standing, plaintiffs must allege an injury in fact that is "concrete and particularized".  <u>Reddy</u> v. <u>Foster</u>, Docket No. 16-1432, 2017 WL 104825, at *4 (1st Cir. Jan. 11, 2017) (quoting <u>Susan B. Anthony List</u> v. <u>Driehaus</u>, 134 S. Ct. 2334, 2341 (2014)).

Plaintiffs are not, however, refugees seeking admission to the United States and consequently, any future implementation of Section 5(b) would not personally affect them.  Although plaintiffs vigorously disagree with such a policy, that sincere disagreement is insufficient injury to confer standing. <u>See</u> <u>Valley Forge Christian Coll.</u> v. <u>Ams. United for Separation of Church & State, Inc.</u>, 454 U.S. 464, 485-86 (1982) ("They fail to identify any personal injury suffered by them as a consequence of the alleged constitutional error, other than the psychological consequence presumably produced by observation of

conduct with which one disagrees.  That is not an injury
sufficient to confer standing under Art. III . . . ." (emphasis
removed)).

Moreover, the language in Section 5 of the EO is neutral
with respect to religion.  Plaintiffs submit in their amended
complaint that Section 5 favors Muslims over Christians, in
violation of the Establishment Clause.  The provisions of
Section 5, however, could be invoked to give preferred refugee
status to a Muslim individual in a country that is predominately
Christian.  Nothing in Section 5 compels a finding that
Christians are preferred to any other group.

### c.    Count III: Due Process claim

The power to admit or exclude aliens is a sovereign
prerogative" and aliens seeking admission to the United States
request a "privilege." Landon v. Plasencia, 459 U.S. 21, 32
(1982).  It is "beyond peradventure" that "unadmitted and non-
resident aliens" have no right to be admitted to the United
States. Adams v. Baker, 909 F.2d 643, 647 (1st Cir. 1990).

There is no constitutionally protected interest in either
obtaining or continuing to possess a visa.  The due process
guaranteed by the Fifth Amendment "attaches only when the
federal government seeks to deny a liberty or property
interest." Knoetze v. U.S., Dep't of State, 634 F.2d 207, 211
(5th Cir. 1981).  A non-citizen has no "inherent property right

in an immigrant visa." Azizi v. Thornburgh, 908 F.2d 1130, 1134 (2d Cir. 1990); see also Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State, Bureau of Consular Affairs, 104 F.3d 1349, 1354 (D.C. Cir. 1997) (holding that aliens "may not assert a Fifth Amendment right in challenging the procedures for granting immigrant visas"); Knoetze, 634 F.2d at 212 (concluding that "revocation of an entry visa issued to an alien already within our country has no effect upon the alien's liberty or property interests"); De Avilia v. Civiletti, 643 F.2d 471, 477 (7th Cir. 1981) (determining there is "no vested right in the issuance of a visa"). Thus, because an alien does not enjoy a property right in a visa, he has no due process right that protects the manner in which a visa is revoked.

Conversely, because the Due Process Clause safeguards all "persons" in the United States, once an alien is in this country, that alien is entitled to Fifth Amendment protection. Zadvydas, 533 U.S. at 693. It is "well established" that aliens have cognizable due process interests which must be protected in deportation hearings. Demore v. Kim, 538 U.S. 510, 523 (2003) (quoting Reno v. Flores, 507 U.S. 292, 306 (1993)). At a minimum, before deportation, aliens are entitled to "notice of the nature of the charges and a meaningful opportunity to be heard." Choeum v. I.N.S., 129 F.3d 29, 38 (1st Cir. 1997).

The plaintiffs who hold F-1 Visas, Ms. Renani and Ms.
Amirsardary ("the F-1 plaintiffs"), contend that the EO violates
their due process rights guaranteed by the Fifth Amendment
because it prevents individuals from the targeted countries from
coming into the United States without any procedural safeguards.
Moreover, they submit that they fear leaving the country because
of concerns about being unable to return.  Defendants respond
that such fears are premature because neither of the F-1
plaintiffs has specific travel plans within the next month.

The F-1 plaintiffs have not demonstrated that they are
likely to succeed on the merits of their due process claim.  It
is not clear whether the F-1 visas of aliens in the United
States at the time of the EO have been revoked, although
defendants' counsel stated at the hearing that he thought they
had been.  Assuming their visas have been revoked, the F-1
plaintiffs have no property or liberty interest in those visas
and thus no due process claim with respect to the supposed
revocation. Knoetze, 634 F.2d at 212.

Although the F-1 plaintiffs certainly would be protected by
the Due Process Clause in the Fifth Amendment if deportation
proceedings were initiated against them, Demore, 538 U.S. at
523, there is no indication that such proceedings are
forthcoming.  Furthermore, while this Court is sympathetic to
the difficult personal circumstances in which these plaintiffs

find themselves, if they choose to leave the country, as non-resident aliens, they have no right to re-enter. Landon, 459 U.S. at 32.  In sum, because due process protections do not apply to visas and the F-1 plaintiffs are not currently subject to deportation proceedings, they have not demonstrated a likelihood of success on the merits of a due process claim at this time.

### d.    Count IV:  Administrative Procedure Act claim

The Court concludes that plaintiffs have not shown a likelihood of success on the merits with respect to Count IV, in which plaintiffs allege that the EO violates the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.

In Franklin v. Massachusetts, 505 U.S. 788, 800-01 (1992), the United States Supreme Court concluded that the Presidency is not an "agency" as defined in the APA, § 701(b)(1), and thus actions by the President are not subject to the APA.  Courts have interpreted Franklin to prohibit review under the APA of actions by the President when he is exercising discretionary authority. See, e.g., Detroit Int'l Bridge Co. v. Gov't of Canada, 189 F. Supp. 3d 85, 104 (D.D.C. 2016).

Here, Congress has granted the President authority to suspend entry for any class of aliens if such entry would be "detrimental to the interests of the United States." 8 U.S.C.

1182(f). Pursuant to, and without exceeding, that grant of discretionary authority, the President issued EO 13,769 and suspended entry of aliens from the seven subject countries. The President's action is thus unreviewable under the APA. See Detroit Int'l Bridge, 189 F. Supp. 3d at 104-05 (concluding that the President's decision to allow a permit for an international bridge was not subject to the APA because he had the authority to do so under the International Bridge Act of 1972, 33 U.S.C. § 535 et seq.).

Because the likelihood of success element is "essential" to the issuance of an injunction, New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 13-14 (1st Cir. 2002), the Court will not continue to impose injunctive relief pursuant to Count IV.

### e. Count V: First Amendment claim

Finally, in Count V, Oxfam claims that the EO has violated its First Amendment rights to freedom of speech, association and petition by barring entry of aliens, including visa holders, into the United States.

The United States Supreme Court, in Kleindienst v. Mandel, 408 U.S. 753, 764, 770 (1972), explained that a denial of a visa to an alien could, under some circumstances, violate a United States citizen's First Amendment right "to receive information". The Court dismissed plaintiffs' First Amendment claim, however,

-17-

because the Attorney General provided a "facially legitimate and
bona fide reason" for denying the alien's visa request.  In such
case, the Court continued, lower courts should not

> look behind the exercise of that discretion, nor test it by
> balancing its justification against the First Amendment
> interests of those who seek personal communication with the
> applicant.

Id. at 770.

The First Circuit Court of Appeals ("First Circuit") has
considered the bounds of Kleindienst on two occasions:  in
Allende v. Shultz, 845 F.2d 1111 (1st Cir. 1988), and in Adams
v. Baker, 909 F.2d 643 (1st Cir. 1990).  That Court concluded in
Allende that plaintiffs adequately raised a First Amendment
claim. 845 F.2d at 1116.  Conversely, in Adams, it held that
plaintiffs' did not assert a valid First Amendment challenge.
909 F.2d at 649-50.  In both cases, however, the First Circuit
undertook an analysis to determine whether the conduct of the
individual who had been denied a visa fit within the statutory
authority relied upon for those denials.

Here, the President has exercised his broad authority under
8 U.S.C. § 1182(f) to suspend entry of certain aliens
purportedly in order to ensure that resources are available to
review screening procedures and that adequate standards are in
place to protect against terrorist attacks. Exec. Order 13,769
§ 3(c).  Such a justification is "facially legitimate and bona

fide" and therefore Oxfam's First Amendment rights are not implicated. See Kleindienst, 408 U.S. at 770 (concluding that the First Amendment rights of American scholars and students were not violated when a Belgian scholar whom they invited to speak was denied entry into the United States).

Although at oral argument plaintiffs directed this Court to American Academy of Religion v. Napolitano, 573 F.3d 115, 137 (2nd Cir. 2009), which held that a "well supported allegation of bad faith" could render a decision not bona fide, that is not the standard in the First Circuit. Therefore, in light of the "plenary congressional power to make policies and rules for exclusion of aliens," Kleindienst, 408 U.S. at 769, which pursuant to 8 U.S.C. § 1182(f), has been delegated to the President, the Court concludes that the government's reasons, as provided in the EO, are facially legitimate and bona fide.

Consequently, Oxfam has not shown a likelihood of success with respect to its claim in Count V. See Kleindienst, 408 U.S. at 770; Adams, 909 F.2d at 650.

### f.    Other preliminary injunction factors

Moving on to the other three factors considered for a temporary restraining order, Jean v. Mass. State Police, 492 F.3d 24, 26-27 (1st Cir. 2007), the potential for irreparable harm weighs in favor of plaintiffs. The harm of being forced to choose between visiting loved ones, participating in a

prestigious doctoral program or founding a business, on the one hand, and staying in this country out of fear of being denied re-entry is painful to contemplate.  Oxfam faces some less life-size challenges but they are important nevertheless.

There are considerations on both sides with respect to a balancing of the hardships.  On the one hand, implementing an effective immigration regime that ensures the safety of all Americans is undoubtedly difficult.  On the other hand, the hardship to the professional and personal lives of the individual plaintiffs and to the operation of the Oxfam world-wide organization is palpable.

Finally, there are public interest considerations on both sides.  The rich immigrant history of the United States has long been a source of strength and pride in this country.  The individual plaintiffs in this case provide particularly compelling examples of the value that immigrants add to our society.  Conversely, the public interest in safety and security in this ever-more dangerous world is strong as well.

When the four factors that the Court must consider before imposing injunctive relief are considered collectively, likelihood of success on the merits weighs most heavily in the decision. Coquico, Inc. v. Rodriguez-Miranda, 562 F.3d 62, 66 (1st Cir. 2009).  Therefore, because plaintiffs have not demonstrated that they are likely to succeed on the merits of

any of their claims, an extension of the restraining order at the present time is not warranted.

**ORDER**

For the forgoing reasons, the Court declines to impose any injunctive relief and will not renew the temporary restraining order that was entered on January 29, 2017 (Docket No. 6).

**So ordered.**

/s/ Nathaniel M. Gorton_____
Nathaniel M. Gorton
United States District Judge

Dated February 3, 2017

# EXHIBIT C

# Temporary Restraining Order (Feb. 3, 2017)

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| STATE OF WASHINGTON, et al., | CASE NO. C17-0141JLR |
| Plaintiffs, | TEMPORARY RESTRAINING ORDER |
| v. | |
| DONALD J. TRUMP, et al., | |
| Defendants. | |

## I.     INTRODUCTION

Before the court is Plaintiffs State of Washington and State of Minnesota's (collectively, "the States") emergency motion for a temporary restraining order ("TRO"). (TRO Mot. (Dkt. ## 3, 19 (as amended)).) The court has reviewed the motion, the complaint (Compl. (Dkt. # 1)), the amended complaint (FAC (Dkt. # 18)), all the submissions of the parties related to the motion, the relevant portions of the record, and the applicable law. In addition, the court heard the argument of counsel on February 3,

//

1  2017. (*See* Min. Entry (Dkt. # 51).) Having considered all of the foregoing, the court

2  GRANTS the States' motion as set forth below.

3  ## II.  PROCEDURAL BACKGROUND

4  On January 30, 2017, the State of Washington filed a complaint seeking

5  declaratory and injunctive relief against Defendants Donald J. Trump, in his official

6  capacity as President of the United States, the United States Department of Homeland

7  Security ("DHS"), John F. Kelly, in his official capacity as Secretary of DHS, Tom

8  Shannon, in his official capacity as Acting Secretary of State, and the United States of

9  America (collectively, "Federal Defendants"). (*See* Compl.) On February 1, 2017, the

10 State of Washington filed an amended complaint adding the State of Minnesota as a

11 plaintiff. (*See* FAC.) The States seek declaratory relief invalidating portions of the

12 Executive Order of January 27, 2017, entitled "Protecting the Nation from Foreign

13 Terrorist Entry into the United States" ("Executive Order") (*see* FAC Ex. 7 (attaching a

14 copy of the Executive Order)), and an order enjoining Federal Defendants from enforcing

15 those same portions of the Executive Order. (*See generally* FAC at 18.)

16 The States are presently before the court seeking a TRO against Federal

17 Defendants. (*See generally* TRO Mot.) The purpose of a TRO is to preserve the status

18 quo before the court holds a hearing on a motion for preliminary injunction. *See Granny*

19 *Goose Foods, Inc. v. Bhd. Of Teamsters & Auto Truck Drivers Local No. 70 of Alameda*

20 *City*, 415 U.S. 423, 439 (1974); *Am. Honda Fin. Corp. v. Gilbert Imports, LLC*, No.

21 CV-13-5015-EFS, 2013 WL 12120097, at \*3 (E.D. Wash. Feb. 22, 2013) ("The purpose

22 //

1 | of a TRO is to preserve the status quo until there is an opportunity to hold a hearing on

2 | the application for a preliminary injunction . . . .") (internal quotation marks omitted).

3 |      Federal Defendants oppose the States' motion. (*See generally* Resp. (Dkt. # 50).)

4 | ### III.    FINDINGS OF FACT & CONCLUSIONS OF LAW

5 |      As an initial matter, the court finds that it has jurisdiction over Federal Defendants

6 | and the subject matter of this lawsuit. The States' efforts to contact Federal Defendants

7 | reasonably and substantially complied with the requirements of Federal Rule of Civil

8 | Procedure 65(b). *See* Fed. R. Civ. P. 65(b). Indeed, Federal Defendants have appeared,

9 | argued before the court, and defended their position in this action. (*See* Not. of App.

10 | (Dkt. ## 20, 21); Min. Entry; *see generally* Resp.; )

11 |      The standard for issuing a TRO is the same as the standard for issuing a

12 | preliminary injunction. *See New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434

13 | U.S. 1345, 1347 n.2 (1977). A TRO is "an extraordinary remedy that may only be

14 | awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat.*

15 | *Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "The proper legal standard for

16 | preliminary injunctive relief requires a party to demonstrate (1) 'that he is likely to

17 | succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of

18 | preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an

19 | injunction is in the public interest.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th

20 | Cir. 2009) (citing *Winter*, 555 U.S. at 20).

21 |      As an alternative to this test, a preliminary injunction is appropriate if "serious

22 | questions going to the merits were raised and the balance of the hardships tips sharply in

ORDER - 3

1  the plaintiff's favor," thereby allowing preservation of the status quo when complex legal

2  questions require further inspection or deliberation. *All. for the Wild Rockies v. Cottrell*,

3  632 F.3d 1127, 1134-35 (9th Cir. 2011). However, the "serious questions" approach

4  supports the court's entry of a TRO only so long as the plaintiff also shows that there is a

5  likelihood of irreparable injury and that the injunction is in the public interest. *Id.* at

6  1135. The moving party bears the burden of persuasion and must make a clear showing

7  that it is entitled to such relief. *Winter*, 555 U.S. at 22.

8        The court finds that the States have satisfied these standards and that the court

9  should issue a TRO. The States have satisfied the *Winter* test because they have shown

10  that they are likely to succeed on the merits of the claims that would entitle them to relief;

11  the States are likely to suffer irreparable harm in the absence of preliminary relief; the

12  balance of the equities favor the States; and a TRO is in the public interest. The court

13  also finds that the States have satisfied the "alternative" *Cottrell* test because they have

14  established at least serious questions going to the merits of their claims and that the

15  balance of the equities tips sharply in their favor. As the court noted for the *Winter* test,

16  the States have also established a likelihood of irreparable injury and that a TRO is in the

17  public interest.

18        Specifically, for purposes of the entry of this TRO, the court finds that the States

19  have met their burden of demonstrating that they face immediate and irreparable injury as

20  a result of the signing and implementation of the Executive Order. The Executive Order

21  adversely affects the States' residents in areas of employment, education, business,

22  family relations, and freedom to travel. These harms extend to the States by virtue of

1  their roles as *parens patriae* of the residents living within their borders. In addition, the

2  States themselves are harmed by virtue of the damage that implementation of the

3  Executive Order has inflicted upon the operations and missions of their public

4  universities and other institutions of higher learning, as well as injury to the States'

5  operations, tax bases, and public funds. These harms are significant and ongoing.

6  Accordingly, the court concludes that a TRO against Federal Defendants is necessary

7  until such time as the court can hear and decide the States' request for a preliminary

8  injunction.

9  ## IV.    TEMPORARY RESTRAINING ORDER

10  It is hereby ORDERED that:

11  1.  Federal Defendants and all their respective officers, agents, servants,

12  employees, attorneys, and persons acting in concert or participation with them

13  are hereby ENJOINED and RESTRAINED from:

14  (a) Enforcing Section 3(c) of the Executive Order;

15  (b) Enforcing Section 5(a) of the Executive Order;

16  (c) Enforcing Section 5(b) of the Executive Order or proceeding with any

17  action that prioritizes the refugee claims of certain religious minorities;

18  (d) Enforcing Section 5(c) of the Executive Order;

19  (e) Enforcing Section 5(e) of the Executive Order to the extent Section 5(e)

20  purports to prioritize refugee claims of certain religious minorities.

21  2.  This TRO is granted on a nationwide basis and prohibits enforcement of

22  Sections 3(c), 5(a), 5(b), 5(c), and 5(e) of the Executive Order (as described in

1      the above paragraph) at all United States borders and ports of entry pending

2      further orders from this court. Although Federal Defendants argued that any

3      TRO should be limited to the States at issue (*see* Resp. at 30), the resulting

4      partial implementation of the Executive Order "would undermine the

5      constitutional imperative of 'a *uniform* Rule of Naturalization' and Congress's

6      instruction that 'the immigration laws of the United States should be enforced

7      vigorously and *uniformly*.'" *Texas v. United States*, 809 F.3d 134, 155 (5th

8      Cir. 2015) (footnotes omitted) (quoting U.S. CONST. art. I, § 8, cl. 4

9      (emphasis added) and Immigration and Reform Control Act of 1986, Pub. L.

10      No. 99-603, § 115(1), 100 Stat. 3359, 3384 (emphasis added)).[1]

11      3.   No security bond is required under Federal Rule of Civil Procedure 65(c).

12      4.   Finally, the court orders the parties to propose a briefing schedule and noting

13      date with respect to the States' motion for a preliminary injunction no later

14      than Monday, February 6, 2017 at 5:00 p.m. The court will promptly schedule

15      a hearing on the States' motion for a preliminary injunction, if requested and

16      necessary, following receipt of the parties' briefing.

17                  **V.     CONCLUSION**

18      Fundamental to the work of this court is a vigilant recognition that it is but one of

19 three equal branches of our federal government. The work of the court is not to create

20 policy or judge the wisdom of any particular policy promoted by the other two branches.

21

---

22      [1]An equally divided Supreme Court affirmed *Texas v. United States*, 809 F.3d 134, in *United States v. Texas*, --- U.S. ----, 136 S. Ct. 2271 (2016) (per curiam).

1    That is the work of the legislative and executive branches and of the citizens of this

2    country who ultimately exercise democratic control over those branches. The work of the

3    Judiciary, and this court, is limited to ensuring that the actions taken by the other two

4    branches comport with our country's laws, and more importantly, our Constitution. The

5    narrow question the court is asked to consider today is whether it is appropriate to enter a

6    TRO against certain actions taken by the Executive in the context of this specific lawsuit.

7    Although the question is narrow, the court is mindful of the considerable impact its order

8    may have on the parties before it, the executive branch of our government, and the

9    country's citizens and residents. The court concludes that the circumstances brought

10    before it today are such that it must intervene to fulfill its constitutional role in our tripart

11    government. Accordingly, the court concludes that entry of the above-described TRO is

12    necessary, and the States' motion (Dkt. ## 2, 19) is therefore GRANTED.

13       Dated this 3RD day of February, 2017.

14

15                            JAMES L. ROBART
                             United States District Judge

16

17

18

19

20

21

22

**EXHIBIT D**

**Feb. 1, 2017 Memorandum**

**THE WHITE HOUSE**

WASHINGTON

February 1, 2017

MEMORANDUM TO THE ACTING SECRETARY OF STATE, THE ACTING ATTORNEY GENERAL, AND THE SECRETARY OF HOMELAND SECURITY

FROM:        Donald F. McGahn II – Counsel to the President

SUBJECT:    Authoritative Guidance on Executive Order Entitled "Protecting the Nation from Foreign Terrorist Entry into the United States" (Jan. 27, 2017)

     Section 3(c) of the Executive Order entitled "Protecting the Nation from Foreign Terrorist Entry into the United States" (Jan. 27, 2017) suspends for 90 days the entry into the United States of certain aliens from countries referred to in section 217(a)(12) of the Immigration and Nationality Act (INA), 8 U.S.C. 1187(a)(12). Section 3(e) of the order directs the Secretary of Homeland Security, in consultation with the Secretary of State, to submit to the President a list of countries recommended for inclusion on a Presidential proclamation that would prohibit the entry of certain foreign nationals from countries that do not provide information needed to adjudicate visas, admissions, or other benefits under the INA.

     I understand that there has been reasonable uncertainty about whether those provisions apply to lawful permanent residents of the United States. Accordingly, to remove any confusion, I now clarify that Sections 3(c) and 3(e) do not apply to such individuals. Please immediately convey this interpretive guidance to all individuals responsible for the administration and implementation of the Executive Order.

1

**EXHIBIT E**

**Transcript of Hearing before Judge Robart**

**(Feb. 3, 2017)**

1     UNITED STATES DISTRICT COURT

2   WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3 _____

4          )
  STATE OF WASHINGTON and  ) C17-00141-JLR
5  STATE OF MINNESOTA,   )
          ) SEATTLE, WASHINGTON
6      Plaintiffs, )
          ) February 3, 2017
7  v.         )
          ) MOTION FOR
8  DONALD TRUMP, in his   ) TEMPORARY
  official capacity as   ) RESTRAINING ORDER
9  President of the United  )
  States; U.S. DEPARTMENT OF )
10 HOMELAND SECURITY; JOHN F. )
  KELLY, in his official  )
11 capacity as Secretary of the )
  Department of Homeland  )
12 Security; TOM SHANNON, in )
  his official capacity as  )
13 Acting Secretary of State; )
  and the UNITED STATES OF  )
14 AMERICA,       )
          )
15      Defendants. )

16 _____

17    VERBATIM REPORT OF PROCEEDINGS
   BEFORE THE HONORABLE JAMES L. ROBART
18    UNITED STATES DISTRICT JUDGE

19 _____

20

21 APPEARANCES:

22

23 For the Plaintiffs:  Noah Purcell
          Colleen Melody
24         Assistant Attorneys General
         Office of the Attorney General
25         800 Fifth Avenue, Suite 2000
         Seattle, WA  98104

```
 1                                  Jacob Campion
                                    Assistant Attorney General of
 2                                  Minnesota
                                    445 Minnesota Street, Suite 1100
 3                                  St. Paul, MN  55101

 4
       For the Defendants:         Michelle Bennett
 5                                  John Tyler
                                    Trial Attorneys
 6                                  U.S. Department of Justice
                                    Civil Division
 7                                  Federal Programs Branch
                                    20 Massachusetts Avenue, NW
 8                                  Washington, DC 20530

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1        THE CLERK:  Case No. C17-141, State of Washington

2  versus Donald J. Trump.  Counsel, please make your

3  appearances for the record.

4        MR. PURCELL:  Noah Purcell for the State of

5  Washington, Your Honor.

6        MS. MELODY:  I'm Colleen Melody, also for the state.

7        MR. CAMPION:  I'm Jacob Campion, I'm an Assistant

8  Attorney General for the State of Minnesota.

9        THE COURT:  Welcome.

10        MS. BENNETT:  Good afternoon, Your Honor, Michelle

11  Bennett from the Department of Justice for the defendants.

12  And with me is my colleague, also from the Department of

13  Justice, John Tyler.

14        THE COURT:  Thank you.  Counsel, welcome.

15      A couple of housekeeping matters to attend to.  We are

16  scheduled to conduct this hearing between 2:30 and 4 o'clock.

17  I'm going to have some very brief housekeeping matters at the

18  start, of which I've already used eight of my ten allotted

19  minutes.  The state will go next.  I will tell you that I've

20  given, in effect, 30 minutes to each side.  If the state

21  wishes, they can reserve some of their time for rebuttal.

22  They're going first.  The federal government is going second.

23      Your prepared remarks, which I'm sure are all very

24  thoughtful and quite helpful, are going to get swallowed by

25  questions, because I have questions that are essential to our

1   resolution of this case and I need to get those answered.  So

2   be prepared for pretty much an interruption from the start.

3       And at around 3:45, having followed the direct

4   presentations, and rebuttal if the state has time left,

5   you're going to hear from the court.  It's my intention to

6   orally rule from the bench but in very conclusory terms.  And

7   we will get a written order to follow, so that if you want to

8   have the Ninth Circuit grade my homework, you'll have

9   something that you can get on file there promptly.

10      So, that will be the order of the day.  And I'm going to

11  hear from the state first, please.

12      Mr. Purcell, why don't we do one other item.  Technically

13  the motion that's before me started off as Docket 3, which

14  was exclusively the State of Washington, and is now Docket

15  19, which is both the states of Washington and Minnesota.

16  We've also had a series of requests to file amicus briefs,

17  and I intend to grant those.  So I'm granting Docket 26, the

18  ACLU; Docket 42, the Service Employees Union; Docket 45,

19  amicus filed by the Amicus Law Professors.  Sounds like the

20  Three Amigos.  Let's see, Docket 46, I may have mentioned, is

21  the Washington State Labor Council.  And, finally, Docket 48,

22  which is the amicus, Americans United For Separation of

23  Church and State.  Those motions are granted.

24      Please note that it's not a motion for intervention, it's

25  simply authorization to file the amicus brief in this

1   particular question.

2      Mr. Purcell.

3        MR. PURCELL:  Thank you, Your Honor.  Good afternoon.

4   In the weeks since President Trump signed the Executive

5   Order at issue here, six federal judges around the country

6   have enjoined or stayed parts of it in response to action by

7   particular plaintiffs, finding a likelihood of success on the

8   merits of the challenges.  The states of Washington and

9   Minnesota are asking you to do the same here today and to

10   enjoin the parts of the order that we challenge.

11      The order is illegal and is causing serious immediate

12   harms to our states, to our state institutions, and to our

13   people, and enjoining the order is overwhelmingly in the

14   public interest.  So, you're familiar, of course, with the

15   standard for a temporary restraining order, I won't waste

16   your time.

17        THE COURT:  You can dispense with that.

18        MR. PURCELL:  I want to first address the likelihood

19   of success on the merits, including the threshold issues that

20   the government has raised, including standing, deference to

21   national security interests, and the facial versus as-applied

22   nature of the challenge.

23        THE COURT:  Well, let me try and derail you here.

24        MR. PURCELL:  Sure.

25        THE COURT:  I'd like to take this in terms of equal

1    protection first.

2         MR. PURCELL:  Okay.

3         THE COURT:  And, in particular, how does the equal

4    protection claim apply to all of the order, which is the

5    120-day-part found in paragraph or Section 5A.  How does this

6    ban discriminate in any way, or violate equal protection,

7    when it's an across-the-board ban?

8         MR. PURCELL:  You're talking about as to refugees?

9    So, our claim about refugees is primarily that it is

10   religiously motivated discrimination, and that the order is,

11   in large part, motivated by religious animus.  So that

12   doesn't require us to show that everyone harmed by the order

13   is of a particular faith, it just requires us to show that

14   part of the motivation for issuing the order was religious

15   discrimination.

16        THE COURT:  Then I'm going to try to put words in

17   your mouth.  Are you telling me, then, that you are not

18   making an equal protection challenge to the refugee ban?

19        MR. PURCELL:  I would say, Your Honor, that we have a

20   -- I would say the focus there is on the religious

21   discrimination aspect.

22        THE COURT:  We're going to get there next.

23        MR. PURCELL:  Okay.  Would you like me to address

24   that further?

25        THE COURT:  No.  Let's move on to my second question

1   on equal protection, then.

2           MR. PURCELL:  Okay.

3           THE COURT:  Do refugees or visa holders that have

4   never physically entered the country have equal protection

5   rights under the constitution?

6           MR. PURCELL:  Your Honor, that is not the focus of

7   our claim.  I think the answer is probably no.  But they do

8   have rights to some constitutional protections.  And

9   certainly their friends and family who are here -- and we're

10  just talking about refugees now, not aliens, for example, who

11  might have been sponsored by a university or something like

12  that to come here.

13          THE COURT:  Right.

14          MR. PURCELL:  Our claim is that -- our claim is

15  primarily focused on the people who are here or have been

16  here and left, their families, their employers and the

17  institutions here.

18          THE COURT:  All right.  Has any court ever set aside

19  an immigration law or regulation on equal protection grounds

20  based on rational review?  I understand it's not the

21  centerpiece, but you've pled it and so you're going to get

22  questioned about it.

23          MR. PURCELL:  We did plead it, and that's just fine,

24  Your Honor.  I was planning to start this morning with due

25  process -- or this afternoon -- but equal protection is just

1    fine.

2         I am not aware of an immigration order being set aside on

3    equal protection grounds.  On the other hand, I'm not aware

4    of any Executive Order quite like this one, that there's so

5    much evidence, before there's even been any discovery, that

6    it was motivated by animus, religiously targeted, and just

7    utterly divorced from the stated purposes of the order.  And

8    I'm happy to talk about that more in terms of -- the

9    government is asking for an extraordinary level of deference

10   here, essentially saying that you can't really look at what

11   were the real motives for the order; you can't test its

12   legality.  And we just think that's wrong, legally and

13   factually.

14        And if you'll spare me for just a minute, indulge me for

15   just a minute and let me -- there's three -- there's a legal

16   point and a factual point.  The legal point is courts often

17   review executive action that has to do with national security

18   for constitutional violations.  If you look at cases like

19   *Hamdi*, *Hamdan*, *Boumediene*, the Supreme Court routinely

20   reviews -- you know, those were cases involving enemy

21   combatants being held offshore.  Here we have a case that

22   largely involves people who have been here, long-time

23   residents who still live here and have lost rights.  And

24   we're asking the court to review that claim.

25        They also suggest, Your Honor, at page 21 to 22 of their

1    brief, based on a case called *Kleindienst* and *Kerry v. Din*,

2    that you can't sort of look behind the stated purposes of the

3    order.  They say that if the President gives a facially

4    legitimate and bona fide reason for excluding an alien, the

5    court will not look behind that reason.

6        But there's two fundamental problems with that argument,

7    Your Honor.  First of all, those cases dealt with the

8    President's power to exclude aliens who were not here, had

9    not been here, and had no right to come back.  That is not

10   this case, where we have a case involving people who have

11   been here, have rights to remain here and rights to return.

12       And in Justice Kennedy and Alito's concurring opinion in

13   that *Kerry v. Din* case, which is a controlling opinion, they

14   held that they would look behind stated motives, even for

15   exclusion of someone who had never been here, if the

16   plaintiff plausibly alleged with sufficient particularity an

17   affirmative showing of bad faith.  And that's at 2141 of the

18   *Din* opinion.  And the Ninth Circuit endorsed that standard in

19   the *Cardenas* opinion, 826 F.3d, 1164.

20            THE COURT:  Well, let me stop because we'll keep in

21   this area.

22            MR. PURCELL:  Okay.

23            THE COURT:  Do you not see some distinction between

24   election campaign statements and then subsequently an

25   election and then an Executive Order which is issued with

1   comment at the time the Executive Order is issued?  It seems

2   to me that it's a bit of a reach to say:  The President is

3   clearly anti-Muslim or anti-Islam, based on what he said in

4   New Hampshire in June.

5        MR. PURCELL:  Well, Your Honor, it might go to the

6   weight to give the evidence, I suppose.  But I don't think

7   it's sort of off the table, especially given that we're only

8   a week into -- well, two weeks now, I suppose, but the order

9   was issued a week after the campaign -- well, after the

10  President took office.

11       THE COURT:  Inauguration.

12       MR. PURCELL:  After the inauguration, I'm sorry.  So

13  it's not as though those are completely irrelevant.  And

14  moreover -- and, again, this is before any discovery -- we

15  have the President's advisor saying on national television

16  that, you know, the President asked him to come up with a

17  Muslim ban -- this was after the election -- asked him to

18  come up with a Muslim ban in a way that would make it legal.

19  And that that's what they did.

20       THE COURT:  Does the Executive Order mention the word

21  "Islamic" or "Muslim?"  Let's stay on religious grounds.

22       MR. PURCELL:  No, it does not, Your Honor.  It does

23  not.  But when we're arguing about religiously motivated

24  targeting, again, the burden is not to prove that it affects

25  every single person of the Islamic faith.  The burden is to

1    prove that a desire to discriminate based on religion was one

2    motivating factor in the adoption of the order.

3         And, again, we're at the pleading stage, four days after

4    having filed our complaint, no discovery, and there's already

5    an overwhelming amount of evidence to suggest that that's the

6    case, that it was, at least in part, motivated by religion.

7         Going back briefly just to the national security.  Part of

8    the evidence of that, Your Honor, is that the tie to the

9    stated purpose of national security is so tenuous here.  I

10   mean, the President apparently had not decided whether the

11   order applied to lawful permanent residents before it was

12   issued.  And there's 500,000, roughly 500,000 lawful

13   permanent residents from these seven listed countries in the

14   United States.  Either those people are an enormous threat to

15   our safety or they're not.  And they've changed their mind

16   about that five times since Friday.  You know, first they

17   said that it did apply to them, and many of those people were

18   excluded from returning to the country.  Then the Department

19   of Homeland Security reiterated that it applied to them.

20   Then the Secretary said that it didn't.  And then -- this is

21   all in our complaint, by the way -- and then the White House

22   spokesperson said it did not.  And then the White House

23   counsel has now issued authoritative guidance, whatever that

24   means, that although there could have been reasonable

25   confusion about what the order meant, it wasn't meant to

1    cover those people.

2        So the point is, if they were an enormous security risk,

3    you would think that they would have made up their mind about

4    that before issuing the order.

5        And the second point, Your Honor --

6            THE COURT:  Well, before we leave that one.

7            MR. PURCELL:  Yeah.

8            THE COURT:  What do you say to the argument that the

9    seven countries that were designated -- and I'll quote the

10   language -- have been designated as, "Countries the

11   government of which has repeatedly provided support for acts

12   of international terrorism under 8 U.S.C. 1187."  Wouldn't

13   that provide a rational basis for the Executive Order?

14           MR. PURCELL:  Your Honor, that would provide a cover,

15   in our view, for -- that was maybe one motivating factor.

16   But when you look at the standard of proving a religious

17   discrimination claim, again, you can't just accept at face

18   value the stated purposes.  Especially where again, before

19   there's even been any discovery, there's so much evidence

20   that it was not targeted at the concerns stated.  I mean, the

21   order applies to infants, it applies to senior citizens, it

22   applies to students and faculty at our state universities who

23   have never been accused of any wrongdoing.

24       The main point I guess I'm getting at here is that the

25   idea that you just can't review, can't review the real

1   reasons for this order, or even ask whether there are real

2   reasons beyond what is stated, is just not supported by the

3   case law.  So we're asking you to -- the main point is, the

4   government is saying you cannot look behind the stated

5   reasons, and we're saying that you can.  The case law doesn't

6   support that argument that they're making.

7           THE COURT:  Would you agree with me that it is only

8   Section 5 that mentions religion?

9           MR. PURCELL:  It's only Section 5 that mentions

10  religion.  We would say it's not only Section 5 that is, in

11  part, motivated by religion.

12          THE COURT:  And the part of that is this resumption

13  of the refugee program after, I think it's 90 days for that

14  provision.  Then it says, minority -- "Practicers of a

15  minority religion in a country."  Does your establishment

16  clause cause of action then extend beyond Section 5?

17          MR. PURCELL:  I think our establishment clause claim

18  is focused on that section.  But I think that both three and

19  five are motivated in part, our allegation is, by preferring

20  one religious view over another.  The *Larson* case that's

21  cited in our brief makes clear that you don't need to have a

22  distinction between named religions on the face of the order

23  for it to be an establishment clause violation.  In that case

24  it didn't name any religions.  It just set standards for how

25  different religious groups would qualify for a tax exemption.

1   And the court said that, combined with the effects on the

2   religious groups, was enough.

3       Your Honor, I want to spend some time on our due process

4   claim.

5           THE COURT:  We're going to get there.

6           MR. PURCELL:  Okay.  Excellent.

7           THE COURT:  Trust me.

8           MR. PURCELL:  Okay.  And also standing.  But if I

9   could turn to the due process claim.

10          THE COURT:  Well, before you go there, let's finish

11  establishment.

12          MR. PURCELL:  Okay.

13          THE COURT:  5(b) isn't implemented for, I think it's

14  100 days.

15          MR. PURCELL:  Um-hum.

16          THE COURT:  Why should I take this up at this time,

17  as opposed to, if you're coming back on a motion for

18  preliminary injunction, deal with it when it's somewhat more

19  concrete?

20          MR. PURCELL:  Well, Your Honor, we're asking you to

21  temporarily restrain what we thought was a narrow subset of

22  the categories that we thought were motivated by these

23  unconstitutional -- that violated the constitution.  If you

24  want to have further thought about whether -- so we're

25  suggesting that the action itself of banning the refugees,

1    and the Syrian refugees indefinitely, and the selection of

2    the countries, was partially religiously motivated.  If you

3    want to wait to rule on whether 5(b) itself, and that

4    favoritism approach going forward is a constitutional

5    violation, I suppose that would be fine.  We're not -- that

6    does not necessarily require immediate injunction.  But that

7    is evidence, I think that provision is evidence, of the

8    religious underpinnings of the order.

9         THE COURT:  All right.  Why don't you move on to due

10   process, since I've used up a fair chunk of your time.

11        MR. PURCELL:  So I think the most obvious way in

12   which the order violates the constitution is its violation of

13   the due process clause.  The due process clause protects

14   everyone in this country, including immigrants.  And a number

15   of cases make that clear.

16        THE COURT:  So is it your position that refugees and

17   other aliens who are presently outside the country are

18   covered by due process?

19        MR. PURCELL:  Your Honor, the Supreme Court has said

20   that aliens who are not in the country and have never been

21   here, the only process they're entitled to is what Congress

22   provides.  So we're not -- again, they're not the focus of

23   our claim.  The focus of our claim is on people who have been

24   here and have, overnight, lost the right to travel, lost the

25   right to visit their families, lost the right to go perform

1    research, lost the right to go speak at conferences around

2    the world.  And also people who had lived here for a long

3    time and happened to be overseas at the time of this order,

4    which came with no warning whatsoever, and suddenly lost the

5    right to return to the United States.

6        So there's a series of cases, and we cited some of these

7    in our brief, Your Honor, but I'd like to -- given that

8    there's only been a short time since the government's filing,

9    I direct you to cases like *Landon v. Plasencia*, 459 U.S. 21.

10            THE COURT:  You might want to slow down a little bit.

11            MR. PURCELL:  Sorry.  *Landon,* 459 U.S. 21, *Rosenberg*,

12   374 U.S. 449, that make very clear that people who have lived

13   here legally for some period of time and then leave

14   temporarily, are protected by the due process clause in

15   attempting to return, and cannot have their right to return

16   taken away without some sort of process.

17       And that's effectively what happened here to thousands of

18   people in Washington, including hundreds of students at our

19   state universities, and faculty.  They just overnight, with

20   no process whatsoever, lost these important rights that they

21   had.

22       Now, the federal government --

23            THE COURT:  A case from your list of cases is

24   *Katzenbach*, which the government cites extensively for the

25   proposition that you've lost that argument.

1          MR. PURCELL:  Right.

2          THE COURT:  How do you respond to that?

3          MR. PURCELL:  Well, they're wrong, Your Honor, for a

4    number of reasons.  First of all, so they say we can't cite

5    that case because we're a state.  But our claim is not the

6    state as state, as we made clear in our standing brief, our

7    claim is the state as proprietor and the state as *parens*

8    *patriae* on behalf of the people of the state.  So the state

9    as a proprietor, I think is the obvious way that that

10   argument of theirs is incorrect, Your Honor.

11       We are asserting the due process rights on behalf of the

12   people of the state who are harmed, and on behalf of the

13   state institutions that they attend.  So, for example, the

14   University of Washington and Washington State University, as

15   well as our community colleges, are arms of the state.  It's

16   very clear under state law they're arms of the state.  We sue

17   on their behalf.  And their students and faculty are being

18   denied due process rights pursuant to this order.

19       And if you look at cases like *Pierce v. Society of*

20   *Sisters*, 268 U.S. 510, and the cases cited in footnote three

21   of our standing brief, it's very clear that schools and

22   universities have standing to bring challenges based on harms

23   to their students.  So that's the first way in which we have

24   standing to bring a due process claim.

25       Second, *Katzenbach,* of course, is before *Massachusetts v.*

1    *EPA* and before the significant change in *parens patriae*

2    standing that that case announced, as detailed in the amicus

3    brief of the law professors and as explained in

4    *Massachusetts v. EPA* itself.  So the *Snapp* decision, the case

5    out of Puerto Rico cited in our briefing, makes it very clear

6    that states can bring *parens patriae* claims asserting

7    discrimination sort of causes of action.  And then

8    *Massachusetts v. EPA* makes it very clear that the sort of

9    *Katzenbach-Mellon* limitations on state standing have been

10   scaled back, if not eliminated altogether.

11        THE COURT:  What's your view of the Fifth Circuit

12   opinion in *United States v. Texas?*

13        MR. PURCELL:  Well, it is a strong basis for standing

14   here as well.  That was primarily an Administrative Procedure

15   Act claim.  And we do have an Administrative Procedure Act

16   claim here.  We didn't have space or time to brief it in our

17   temporary restraining order motion.  And I should say there's

18   a number of claims actually, in our complaint, that we think

19   we're likely to prevail on, that we just didn't have time or

20   space to brief in the 48 hours and 24 pages of the temporary

21   restraining order motion.

22        And that's one of them, Your Honor.  And that case makes

23   very clear that the harms to the state that we're suffering

24   here are sufficient to generate standing in a proprietary

25   capacity.  There the state was arguing, essentially, added

1  driver's license costs that were sort of unspecified, the

2  exact amount.  And here we have claimed, very clearly, lost

3  tax revenue, harms to our state universities in terms of

4  wasted money that was spent sponsoring people to come here

5  and teach and perform research, wasted money that was spent

6  buying tickets for people who will no longer be able to go

7  and speak or research at conferences, a wide range of

8  proprietary harms, Your Honor, that do suffice under *U.S. v.*

9  *Texas* to show standing.

10        THE COURT:  Let's go to the INA claim, and then leave

11 you some time to actually talk to me.  Do states have a right

12 of action under Section 8 U.S.C. 1152 (a)(1)(A)?

13        MR. PURCELL:  Your Honor, I'm sorry, I honestly do

14 not have a good answer to that question.  I think we can

15 assert -- we should be allowed to assert the rights of our

16 people here as *parens patriae* who are harmed by

17 discrimination, the nationality discrimination embodied in

18 this order.  But the INA -- I think I would say our INA claim

19 primarily supplements our other claims by showing that this

20 action, the President's action here, is not endorsed by

21 Congress.  It's not consistent with congressional directives.

22 It's actually contrary to what Congress has said about how

23 these sorts of decisions are supposed to be made, which

24 further undermines the federal government's argument to

25 deference to the President's decisionmaking in this context.

1       THE COURT:  All right.  You've got ten minutes.  I

2  won't ask you any more questions.

3       MR. PURCELL:  Your Honor, I'm perfectly happy to have

4  you ask me questions.

5       So I guess, first of all, I want to overall emphasize that

6  we have two distinct bases for standing here in terms of our

7  proprietary interests, the harms to the University of

8  Washington, Washington State University, our other state

9  colleges and universities, and then our *parens patriae* claim.

10  Those are real harms in both senses.

11       The federal government really has offered no meaningful

12  response to our claims of proprietary harm to the

13  universities.  I know they've claimed that tax harms are

14  insufficient, in some of their pleading, but all the cases

15  they cite predate *Massachusetts v. EPA*, and they're

16  inconsistent with, for example, the Fifth Circuit's approach

17  in *U.S. v. Texas*.  If the added cost of issuing driver's

18  licenses is sufficient to generate standing, there's no

19  reason why the lost revenue of losing visitors who would come

20  here and spend money should be insufficient to generate

21  standing.  More revenue versus less revenue, it's two sides

22  of the same coin.

23       And as to the universities, the federal government claims

24  that these harms are "illusory" because most of the people we

25  allege who will be affected actually won't be.  But there's

1    just no evidence to support that.  So they say now -- again,

2    their position has changed five times.  And I don't mean any

3    ill intent towards counsel.  I know they don't have any

4    control over this.  But the federal government's position

5    about what the Executive Order means has changed repeatedly

6    since the order was issued.  And so now they say it protects

7    long-term lawful permanent residents or doesn't apply to

8    them.  But that wasn't their initial position.  And in any

9    event, we have hundreds of students and faculty at our

10   universities who are here on visas who -- again, overnight --

11   lost the right to travel for any number of purposes or to

12   return to the country.

13       The only other point I'd make, Your Honor, they make much

14   of the idea that this is a facial challenge, we can't show

15   that it's illegal in all applications.  And that's incorrect,

16   Your Honor.  The Ninth Circuit has repeatedly held that when

17   -- in analyzing whether something is a facial or as-applied

18   challenge, you look at whether it's a challenge to the

19   entirety of the action or to parts of it.  And that's cases

20   like *Hoye v. Oakland*, 653 F.3d 835.

21       Here we're challenging only parts of the Executive Order.

22   It's very clear that this is an as-applied challenge to parts

23   of the order.  We don't need to show it's unconstitutional in

24   every application.  I apologize for citing so many cases,

25   Your Honor, in oral argument.  I don't normally do that.

1    It's just that, of course, we had no opportunity to file a

2    response in only a short period of time from when they filed.

3         And the last thing I'd say, Your Honor, for now -- and

4    then I'd just like to reserve the remainder of my time -- is

5    that the establishment clause.  The establishment clause, one

6    of the original purposes of it was to protect the states

7    against the federal government choosing a national religion

8    and imposing it on the states.  So the idea that the state

9    would not have standing to challenge a national government --

10   well, the President, anyway, expressing a preference is just

11   -- it makes no sense.

12        And, again, you know, I can't cite you to a case where a

13   state sued the federal government over an establishment cause

14   violation, but I also can't cite you to an Executive Order

15   ever before quite like this one or the circumstances that we

16   are facing today.

17        So I'd like to reserve the remainder of my time and just

18   conclude by saying, the question is likelihood of success,

19   irreparable harm, and the balance of equities.  We feel we've

20   shown a strong likelihood of success, as the other courts

21   have ruled.  And we'd ask you to enjoin this order

22   temporarily.  Thank you, Your Honor.

23             THE COURT:  Ms. Bennett, are you arguing?

24             MS. BENNETT:  Yes, Your Honor.

25             THE COURT:  Thank you for coming.  I thought your

1    brief was extremely well done.  It was helpful.

2          MS. BENNETT:  Thank you, Your Honor.

3      May it please the court.  Your Honor, for some of the

4    reasons we mentioned we think we have very good reasons why

5    the state is not likely to prevail on the merits.  But I'd

6    like to start with standing, which I think distinguishes this

7    case from some of the other cases that have been filed around

8    the country.

9          THE COURT:  Well, let's concentrate on standing.

10   Tell me why you think that the Fifth Circuit is wrong, in

11   what seemed to be fairly marginal circumstances, and they

12   strongly come out, without hesitation or doubt, to find

13   standing?

14         MS. BENNETT:  Well, Your Honor, we do disagree with

15   the Fifth Circuit's decision.  Of course we also think that

16   case would be distinguishable.  We disagree with the decision

17   because we do think it has to be a particularized impact on

18   the state.  In *United States v. Texas*, the court found that

19   the state itself had injury.  It wasn't an injury in its

20   *parens patriae* capacity.  And it was basically that the --

21         THE COURT:  Let me stop you.  In the State of

22   Washington, and I can't speak to Minnesota, but both the

23   University of Washington and Washington State are considered

24   parts of the state government.  And they've cited a litany of

25   direct consequences, damages to them.  That's compared to,

1    what, the $13.40 in Texas for issuing a driver's license?

2         MS. BENNETT:  Well, Your Honor, in Texas it was a

3    monetary injury, right?  Here the injuries that the state

4    talks about to its universities, in particular, are

5    reputational harm or that students won't come there, that it

6    will undermine their diversity.  They don't cite any cases

7    that define lack of diversity at a university, or something

8    like that, even assuming they could prove that as an injury.

9         THE COURT:  I don't think that's their argument.  I

10   think they're talking about direct financial harm in their

11   declarations.

12        MS. BENNETT:  I mean, I don't read them that way,

13   Your Honor.  I didn't see any sort of calculations of

14   financial harm like there were in Texas.  They talked about

15   faculty members that might not be able to teach; although

16   most of those were lawful permanent residents that actually

17   were not affected by the order.  They talked about the

18   possibility of some students that might not be able to

19   travel.  Most of it was very speculative.  I didn't see --

20   the only place that I saw numbers of monetary losses was in

21   their allegations about lost tax revenue.  And as we

22   explained in our brief, those are -- lots of courts have

23   recognized that sort of generalized grievances like that are

24   not cognizable injuries, analogizing it to the

25   taxpayer-standing context.

25

1    THE COURT:  If I have a student who is admitted to

2  one of those two universities, who is in a country who is now

3  unable to come to the United States, enroll and pay tuition,

4  is that not a direct financial harm?

5    MS. BENNETT:  Your Honor, we don't think it's a

6  direct financial harm to the state.  We think it's -- I mean,

7  perhaps given the circumstances, and it would depends on the

8  circumstances, could be a harm to the individual.  But the --

9    THE COURT:  No, they're benefitting, they're not

10  paying that outrageous tuition.  You know, it's the

11  University of Washington, part of the State of Washington, or

12  Washington State, part of the State of Washington, who are

13  not receiving these dollars from this student who, under the

14  Executive Order, can't get into the United States.

15    MS. BENNETT:  Well, Your Honor, I mean, first of all,

16  I'll point out that I'm not sure they make those allegations

17  of a specific student.  But I would also say that we think

18  that injury is too far down the chain of causation.  That

19  it's an incidental impact.  And if Your Honor were to find

20  standing in that circumstance, it's hard to imagine a federal

21  law or a federal action that wouldn't in some way down the

22  line have effect on states, which would essentially allow

23  states to sue to challenge any federal law if they could

24  point to a way in which some individual was affected by the

25  law because it applied to them, and then that individual, the

1    effect on that individual had some effect on the state.  And

2    we think that that's too expansive of a definition of

3    standing.

4          THE COURT:  Well, the odd couple of the Fifth Circuit

5    in their opinion in *United States v. Texas*, that seems to me

6    to, you know, basically follow the lines of what you just

7    said is improper.

8          MS. BENNETT:  Well, Your Honor, as I said, we

9    respectfully disagree with the Fifth Circuit's decision and

10   note, of course, as Your Honor knows, that you're not bound

11   by that decision.

12     Plaintiffs haven't cited anything in the Ninth Circuit

13   that relies on that sort of injury.  As we explained in the

14   briefs, some of the cases they cited, I believe the one

15   school case that they cite involved a bank that had

16   terminated its loan guarantee program with the school.  So

17   that was a more direct effect on the school.  Whereas here

18   the government is not regulating in any way the school.  The

19   government's interactions are with individuals.  And they

20   are, perhaps, down-the-line consequences on the state,

21   although we think many of those, if not all of them, are

22   speculative.

23          THE COURT:  Let me move you off of standing, if you

24   would.  Given the breadth of authority of the Executive in

25   the area of immigration, do you acknowledge any limitation on

1　　his or her power?

2　　　　　MS. BENNETT:  Your Honor, I don't think Your Honor

3　　needs to answer that question to decide on this case.

4　　　　　THE COURT:  No, but it seemed like a good question.

5　　　　　MS. BENNETT:  I don't think it would be wise to sort

6　　of opine on what the extent of the Executive's power is.

7　　Here we have specific circumstances where the President has

8　　issued this Executive Order.  It was pursuant to authority

9　　that Congress gave him in Section 212(f) of the INA that

10　　specifically allows him to suspend the entry of certain

11　　aliens or class of aliens when he finds that it would be

12　　detrimental to the interests of the United States to allow

13　　them in.

14　　　So here we have the President acting pursuant to power

15　　that Congress gave him, which means, under the *Youngstown*

16　　*Steel* seizure cases, he's acting at the apex of his power.

17　　　And the Executive Order, as Your Honor mentioned, is

18　　tied -- the countries that it applies to -- is tied to

19　　countries that Congress previously, for two of them,

20　　explicitly designated as countries of concern, and that

21　　Congress designated authority to the President to -- or,

22　　sorry, to federal agencies, to designate other countries.

23　　　And under the prior administration, the remaining five

24　　countries were designated as areas of concern.  And so we

25　　think in the context of, certainly in the context of this

1   case, the President is acting well within his -- the

2   authority that Congress has given him.  And Your Honor need

3   not opine on what he may or may not be able to do beyond

4   that.

5        Your Honor, with respect to the plaintiffs' argument that

6   the President's authority is somehow limited by Section

7   1152(a)(1)(A) of the INA, as we explained in our briefing, we

8   don't read that as a limitation on the President's expansive

9   power under 212(f).  As we noted in our briefs, there have

10  been other presidents that have exercised the power in 212(f)

11  in ways that distinguish between nationalities, as the

12  President has done here.

13       We also mentioned that these distinctions between

14  nationalities were made explicitly by Congress in 8 U.S.C.

15  1187.  That's what the President has tied the Executive Order

16  to here.  And so we don't understand 1152(a) as imposing a

17  limitation on the President's power.

18       If it did, as we pointed out in our brief, you can imagine

19  a situation where basically that provision would prevent the

20  President from suspending the entry of aliens from countries

21  that the United States has to be at war with.  And we don't

22  think that's a fair reading of the statute.  So we think that

23  212(f) applies in situations where the President has made the

24  determination that the entry of certain aliens would be

25  detrimental to the United States, and situations where

1    that -- when that determination has not been made, then the

2    other provision in 1152 applies to prevent these

3    discrimination -- to bar certain types of discrimination in

4    the issuance of immigrant visas.

5           THE COURT:  I'd like to move you along to equal

6    protection if we can.

7           MS. BENNETT:  Sure.

8           THE COURT:  You strongly urge that strict scrutiny

9    doesn't apply.  Can it ever apply in the immigration context,

10   in the government's view?

11          MS. BENNETT:  Your Honor, again, I hesitate to opine

12   on whether it can ever apply as opposed to whether it applies

13   under the circumstances of this case.  The courts have made

14   clear that distinctions based on nationality, which is what

15   this Executive Order does, in the immigration context, are

16   completely valid and legitimate and do not violate the

17   Constitution.  And so in the context of this case, there's no

18   equal protection violation.

19      With respect to the argument of religious discrimination.

20   Again, it's a little bit confusing whether the -- exactly

21   what the state's religious discrimination claim is.  We

22   understand it to be limited to Section 5 of the Executive

23   Order, which is about refugees.  And in that context, for

24   reasons Your Honor mentioned, we think the claim is unripe.

25   But it also -- that provision doesn't discriminate against

1    religion.

2         THE COURT:  Well, no.  It may not discriminate, but

3    it favors one over another.

4         MS. BENNETT:  It doesn't, Your Honor.  It sets up a

5    system -- it doesn't even set up a system.  It says, 120 days

6    from now, once the suspension of the refugee program is back

7    on track, that the executive branch, the Secretary of

8    Homeland Security and Secretary of State, are to make changes

9    to the extent permitted by law to the prioritized refugee

10   claims based on religious-based persecution where the

11   religion is a minority religion in that individual's country

12   of nationality.

13        And, Your Honor, that provision doesn't just apply to the

14   seven countries that are designated in Section 3 of the

15   order.  It applies to all countries.  So you can imagine

16   that, while it might be true that the seven countries are

17   majority of Muslims, there are other countries where Islam

18   would not be the majority religion.  And in those contexts

19   the minority religion might be Islam.

20        THE COURT:  But under the establishment cases, I

21   think you're arguing against your own position, aren't you?

22   What you're saying is, in any particular country we're going

23   to reward someone for belonging to a particular faith or

24   practicing a particular faith.

25        MS. BENNETT:  Well, Your Honor, I don't think we're

1 saying that.  The government has long prioritized or

2 permitted asylum claims or other types of claims in the

3 immigration context based on religious persecution.  So the

4 government is not doing anything different than what it's

5 already done.  It's not about the particular religion, it's

6 essentially accommodating religion, which the government has

7 always done.

8   But as Your Honor -- as we said before, this is something

9 that the President has directed executive agencies to look

10 into this matter going forward.  And so until -- certainly

11 until 120 days passes, but we think even beyond that, because

12 until it's actually implemented we don't know what it's going

13 to look like, that there's no establishment-cause problem.

14   THE COURT:  All right.  I think I understand your

15 argument.  Let's talk about Section 3.  I'm going to do the

16 same thing, trying to leave you some time to just talk as

17 opposed to being interrupted.

18   The rationale for Section 3 is invoking 9/11.  And my

19 question to you is:  Have there been terrorist attacks in the

20 United States by refugees or other immigrants from the seven

21 countries listed, since 9/11?

22   MS. BENNETT:  Your Honor, I don't know the specific

23 details of attacks or planned attacks.  I think -- I will

24 point out, first of all, that the rationale for the order was

25 not only 9/11, it was to protect the United States from the

1  potential for terrorism.

2      I will also note that the seven countries that are listed

3  in the Executive Order are the same seven countries that were

4  already subject to other restrictions in obtaining visas that

5  Congress put in place, both by naming countries, Syria and

6  Iraq, and that the prior administration put in place by

7  designating them as places where terrorism is likely to

8  occur, or -- the specific factors are whether the presence in

9  a particular country increases the likelihood that an alien

10 is a credible threat to U.S. security or an area that is a

11 safe haven for terrorists.

12         THE COURT:  Well, let me walk you back, then.  You're

13 from the Department of Justice, if I understand correctly?

14         MS. BENNETT:  Yes.

15         THE COURT:  So you're aware of law enforcement.  How

16 many arrests have there been of foreign nationals for those

17 seven countries since 9/11?

18         MS. BENNETT:  Your Honor, I don't have that

19 information.  I'm from the civil division if that helps get

20 me off the hook.

21         THE COURT:  Let me tell you.  The answer to that is

22 none, as best I can tell.  So, I mean, you're here arguing on

23 behalf of someone that says:  We have to protect the United

24 States from these individuals coming from these countries,

25 and there's no support for that.

1    MS. BENNETT:  Your Honor, I think the point is that

2    because this is a question of foreign affairs, because this

3    is an area where Congress has delegated authority to the

4    President to make these determinations, it's the President

5    that gets to make the determinations.  And the court doesn't

6    have authority to look behind those determinations.  They're

7    essentially like determinations that are committed to agency

8    discretion.

9        And we do think that -- despite plaintiffs' claim -- that

10   *Kleindienst v. Mandel* is directly on point.  And if the four

11   corners of the Executive Order offer a facially legitimate

12   and bona fide reason for it, which they do here, that the

13   court can't look behind that.

14       THE COURT:  Well, counsel, I understand that from

15   your papers, and you very forcefully presented that argument.

16   But I'm also asked to look and determine if the Executive

17   Order is rationally based.  And rationally based to me

18   implies that to some extent I have to find it grounded in

19   facts as opposed to fiction.

20       MS. BENNETT:  Well, Your Honor, we actually don't

21   think you are supposed to look at whether it's rationally

22   based.  We think that the standard is, again, facially

23   legitimate, and that there are some cases that say the court

24   would have to find it wholly irrational.  And again, Your

25   Honor, I would point to the fact that Congress itself has

1   specifically designated two of these countries as areas of
2   concern with respect to terrorism.  And the Obama
3   Administration, the executive branch, designated the
4   remaining five.  And so it's not that this Executive Order
5   is, in that regard, saying anything new about these being
6   countries of concern as it regards terrorism.
7          THE COURT:  Well, let's go back to something you were
8   starting to get around to when I interrupted you.  You were
9   going to argue *Katzenbach*.  Isn't that just classic dicta?
10         MS. BENNETT:  Your Honor, I think to the extent
11  you're talking about that states --
12         THE COURT:  I'm talking about the language you quote
13  in your brief.
14         MS. BENNETT:  Well, I mean, we also, I think, cited
15  that case for the idea that states don't have *parens patriae*
16  standing.  But for the idea that states don't have due
17  process rights, we cite other cases in our brief.  I think
18  that it's a well-established -- the Fifth Amendment applies
19  to persons, and cases established that the state is not a
20  person in that regard.  And so the state doesn't have due
21  process rights to assert.
22         THE COURT:  Well then how do I reconcile that with
23  *Massachusetts v. EPA*?
24         MS. BENNETT:  Your Honor, *Massachusetts v. EPA*, which
25  was a standing case.  Right?  So there the facts were very

1    specific.  There you had two factors that the court found

2    relevant.  One, you had an actual injury to the territorial

3    sovereignty of Massachusetts.  The court talked about how

4    global warming actually affected the territory of

5    Massachusetts, its coastline, an area that was owned by the

6    state.  And the second factor was that Congress had

7    explicitly given states and other parties a procedural right,

8    when someone petitioned the EPA to look into global warming

9    and the EPA denied that petition, then Congress created a

10   procedural mechanism for that person to challenge that

11   decision.

12       So the court said, in an area where the state has an

13   injury-in-fact, it's an injury to its territorial sovereignty

14   and these explicit procedural rights, that there's standing.

15   And neither one of those circumstances are present here.

16   Washington, of course, doesn't allege any injury to its

17   territorial sovereignty.  It doesn't -- you know, its other

18   alleged injuries are sort of incidental.

19           THE COURT:  Explain to me what you mean by the term

20   "territorial sovereignty."

21           MS. BENNETT:  Injury to its territory.  So it's

22   pollution of its rivers, for example, pollution of its

23   coastline, pollution of its land.

24           THE COURT:  So the federal government can do whatever

25   it wanted to people who live here, and as long as the land is

1   not damaged, there's no harm or there's no cause of action?

2        MS. BENNETT:  Well, Your Honor, I mean, I wouldn't

3   make a statement that broad.  I think that the statement I

4   would make here is that when the federal government regulates

5   individuals, and there are sort of speculative downstream

6   effects that might affect the state in terms of lost revenue

7   and stuff like that, cases have said no, that that's not

8   sufficient.  That it's not sufficiently direct as it was in

9   Massachusetts.

10        THE COURT:  All right.  Before I run out of all your

11  time also, what limits does 1152(a)(1)(A) place on the

12  Executive?

13        MS. BENNETT:  Your Honor, we think -- so, in terms of

14  when, as I was trying to explain before, in terms of when the

15  President has made a determination under Section 212(f) of

16  the INA, that entry of certain aliens should be suspended

17  because it would be detrimental to the United States

18  otherwise, we think that that trumps the 1152(a).

19        THE COURT:  Well, let's concentrate on that.  You

20  argue this in your brief that the Executive can classify

21  aliens by origin of birth or nationality.  And then there is

22  a statute that says the classic anti-discrimination language.

23  How do I reconcile those two concepts?

24        MS. BENNETT:  Your Honor, so we think that the

25  1152(a) only applies when the President has not made that

1    designation.  And I will -- to sort of play this out a little

2    more --

3         THE COURT:  Stop there.  Tell me what the authority

4    is for that argument.  You make it in your briefing and you

5    don't give me any authority for it there; you just sort of

6    make the statement that, yes, that's our position.  Help me

7    understand where it comes from.

8         MS. BENNETT:  I think the first principle would be

9    that the court is supposed to attempt to reconcile competing

10   provisions of a statute.  I think there's also, Your Honor, a

11   constitutional avoidance point.  Here the President is acting

12   in an area of his Article II powers in foreign affairs.  And

13   if the court were to find some sort of conflict between the

14   two, the court might run up against the constitutional

15   question of whether the President had authority to make

16   distinctions based on nationality.

17        THE COURT:  Or that the Executive is running up

18   against the law that Congress has passed.

19        MS. BENNETT:  Well, Your Honor, to the extent that

20   you're concerned about that, I would just note that Congress

21   itself, in the INA, makes those very same distinctions based

22   on nationality.  In the provision that the President is

23   relying on here 11 -- 8 U.S.C. 1187, where it says that

24   different rules in terms of applying for visas apply to, and

25   it names two countries, Iraq and Syria, and then allows the

 1    President to designate others.

 2        We think that a reading that says that 1152 applies, no

 3    matter what, would trump that provision or would suggest that

 4    that provision was invalid.

 5            THE COURT:  I don't get a lot of chance to do

 6    statutory interpretation.  But let's concentrate on that for

 7    a moment.  As I understand it, 1152(a) was promulgated after

 8    1182(f).  Do you agree with that?

 9            MS. BENNETT:  Yes, Your Honor.

10            THE COURT:  And didn't Congress then have to, by

11    statutory construction, Congress had to be aware of 1182(f)?

12            MS. BENNETT:  Yes, Your Honor.  That's right.

13            THE COURT:  And in that particular provision it makes

14    a number of exceptions, but it does not except to 52.

15            MS. BENNETT:  Because we don't think Congress thought

16    it applied.  Again, this is a -- the 1152(a) is in a narrower

17    section of the statute that talks about creating a uniform

18    quota system for immigrant visas, for which people are going

19    to be allowed to come into this country.  And we just think

20    that that's a narrower section of the statute and that the

21    President's broader authority -- again, Your Honor, I

22    hesitate to repeat this, but I think it's a good example.  I

23    mean, Your Honor, if this provision of 1152 trumped 212(f),

24    then the President would essentially be prohibited from

25    restricting the entry of aliens to a country at which the

 1    United States was at war.  And we just don't think that

 2    Congress could have meant that.

 3              THE COURT:  You've shaken those bones about as much

 4    as you can get out of them.

 5        Why shouldn't the court assume that Congress did not want

 6    to except 1182(f) from the operation of 1151?  I mean,

 7    Justice Scalia has not been with us for a year, but it seems

 8    that what you're running to now is, oh, all I have to do is

 9    look at the legislative history and that must have been what

10    they meant.

11              MS. BENNETT:  Well, I don't think Your Honor needs to

12    look at the legislative history.  I think you can look at the

13    text and the structure of the statute, that this broader

14    power authorizing the President to suspend the entry of any

15    aliens, or any class of aliens, supersedes this other

16    provision that otherwise would apply in the absence of that.

17        I would also note, Your Honor, that we also make

18    additional arguments in our brief about the procedural

19    exemption to 1152(a) and its narrowness as well.  But we

20    think 212(f) trumps that provision.

21              THE COURT:  All right.  You've got about six minutes

22    left, so I won't interrupt you either for a bit here.

23              MS. BENNETT:  Okay, Your Honor.  Thank you.

24        I'll just make a few more points.  I think I covered

25    largely what I wanted to cover.  But with respect to the

1    remaining two preliminary injunction factors, I would just

2    say that the state, we don't think they've established

3    standing and injury.  But certainly even if Your Honor

4    disagrees, they haven't shown irreparable harm.  As this

5    process has sort of shown, the Executive Order sets up a

6    case-by-case -- or sets up a system where there can be

7    case-by-case waivers of specific exemptions.

8        And so the idea that a state can come in and sort of sue

9    on behalf of all of its citizens without really sort of

10   playing out specific circumstances where it's been applied

11   unlawfully, we think that's not the proper avenue for a TRO.

12       Again, that certainly, perhaps, some of these individuals

13   could bring their own case and we'd have to look at the facts

14   of those cases.  But as for this facial challenge, for Your

15   Honor to enjoin this restraining order, or frankly even parts

16   of it, even provisions of it, we think that's a facial

17   challenge and that Your Honor can't do that in light of the

18   fact that it is lawful in some of its applications.

19       And then we would just point to the balance of the

20   equities, Your Honor, and note again that in this regard the

21   President was acting pursuant to congressional authority, at

22   the height of his power, in the area of national security,

23   foreign affairs and immigration.

24       So we'd ask that Your Honor deny the TRO.

25           THE COURT:  Thank you.

1          MS. BENNETT:  Thank you.

2          THE COURT:  Mr. Purcell, you have about six minutes.

3          MR. PURCELL:  Thank you, Your Honor.

4      Just a few points.  First, the federal government has

5  argued that the harms to UW and WSU and their students and

6  faculty are abstract.  That just couldn't be further from the

7  case.  They have students and faculty who are literally

8  stranded overseas, as they've stated in the declarations.

9  They have sponsored visas for people that are wasted because

10 they are not going to be able to come.  They went to great

11 time and expense to do that.

12     This harm is much more direct and immediate than what was

13 happening in either *Massachusetts v. EPA* or *Texas v. United*

14 *States*.  In *Texas v. United States* the immigration program

15 that was challenged hadn't even taken effect yet.  No one had

16 even qualified for if yet.  The harm was a ways down the

17 road.  And the court there still granted a preliminary

18 injunction.  Here there's literally people stuck overseas who

19 can't get back to their universities.

20         THE COURT:  But the causes of action belong to them.

21 The state can't be exercising them on their behalf.

22         MR. PURCELL:  The universities and their students are

23 harmed by those harms, Your Honor.  It's the university that

24 spent the money to bring the people here who can no longer

25 come.  It's the university that went to the time and trouble

1    of sponsoring those scholars to come.  And they're harmed

2    immediately.  So perhaps, yes, certainly, the people who are

3    stranded overseas may have their own claim, but that doesn't

4    mean that the state has no claim.  *Massachusetts v. EPA* makes

5    that clear, Your Honor.

6        The federal government also talked about a Ninth Circuit

7    case not saying anything remotely like *Texas v. United*

8    *States*.  We cited the *City of Sausalito* case on page two of

9    our standing brief, where the court found standing based on

10   aesthetic harms to a local government that were not

11   quantified in any sort of monetary way.

12       You also asked me, Your Honor, if the court had ever

13   blocked part of an immigration order based on the equal

14   protection clause and due process clause, and my co-counsel

15   very helpfully pointed out that, in fact, two courts have

16   blocked parts of this order based on the equal protection

17   clause and due process clause.  And I can give you those

18   orders.

19       It's the *Darweesh* case out of the United States District,

20   Eastern District of New York.  That order was entered on

21   January 28th -- sorry, that order was entered on January,

22   yes, 28th.  And the -- I'm going to butcher this name --

23   *Tootkaboni* case, out of the District of Massachusetts, issued

24   on January 29th.

25       And both of those cases found that the petitioners had a

1    strong likelihood of success in establishing the violations

2    of the due process and the equal protection clause of the

3    United States Constitution.  I don't have all the orders with

4    me, but at least those two have found it on this order.

5         The next thing I'd say, Your Honor, is that the

6    religious-based claims, the federal government is trying to

7    limit those only to the refugee portions of the order.  Our

8    position is broader than that, Your Honor.  We're saying part

9    three and part five were motivated, in part, by desire to

10   target a particular, unpopular religious group, Muslims, and

11   that that undermines the basis for both of those sections.

12        Your Honor helpfully pointed out that the *Katzenbach*

13   language is dicta.  I'm sorry I didn't say that, but you're

14   absolutely right.  And, frankly, the federal government's

15   position about the standard of review here is frightening.  I

16   mean, they're basically saying that you can't review anything

17   about what the President does or says, as long as he says

18   it's for national security reasons.  And that just can't be

19   the law.

20        And the last thing I'd say, Your Honor, is that we are

21   asking here for nationwide relief.  We do have now two states

22   that are part of this case that are obviously some distance

23   apart.  We also have people trying to come to Washington from

24   all over the world, through various places, and we believe

25   that nationwide relief is appropriate here for the same

1    reasons that it was in *United States v. Texas*.

2        So, Your Honor, in sum, the state is grievously harmed

3    here, both in its proprietary capacity and in its *parens*

4    *patriae* capacity. The declarations that are attached to our

5    briefing, the descriptions of people who have been harmed in

6    the amicus briefs, are heartbreaking. And it's not just harm

7    to people who are trying to come here who have never been

8    here. Again, that is not the focus of our claim. The focus

9    of our claim is the harm to people who have been here, in

10   many cases for many years, following the law, and you know,

11   traveled overseas without warning that this was going to

12   happen, or could no longer travel, and have lost fundamental

13   rights without any process at all in an order that was

14   motivated largely by religious animus.

15       So we're asking you to enter the temporary restraining

16   order that we're seeking here. Thank you, Your Honor.

17           THE COURT: Thank you, counsel. I think argument was

18   helpful.

19       The following oral opinion will constitute the informal

20   opinion of the court. It is a formal opinion for purposes of

21   ruling on this motion. But as I indicated to you, I intend

22   to do a formal written order. And hopefully we will have

23   that on file over the weekend, so that by the time the Ninth

24   Circuit opens on Monday you'll be in a position to be able to

25   seek review of it.

1    Before the court is plaintiffs State of Washington and

2    State of Minnesota's emergency motion for a temporary

3    restraining order.  For the audience out there, lawyers refer

4    to those as TROs.  And that's not initials that we like to

5    see.

6        The court has reviewed the motion, the complaint, the

7    amended complaint, the submissions of the parties, the

8    submissions of the amici, the relevant portions of the

9    record, and most importantly, the applicable law.  And I do

10   very much appreciate the fact that counsel have come for oral

11   argument today on a very expedited basis; and have done a

12   nice job of submitting written materials to the court, which

13   are helpful, and also participating in oral argument.

14       I'm going to digress for a moment and remind people who

15   see this opinion and wonder what's going on.  Fundamental to

16   the work of this court is a recognition that it is only one

17   of three branches, three equal branches of our government.

18   The role assigned to the court is not to create policy, and

19   it's not to judge the wisdom of any particular policy

20   promoted by the other two branches.  That is the work of the

21   legislative and executive branches and the citizens who

22   ultimately, by exercising their rights to vote, exercise

23   democratic control over those branches.

24       The work of the judiciary is limited to ensuring that the

25   actions taken by those two branches comport with our laws,

1   and most importantly, our constitution.

2       There is a very narrow question before the court today

3   that is asked to be considered and that is whether it is

4   appropriate to enter a TRO against certain actions taken by

5   the Executive that are enumerated in this specific lawsuit.

6   Although that question is narrow, the court is mindful of the

7   considerable impact that its order may have on the parties

8   before it, the executive branch of our government, and the

9   country's citizens and residents.

10      I will not repeat the procedural background of this case.

11  It will be in the written order.  I would instead note that

12  the motion was filed and that the federal defendants opposed

13  the state's motion.

14      Any question regarding lawsuits in federal court starts

15  with the issue of:  Does the court have jurisdiction over the

16  federal defendants and the subject matter of the lawsuit?  In

17  terms of notice to the federal defendants, that was certainly

18  accomplished, and indeed, the federal defendants have

19  appeared and argued before the court and defended their

20  position in this action.  And since this is an attack based

21  on the constitution and federal law, I find that I do have

22  subject matter jurisdiction.

23      The standard for issuing a restraining order in this

24  circuit is the same as for issuing a preliminary injunction.

25  A temporary restraining order is, as the government has

47

1    noted, an extraordinary remedy that may only be awarded upon

2    a clear showing that the plaintiff is entitled to such

3    relief.  A citation to the *Winter* case, which is well known

4    to the lawyers.

5        The legal standard for preliminary injunctive relief, and

6    hence for a temporary restraining order, is that the

7    plaintiff must be likely to succeed on the merits, that it

8    will suffer irreparable harm in the absence of preliminary

9    relief, that the balance of equities tips in their favor, and

10   finally, that the injunction is in the public interest.

11       The Ninth Circuit has an alternative test which it's used

12   from time to time and is well known to the parties and will

13   be in the written order.

14       It is an interesting question in regards to the standing

15   of the states to bring this action.  I'm sure the one item

16   that all counsel would agree on is that the standing law is a

17   little murky.  I find, however, that the state does have

18   standing in regards to this matter, and therefore they are

19   properly here.  And I probed with both counsel my reasons for

20   finding that, which have to do with direct, immediate harm

21   going to the states, as institutions, in addition to harm to

22   their citizens, which they are not able to represent as

23   directly.

24       Therefore, turning to the merits.  The court finds that

25   for purposes of the entry of the temporary restraining order,

1    that the state has met its burden of demonstrating that it

2    faces immediate and irreparable injury as a result of the

3    signing and implementation of the Executive Order.

4        I find that the state has satisfied the test that it is

5    likely to succeed on the merits of the claim, which would

6    entitle them to relief.  I find that the balance of equities

7    favor the states.  And lastly, I find that a temporary

8    restraining order is in the public interest.

9        If I were to apply the Ninth Circuit's alternative test, I

10   would find that the states have established a question, a

11   serious question going to the merits, and the balance of

12   equities tips sharply in their favor.  As such, I find that

13   the court should and will grant the temporary restraining

14   order.

15       The scope of that order is as follows:  Federal defendants

16   and all their respective officers, agents, servants,

17   employees, attorneys, and persons acting in concert or

18   participation with them are hereby enjoined and restrained

19   from:

20       (A)  Enforcing Section 3(c) of the Executive Order;

21       (B)  Enjoined and restrained from enforcing section 5(a)

22   of the Executive Order;

23       (C)  Enjoined and restrained from enforcing Section 5(b)

24   of the Executive Order, or proceeding with any action that

25   prioritizes the refugee claims of certain religious

1   minorities;

2       (D)   Enjoined and restrained from enforcing Section 5(c)

3   of the Executive Order, and lastly;

4       (E)   Enjoined and restrained from enforcing Section 5(e)

5   of the Executive Order, to the extent Section 5(e) purports

6   to prioritize refugee claims of certain religious minorities.

7       This TRO is granted on a nationwide basis and prohibits

8   enforcement of Sections 3(c), 5(a), 5(b), 5(c) and 5(e) of

9   the Executive Order at all United States borders and ports of

10  entry pending further orders from this court.

11      I considered the question of the government's request that

12  the order should be limited to Minnesota and Washington, but

13  I find that such partial implementation of the Executive

14  Order would undermine the constitutional imperative of a

15  uniform rule of naturalization and Congress's instruction

16  that immigration laws of the United States should be enforced

17  vigorously and uniformly.  That's language is from *Texas v.*

18  *United States*, 809 F.3d, 134, 155, 5th Circuit 2015.

19      I find that no security bond is required under the Federal

20  Rules of Civil Procedure 65(c), and I direct that the parties

21  confer and get back to the court promptly -- today wouldn't

22  be too late, but by next week -- regarding a date for the

23  preliminary injunction hearing, the time for the motion for

24  the preliminary injunction, the time for the federal

25  defendants to file their opposition and for the states to

1    file their reply.

2        Once we know that, we'll promptly schedule a hearing on

3    the motion for preliminary injunction after we are in receipt

4    of the parties' briefing.

5        The court concludes that the circumstances that brought it

6    here today are such that we must intervene to fulfill the

7    judiciary's constitutional role in our tri-part government.

8    Therefore, the court concludes that entry of the

9    above-described TRO is necessary and the state's motion is

10   hereby granted.

11       Counsel, anything further at this time?  Mr. Purcell?

12           MR. PURCELL:  No, Your Honor.

13           THE COURT:  Ms. Bennett?

14           MS. BENNETT:  One more thing, Your Honor, as a

15   procedural matter the government would move Your Honor to

16   stay the TRO, for the same purposes that we opposed the TRO,

17   pending a decision of the ASG of whether to appeal, whether

18   to file an appeal.

19           THE COURT:  I'm sorry, pending a decision by the...

20           MS. BENNETT:  I'm sorry, the Acting Solicitor

21   General; I'm sorry, Your Honor, we use lots of acronyms.  By

22   the Acting Solicitor General.

23           THE COURT:  I understand the motion and I am going to

24   deny it.

25           MS. BENNETT:  Thank you, Your Honor.

1    THE COURT:  I will do everything I can to get you

2  prompt appellate review, which I think is the appropriate

3  case to take.

4    MS. BENNETT:  Thank you, Your Honor.

5    THE COURT:  We will be in recess.  Thank you,

6  counsel.

7              (The proceedings recessed.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


I, Debbie K. Zurn, RMR, CRR, Court Reporter for the United States District Court in the Western District of Washington at Seattle, do hereby certify that I was present in court during the foregoing matter and reported said proceedings stenographically.

I further certify that thereafter, I have caused said stenographic notes to be transcribed under my direction and that the foregoing pages are a true and accurate transcription to the best of my ability.


/s/ *Debbie Zurn*

DEBBIE ZURN
OFFICIAL COURT REPORTER