No. 17-35105

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

STATE OF WASHINGTON, et al.,

*Plaintiffs-Appellees,*

*v.*

DONALD J. TRUMP, et al.,

*Defendants-Appellants.*

On Appeal from an Order of the United States
District Court for the Western District of Washington

United States District Judge James L. Robart
Case No. 2:17-cv-00141-JLR

## BRIEF OF TECHNOLOGY COMPANIES AND OTHER BUSINESSES AS *AMICI CURIAE* IN SUPPORT OF APPELLEES

Andrew J. Pincus
Paul W. Hughes
MAYER BROWN LLP
1999 K Street N.W.
Washington, D.C. 20006
(202) 263-3000

*Counsel for* Amici Curiae

## CORPORATE DISCLOSURE STATEMENTS

*Amici curiae* submit their corporate disclosure statements, as required by

Fed. R. App. P. 26.1 and 29(c), in Appendix B.

/s/ Paul W. Hughes

February 5, 2017         Paul W. Hughes
Attorney for *Amici Curiae*

i

# TABLE OF CONTENTS

Interest of *Amici Curiae* ..............................................................................1

Argument..........................................................................................................1

I.   American Innovation And Economic Growth Are Intimately Tied To
     Immigration ...........................................................................................4

II.  The Executive Order Harms The Competitiveness Of U.S. Companies ..........8

III. The Executive Order Is Unlawful ...................................................13

    A. The Order discriminates on the basis of nationality ...................................13

    B. The Order exercises discretion arbitrarily..................................16

Conclusion .....................................................................................................20

Appendix A - List of *Amici Curiae* ..........................................................1a

Appendix B - Corporate Disclosures for *Amici Curiae* ........................................ 6a

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arizona v. United States*,
  132 S. Ct. 2492 (2012)........................................................................16

*Aziz v. Trump*,
  17-cv-116 (E.D. Va. Feb. 1, 2017) ......................................................9

*Bertrand v. Sava*,
  684 F.2d 204 (2d Cir. 1982) ...............................................................15

*Coates v. City of Cincinnati*,
  402 U.S. 611 (1971)............................................................................19

*FCC v. League of Women Voters of Cal.*,
  468 U.S. 364 (1984)............................................................................18

*Foley v. Connelie*,
  435 U.S. 291 (1978)..............................................................................1

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972)............................................................17, 19, 20

*Judulang v. Holder*,
  565 U.S. 42 (2011)..............................................................................16

*United States ex rel. Knauff v. Shaughnessy*,
  338 U.S. 537 (1950)..............................................................16, 17, 18

*Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*,
  45 F.3d 469 (D.C. Cir. 1995)..............................................................14

*Mojica v. Reno*,
  970 F. Supp. 130 (E.D.N.Y. 1997) ......................................................7

*Olsen v. Albright*,
  990 F. Supp. 31 (D.D.C. 1997)...........................................................15

*Rosenberg v. Fleuti*,
  374 U.S. 449 (1963)......................................................................16, 20

*Wong Wing Hang v. INS*,
 360 F.2d 715 ..................................................................................15

**Statutes and Rules**

8 U.S.C.
 § 1152(a)(1)(A)..................................................................14, 15, 16
 § 1182(f).................................................................................17, 18
 § 1185(a)(1)...............................................................................17

Fed. R. App. 29(a)(4)(E)......................................................................1

**Other Authorities**

Americas Soc'y & Council of The Americas, *Bringing Vitality To
 Main Street* (2015), https://goo.gl/i9NWc9 ......................................4, 5

Anca D. Cristea, *Buyer-Seller Relationships in International Trade*,
 84 J. Int'l Econ. 207 (2011) ...............................................................11

BGRS, *Breakthrough to the Future of Global Talent Mobility: Global
 Mobility Trends Survey* (2016), http://goo.gl/ZhIxSr ..........................11

Cong. Research Serv., *Executive Authority to Exclude Aliens: In Brief*
 (Jan. 23, 2017), https://goo.gl/D0bRkS .............................................19

Dep't of Homeland Security, *Protecting The Nation From Foreign
 Terrorist Entry To The United States* (Jan. 29, 2017),
 https://goo.gl/IYa1bg .......................................................................9

Diana Furchtgott-Roth, Manhattan Institute, *The Economic Benefits
 Of Immigration* (Feb. 2013), https://goo.gl/lsWhb5.............................5

Elizabeth Grieco, U.S. Census Bureau, *The Foreign-Born Population
 in the United States* (2012), https://goo.gl/PZ3pnE..............................1

Gallup, *Majority of Americans Identify Themselves as Third
 Generation Americans* (July 10, 2001), https://goo.gl/o7PRxv ...........1

H.R. Rep. No. 89-745 (1965)..........................................................14, 16

The Hamilton Project, *Ten Economic Facts About Immigration*
 (Sept. 2010), goo.gl/3zpdpn.............................................................6

Harv. Bus. Rev., *Strategic Global Mobility* (2014),
http://goo.gl/AV3nhJ .................................................................................11

Hearing before the Subcomm. on Immigration and Naturalization, S.
Comm. on the Judiciary, 89th Cong., 1st Sess. (Feb. 10, 1965) .......................14

*Immigration Laws and Iranian Students*,
4A Op. O.L.C. 133 (1979)............................................................................17

John F. Kennedy, A Nation of Immigrants (1958)................................................1, 2

Jonathan Shieber, *Apple CEO Tim Cook Sent An Email to Employees
About the Immigration Ban*, TechCrunch (Jan. 28, 2017),
https://goo.gl/qzXDJO ..................................................................................10

Kathianne Boniello, *Customs Agents Ignore Judge, Enforce Trump's
Travel Ban: ACLU*, N.Y. Post, Jan. 19, 2017,
https://goo.gl/AgcHd4...................................................................................9

Laura King et al., *Confusion Reigns at U.S. Airports as Protests of
Trump Executive Order Enter Second Day*, L.A. Times,
Jan. 29, 2017, goo.gl/9kSm9G......................................................................8

Letter from Bradford L. Smith, President and Chief Legal Advisor,
Microsoft, to John F. Kelly, Sec'y of Homeland Security, and Rex
W. Tillerson, Sec'y of State (Feb. 2, 2017), https://goo.gl/AZtcFV .................10

Lyndon B. Johnson, Remarks at the Signing of the Immigration Bill
(Oct. 3, 1965) ...............................................................................................7

Maksim Belenkiy & David Riker, *Face-to-Face Exports: The Role of
Business Travel in Trade Promotion*, 51 J. Travel Res. 632 (2012) .................11

Memorandum from Donald F. McGahn II, Counsel to the President,
to the Acting Sec'y of State, the Acting Att'y Gen., and the Sec'y
of Homeland Security (Feb. 1, 2017), https://goo.gl/oqb9A6............................9

Miriam Jordan et al., *Donald Trump's Immigration Order Sparks
Confusion, Despair at Airports*, Wall St. J., Jan. 29, 2017,
goo.gl/eTbrsY ...............................................................................................8

Muzaffar Chishti & Claire Bergeron, *Post-9/11 Policies Dramatically Alter the U.S. Immigration Landscape*, Migration Policy Inst. (Sep. 8, 2011), https://goo.gl/6rdagt .................................................................2

New American Economy, *Reason for Reform* (Oct. 2016) ......................................5

Nune Hovhannisyan & Wolfgang Keller, *International Business Travel: An Engine of Innovation*, 20 J. Econ. Growth 75 (2015) ....................11

Pew Research Center, *Second-Generation Americans: A Portrait of the Adult Children of Immigrants* (Feb. 7, 2013), https://goo.gl/SRaXxc .................................................................................1

Pia Orrenius, *Benefits of Immigration Outweigh the Costs*, The Catalyst: A Journal of Ideas from the Bush Institute (2016), https://goo.gl/qC9uOc .................................................................................5

Partnership for a New American Economy, *The "New American" Fortune 500* (2011), http://goo.gl/yc0h7u ............................................4

Partnership for a New American Economy, *Open For Business: How Immigrants Are Driving Small Business Creation in the United States*, Aug. 2012, https://goo.gl/zqwpVQ ............................................5

S. Rep. No. 89-748 (1965) ....................................................................................14

Seth Fiegerman, *Former Google Exec Calls Trump Travel Ban An "Enormous Problem,"* CNN Tech (Jan. 30, 2017), https://goo.gl/vNVgLt .................................................................................11

Shannon Pettypiece & Michelle Jamrisko, *Trump's Order on Refugee Limits Draws Iran Retaliation Threat*, Bloomberg Politics (Jan. 27, 2017), http://goo.gl/DKLWgf ............................................12

Stuart Anderson, *Immigrant Flooding America with Nobel Prizes*, Forbes (Oct. 16, 2016), http://goo.gl/RILwXU ....................................6

Tara Palmeri & Bryan Bender, Politico, *U.S. Diplomats Warning GE's Major Deals in Iraq at Risk over Travel Ban*, Feb. 1, 2017, http://goo.gl/nhj9CZ .................................................................................12

U.S. Dep't of State, National Consortium for the Study of Terrorism
    and Responses to Terrorism: Annex of Statistical Information
    (2016) ................................................................................................................ 18

U.S. Dep't of State, Office of the Historian, *The Immigration Act of
    1924 (The Johnson-Reed Act)*, https://goo.gl/5foFNZ ........................................ 7

Vivek Wadhwa, et al., *America's New Immigrant Entrepreneurs*
    (2007), https://goo.gl/wCIySz ............................................................................ 6

4 Woodrow Wilson, A History of the American People (1902) .............................. 7

## INTEREST OF *AMICI CURIAE*

*Amici curiae* are 97 leading businesses from the technology sector and other parts of the economy. A list of *amici* is set forth in Appendix A.[1]

## ARGUMENT

America proudly describes itself as "a nation of immigrants." *Foley v. Connelie*, 435 U.S. 291, 294 (1978). We are: in 1910, 14.7% of the population was foreign born; in 2010, 12.9%.[2] A quarter of us have at least one parent who was born outside the country.[3] Close to half of us have a grandparent born somewhere else.[4] Nearly all of us trace our lineage to another country.

The "contributions of immigrants," then-Senator John F. Kennedy explained, "can be seen in every aspect of our national life." John F. Kennedy, A Nation of Immigrants 4 (1958). "We see it in religion, in politics, in business, in the arts, in education, even in athletics and in entertainment." *Id.* There is "no part of our nation," he recognized, "that has not been touched by our immigrant background." *Id.*

---

[1]  *Amici* state that no party's counsel authored this brief in whole or in part, that no party or party's counsel contributed money that was intended to fund preparing or submitting the brief, and that no person other than *amici* or its counsel contributed money that was intended to fund preparing or submitting the brief. *See* Fed. R. App. 29(a)(4)(E).

[2]  Elizabeth Grieco, U.S. Census Bureau, *The Foreign-Born Population in the United States* 3 (2012), https://goo.gl/PZ3pnE.

[3]  Pew Research Center, *Second-Generation Americans: A Portrait of the Adult Children of Immigrants* 8 (Feb. 7, 2013), https://goo.gl/SRaXxc.

[4]  Gallup, *Majority of Americans Identify Themselves as Third Generation Americans* (July 10, 2001), https://goo.gl/o7PRxv.

Immigrants make many of the Nation's greatest discoveries, and create some of the country's most innovative and iconic companies. Immigrants are among our leading entrepreneurs, politicians, artists, and philanthropists. The experience and energy of people who come to our country to seek a better life for themselves and their children—to pursue the "American Dream"—are woven throughout the social, political, and economic fabric of the Nation.

For decades, stable U.S. immigration policy has embodied the principles that we are a people descended from immigrants, that we welcome new immigrants, and that we provide a home for refugees seeking protection. At the same time, America has long recognized the importance of protecting ourselves against those who would do us harm. But it has done so while maintaining our fundamental commitment to welcoming immigrants—through increased background checks and other controls on people seeking to enter our country.[5]

On January 27, 2017, President Donald J. Trump signed Executive Order 13769. *See* 82 Fed. Reg. 8977 (2017) (the "Order"). The Order alters immigration policy in significant respects:

---

[5] "In the decade since 9/11," immigration policy has incorporated, among other things, "major new border security and law enforcement initiatives, heightened visa controls and screening of international travelers and would-be immigrants, the collection and storage of information in vast new interoperable databases used by law enforcement and intelligence agencies, and the use of state and local law enforcement as force multipliers in immigration enforcement." Muzaffar Chishti & Claire Bergeron, *Post-9/11 Policies Dramatically Alter the U.S. Immigration Landscape*, Migration Policy Inst. (Sep. 8, 2011), https://goo.gl/6rdagt.

- **Seven-nation entry bar:** for a period of at least 90 days, nationals of seven nations—Syria, Libya, Iran, Iraq, Somalia, Yemen, and Sudan—are barred from entering the United States. Order § 3(c).

- **Potential expansion of entry bar:** the Order indicates that this entry bar could be lengthened, and may be expanded to include individuals from any country that is determined, based on unspecified criteria, not to provide sufficient information to the United States. *Id*. § 3(e)-(f).

- **Waivers based on unconstrained discretion:** the Order permits the Secretaries of State and Homeland Security to exercise discretion in issuing visas to nationals from the seven affected countries "on a case-by-case basis." *Id*. § 3(g).

- **Refugee suspension:** for a period of at least 120 days, the United States is suspending the Refugee Admissions Program. *Id*. § 5(a). If the Refugee Admission Program resumes, the Secretary of Homeland Security is to "prioritize refugee claims made by individuals on the basis of religious-based persecution, provided that the religion of the individual is a minority religion in the individual's country of nationality." *Id.* § 5(b).

The Order effects a sudden shift in the rules governing entry into the United States, and is inflicting substantial harm on U.S. companies. It hinders the ability of American companies to attract great talent; increases costs imposed on business; makes it more difficult for American firms to compete in the international marketplace; and gives global enterprises a new, significant incentive to build operations—and hire new employees—outside the United States.

The Order violates the immigration laws and the Constitution. In 1965, Congress prohibited discrimination on the basis of national origin precisely so that the Nation could not shut its doors to immigrants based on where they come from. Moreover, any discretion under the immigration laws must be exercised reasonably, and subject to meaningful constraints.

3

## I. American Innovation And Economic Growth Are Intimately Tied To Immigration.

The tremendous impact of immigrants on America—and on American business—is not happenstance. People who choose to leave everything that is familiar and journey to an unknown land to make a new life necessarily are endowed with drive, creativity, determination—and just plain guts. The energy they bring to America is a key reason why the American economy has been the greatest engine of prosperity and innovation in history.

Immigrants are leading entrepreneurs. "The American economy stands apart because, more than any other place on earth, talented people from around the globe want to come here to start their businesses." Partnership for a New American Economy, *The "New American" Fortune 500*, at 5 (2011), http://goo.gl/yc0h7u.

Some of these businesses are large. Immigrants or their children founded more than 200 of the companies on the Fortune 500 list, including Apple, Kraft, Ford, General Electric, AT&T, Google, McDonald's, Boeing, and Disney. *Id*. at 1. Collectively, these companies generate annual revenue of $4.2 *trillion*, and employ millions of Americans. *Id*. at 2.

Many of these businesses are small. "While accounting for 16 percent of the labor force nationally and 18 percent of business owners, immigrants make up 28 percent of Main Street business owners." Americas Soc'y & Council of The Americas, *Bringing Vitality To Main Street* (2015), https://goo.gl/i9NWc9. These

4

are "the shops and services that are the backbone of neighborhoods around the country." *Id*. Between 2006 and 2010, immigrants opened 28% of all new businesses in the United States. *See* Partnership for a New American Economy, *Open For Business: How Immigrants Are Driving Small Business Creation in the United States* 3, Aug. 2012, https://goo.gl/zqwpVQ.

Immigrant-entrepreneurs come from all parts of the world. In 2014, "19.1 percent of immigrants from the Middle East and North Africa were entrepreneurs." New American Economy, *Reason for Reform* 2 (Oct. 2016), https://goo.gl/32dLNM.

Immigrants also fuel the growth of the economy as a whole. "When immigrants enter the labor force, they increase the productive capacity of the economy and raise GDP. Their incomes rise, but so do those of natives." Pia Orrenius, *Benefits of Immigration Outweigh the Costs*, The Catalyst: A Journal of Ideas from the Bush Institute (2016), https://goo.gl/qC9uOc. Immigrants do not take jobs away from U.S. citizens—they create them. Thus, immigration "expand[s] the American work-force, and encourage[s] more business start-ups"—ensuring that "[b]usinesses ranging from Apple Corporation to apple growers would be able to find the workers they need in America." Diana Furchtgott-Roth, Manhattan Institute, *The Economic Benefits Of Immigration* 1 (Feb. 2013), https://goo.gl/lsWhb5.

Immigrants are innovators. Since 2000, more than one-third of all American

Nobel prize winners in Chemistry, Medicine, and Physics have been immigrants. *See* Stuart Anderson, *Immigrant Flooding America with Nobel Prizes*, Forbes (Oct. 16, 2016), http://goo.gl/RILwXU. Among individuals with advanced educational degrees, immigrants are nearly three times more likely to file patents than U.S.-born citizens. Michael Greenstone & Adam Looney, The Hamilton Project, *Ten Economic Facts About Immigration* 11 (Sept. 2010), https://goo.gl/3zpdpn. By one estimate, non-citizen immigrants were named on almost a quarter of all U.S.-based international patent applications filed in 2006. Vivek Wadhwa et al., *America's New Immigrant Entrepreneurs* 4 (Jan. 4, 2007), https://goo.gl/wCIySz. Inventions and discoveries by immigrants have profoundly changed our Nation. Some, like alternating current (Nikola Tesla), power our world. Others, like nuclear magnetic resonance (Isidore Rabi) and flame-retardant fiber (Giuliana Tesoro), save lives. And yet others, like basketball (James Naismith), blue jeans (Levi Strauss), and the hot dog (Charles Feltman), are integral to our national identity.

America's success in attracting and incorporating immigrants into our society is unrivaled in the world. To be sure, America has in the past deviated from this ideal. Woodrow Wilson in 1901 decried the immigration to the United States of "multitudes of men of the lowest class from the south of Italy and men of the meanest sort out of Hungary and Poland, men out of the ranks, where there was neither skill nor energy nor any initiative of quick intelligence, and they came in

6

numbers which increased from year to year, as if the countries of the south of Europe were disburdening themselves of the more sordid and hapless elements of their population." 4 Woodrow Wilson, A History of the American People 212-13 (1902). The Immigration Act of 1917 (also known as the Literacy Act) barred immigration from parts of Asia. And in 1924, the Johnson-Reed Act significantly restricted Italian and Jewish immigration to the United States in an effort to "preserve the ideal of U.S. homogeneity." U.S. Dep't of State, Office of the Historian, *The Immigration Act of 1924 (The Johnson-Reed Act)*, https://goo.gl/5foFNZ.

But the march of time has discredited these laws and policies. Since World War II, American immigration policy has been one of "tolerance, equality and openness" in which "the United States has revived its traditional rhetoric of welcome—and matched its words with action." *Mojica v. Reno*, 970 F. Supp. 130, 145 (E.D.N.Y. 1997).

When President Johnson signed the Immigration and Nationality Act in 1965—the law establishing the immigration framework that remains today, including the elimination of national quotas, he stated:

> America was built by a nation of strangers…. And from this experience, almost unique in the history of nations, has come America's attitude toward the rest of the world. We, because of what we are, feel safer and stronger in a world as varied as the people who make it up— a world where no country rules another and all countries can deal with the basic problems of human dignity and deal with those problems in their own way.

7

Lyndon B. Johnson, Remarks at the Signing of the Immigration Bill (Oct. 3, 1965).

These principles have defined American immigration policy for the past 50 years. The beneficiaries are not just the new immigrants who chose to come to our shores, but American businesses, workers, and consumers, who gain immense advantages from immigrants' infusion of talents, energy, and opportunity.

## II.    The Executive Order Harms The Competitiveness Of U.S. Companies.

The Executive Order abandons those principles—and inflicts significant harm on American business, innovation, and growth as a result. The Order makes it more difficult and expensive for U.S. companies to recruit, hire, and retain some of the world's best employees. It disrupts ongoing business operations. And it threatens companies' ability to attract talent, business, and investment to the United States.

1. The Order threatens the long-standing stability of the U.S. immigration laws, which have been marked by clear, settled standards and constrained discretion—introducing sudden changes without notice, unclear standards for implementation, and no standards for the exercise of waiver authority. That shift deprives employees and businesses of the predictability they require.

The uncertainty became apparent as soon as the Order was issued. Officials at U.S. airports struggled to implement it.[6] After several courts temporarily en-

---

[6]    *See, e.g.*, Laura King et al., *Confusion Reigns at U.S. Airports as Protests of*

joined the Order, government officials reportedly did not comply.[7]

This confusion appears to be a consequence of the sudden issuance of the Order, without public notice and without following the normal channels for government review. Because the Order denies entry to all "aliens" from the seven targeted countries, Order § 3(c), government officials initially excluded lawful permanent residents (LPRs) from the country; within two days, the Department of Homeland Security changed course and exempted LPRs from the Order's scope;[8] then, four days later, the Counsel to the President reversed course again and claimed that the Order did not (despite its plain text) apply to LPRs in the first place.[9]

The Order establishes a system of "case-by-case" exceptions, but does not specify any criteria for issuing exceptions. Order §§ 3(g), 5(e). Because individual immigration officers appear to have unconstrained discretion in issuing exceptions,

---

*Trump Executive Order Enter Second Day*, L.A. Times, Jan. 29, 2017, goo.gl/9kSm9G; Miriam Jordan et al., *Donald Trump's Immigration Order Sparks Confusion, Despair at Airports*, Wall St. J., Jan. 29, 2017, http://goo.gl/eTbrsY.

[7] *See, e.g.*, *Aziz v. Trump*, 17-cv-116 (E.D. Va. Feb. 1, 2017) (Dkt. No. 20) (motion by Commonwealth of Virginia to hold the government in contempt); Kathianne Boniello, *Customs Agents Ignore Judge, Enforce Trump's Travel Ban: ACLU*, N.Y. Post, Jan. 19, 2017, https://goo.gl/AgcHd4.

[8] *See*, *e.g.*, Dep't of Homeland Security, *Protecting The Nation From Foreign Terrorist Entry To The United States* (Jan. 29, 2017), https://goo.gl/IYa1bg.

[9] Memorandum from Donald F. McGahn II, Counsel to the President, to the Acting Sec'y of State, the Acting Att'y Gen., and the Sec'y of Homeland Security (Feb. 1, 2017), https://goo.gl/oqb9A6 ("[T]o remove any confusion, I now clarify that Sections 3(c) and 3(e) do not apply to such individuals.").

it is unclear what exemptions will be given, or why—and whether that authority is being exercised fairly and without discrimination or favoritism.

If the Order stands, it is impossible for individuals and businesses to anticipate which countries may be affected next. The Order itself promises to ban individuals from additional countries if those nations do not provide information the Secretary of State deems necessary to approve visas. *See* Order § 3(e)-(f).

The Order has had immediate, adverse effects on the employees of American businesses. Several major companies reported substantial disruptions from the Order, because their employees were ensnared in the Order's travel restrictions.[10]

This instability and uncertainty will make it far more difficult and expensive for U.S. companies to hire some of the world's best talent—and impede them from competing in the global marketplace. Businesses and employees have little incentive to go through the laborious process of sponsoring or obtaining a visa, and relocating to the United States, if an employee may be unexpectedly halted at the border. Skilled individuals will not wish to immigrate to the country if they may be cut off without warning from their spouses, grandparents, relatives, and friends—they will not pull up roots, incur significant economic risk, and subject their family

---

[10] *See, e.g.*, Letter from Bradford L. Smith, President and Chief Legal Advisor, Microsoft, to John F. Kelly, Sec'y of Homeland Security, and Rex W. Tillerson, Sec'y of State, at 5 (Feb. 2, 2017), https://goo.gl/AZtcFV; Jonathan Shieber, *Apple CEO Tim Cook Sent An Email to Employees About the Immigration Ban*, TechCrunch (Jan. 28, 2017), https://goo.gl/qzXDJO.

to considerable uncertainty to immigrate to the United States in the face of this instability.[11]

2. The Order's bans on travel are also significantly impairing day-to-day business. The marketplace for today's businesses is global. Companies routinely send employees across borders for conferences, meetings, or job rotations, and invite customers, clients, or users from abroad. Global mobility is critical to businesses whose customers, suppliers, users, and workforces are spread all around the world.[12]

Global business travel lets employees develop new skills, take on expanded roles, and stay abreast of new technological or business developments. It also facilitates new markets and business partnerships. Indeed, one study has shown that each additional international business trip increases exports from the United States to the visited country by, on average, over $36,000 per year.[13]

But the Order means that many companies and employees (both inside and

---

[11] Seth Fiegerman, *Former Google Exec Calls Trump Travel Ban An "Enormous Problem*,*"* CNN Tech (Jan. 30, 2017), https://goo.gl/vNVgLt ("It sends a powerful signal that this is not a country that wants the best people in the world.").

[12] *See, e.g.*, BGRS, *Breakthrough to the Future of Global Talent Mobility: Global Mobility Trends Survey* (2016), http://goo.gl/ZhIxSr; Harv. Bus. Rev., *Strategic Global Mobility* (2014), http://goo.gl/AV3nhJ.

[13] Maksim Belenkiy & David Riker, *Face-to-Face Exports: The Role of Business Travel in Trade Promotion*, 51 J. Travel Res. 632, 637 (2012); *see also* Anca D. Cristea, *Buyer-Seller Relationships in International Trade*, 84 J. Int'l Econ. 207 (2011); Nune Hovhannisyan & Wolfgang Keller, *International Business Travel: An Engine of Innovation*, 20 J. Econ. Growth 75 (2015).

outside the United States) are unable to take advantage of these opportunities. That is true even for persons or countries not currently covered by the Order because there is no way to know whether a given country may be added to the no-entry list.

The Order also could well lead to retaliatory actions by other countries, which would seriously hinder U.S. companies' ability to do business or negotiate business deals abroad.[14] Many companies do business in one or more of the countries currently covered by the Order. Indeed, U.S. diplomats already are reporting that General Electric may lose out on business deals in Iraq potentially worth billions of dollars.[15] Additional actions against American citizens or business will have a further ripple effect.

3. For all of these reasons, the Order will incentivize both immigration to and investment in foreign countries rather than the United States. Highly skilled immigrants will be more interested in working abroad, in places where they and their colleagues can travel freely and with assurance that their immigration status will not suddenly be revoked. Multinational companies will have strong incentives, including from their own employees, to base operations outside the United States or to move or hire employees and make investments abroad. Foreign companies

---

[14] *See* Shannon Pettypiece & Michelle Jamrisko, *Trump's Order on Refugee Limits Draws Iran Retaliation Threat*, Bloomberg Politics (Jan. 27, 2017), http://goo.gl/DKLWgf.

[15] Tara Palmeri & Bryan Bender, *U.S. Diplomats Warning GE's Major Deals in Iraq at Risk over Travel Ban*, Politico (Feb. 1, 2017), http://goo.gl/nhj9CZ.

will have significantly less incentive to establish operations in the United States and hire American citizens, because the Order will preclude the ability of those companies to employ their world-class talent within their U.S. subsidiaries. Ultimately, American workers and the economy will suffer as a result.

Of course, the federal government can and should implement targeted, appropriate adjustments to the nation's immigration system to enhance the Nation's security. But a broad, open-ended ban—together with an indication that the ban could be expanded to other countries without notice—does not fit the goal of making the country more secure. Instead, it will undermine American interests.

## III. The Executive Order Is Unlawful.

The problems that render the Executive Order harmful to businesses and their employees also make it unlawful. Fairness, regularity, and predictability are core principles of immigration law and of U.S. law generally.

### A. The Order discriminates on the basis of nationality.

Immigration law contains a clear command: in issuing visas and making admission decisions, immigration officials cannot discriminate based on an alien's nationality, race, sex, or any other invidious classification. The Order violates that commitment, and harms the Nation's economy and competitiveness in the process.

Congress first codified an antidiscrimination requirement in the immigration laws in 1965. For four decades before that, U.S. immigration was governed by the

13

"national origin system," a set of discriminatory quotas under which "the selection of immigrants was based upon race and place of birth." H.R. Rep. No. 89-745, at 8-10 (1965). As President Johnson explained in 1965, this system was not just "incompatible with our basic American tradition"; "too often," he added, "it arbitrarily denie[d] us immigrants who ha[d] outstanding and sorely needed talents and skills." *Id.* at 11-12. Many others echoed these views.[16]

Congress agreed. That year, it "aboli[shed] … the national origins system" and replaced it with one based largely upon "the advantage to the United States of the special talents and skills of an immigrant." *Id.* at 18; *see* S. Rep. No. 89-748, at 10 (1965). To make this reform effective, Congress enacted 8 U.S.C. § 1152(a)(1)(A), a sweeping antidiscrimination rule providing that "no person shall … be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence." As the D.C. Circuit has observed, "Congress could hardly have chosen more explicit language." *Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*, 45 F.3d 469, 473 (D.C. Cir. 1995), *vacated on other grounds*, 519 U.S. 1 (1996). It "unambiguously directed that no nationality-based discrimination shall occur." *Id.*

---

[16] *See* Hearing before the Subcomm. on Immigration and Naturalization, S. Comm. on the Judiciary, 89th Cong., 1st Sess. 8 (Feb. 10, 1965) (statement of Att'y Gen. Katzenbach) ("[W]e are depriving ourselves of brilliant, accomplished, and skilled residents of foreign countries who want to bring their talents here.").

14

This clear directive is reinforced by other antidiscrimination requirements. Since 1966, federal courts have categorically held that discretion under the immigration laws "may not be exercised to discriminate invidiously" against *any* "race or group," even if that group is not specifically named in section 1152(a)(1)(A). *Wong Wing Hang v. INS*, 360 F.2d 715, 719 (2d Cir. 1966) (Friendly, J.); *see also Bertrand v. Sava*, 684 F.2d 204, 212 n.12 (2d Cir. 1982) ("Invidious discrimination against a particular race or group … is a type of irrational conduct generally not countenanced by our law."). The Equal Protection Clause bars all federal officials, including the President, from treating individuals differently because of their national origin.

The Order violates these basic precepts. It bars anyone from seven countries from immigrating to the United States for a period of 90 days, and provides that the President may indefinitely bar immigration from other countries, as well. Order § 3(c), (e)-(f). The Order thus does exactly what section 1152(a)(1)(A) and the Constitution prohibit: it discriminates against immigrants on the basis of nationality. *See Olsen v. Albright*, 990 F. Supp. 31, 39 (D.D.C. 1997) ("The principle that government must not discriminate against particular individuals because of the color of their skin or the place of their birth means that the use of generalizations based on these factors [in the immigration context] is unfair and unjustified.").

In so doing, the Executive Order revives a form of the discriminatory and

15

costly "national origin system" that Congress abolished in 1965. Although the rationale for the Order differs from that system's, its basic contours are nearly the same: a system of priority "based upon … place of birth." H.R. Rep. No. 89-745, at 10. And its costs will be much the same, too. It will deprive the United States of some of the best and brightest; needlessly break up families; and betray "our basic American tradition." *Id.* at 11. In 1965, Congress enacted section 1152(a)(1)(A) to stop these harms and base admission decisions instead on an immigrant's "special talents and skills," *id.* at 18—a decent and fair policy that has served the Nation, its businesses, and its immigrants well for half a century.

### B.    The Order exercises discretion arbitrarily.

The Order is also contrary to the immigration laws' and the Constitution's insistence that discretion must be reasonably exercised and adequately constrained. Numerous provisions of the immigration laws vest Executive officials with "broad discretion" to admit, deport, or deny entry to foreign nationals. *Arizona v. United States*, 132 S. Ct. 2492, 2499 (2012). But Congress and the courts have long recognized that everyone—from the President to individual immigration officers—must exercise his or her discretion in a rational manner that accords with the policies of the immigration laws. *See, e.g.*, *Judulang v. Holder*, 565 U.S. 42, 58-59 (2011); *Rosenberg v. Fleuti*, 374 U.S. 449, 455 (1963); *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950).

16

Moreover, the Due Process Clause demands that every grant of discretion "provide explicit standards" so that officers will not act "on an ad hoc and subjective basis." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). These safeguards ensure that the immigration laws are not enforced in an "arbitrary and discriminatory" manner, *id.* at 109, and that immigrants, their families, and their employers are afforded consistent and predictable treatment at the hands of the Federal Government. The Executive Order fails to satisfy that standard in two significant respects.

1. The Order issues an overbroad, seven-country ban on immigration that lacks any basis in precedent. The Order justifies this ban by citing 8 U.S.C. § 1182(f), which authorizes that President to "suspend the entry of … any class of aliens" whose entry he finds "would be detrimental to the interests of the United States." Like other grants of discretion under the immigration laws, however, that power is not unbounded. As the Office of Legal Counsel—the President's own legal adviser—has explained, any suspension the President makes under this provision "must meet the test of 'reasonableness.'" U.S. Dep't of Justice, *Immigration Laws and Iranian Students*, 4A Op. O.L.C. 133, 140 (1979). Other immigration provisions reinforce that conclusion: section 1185(a)(1) provides that aliens may not "enter the United States except under such *reasonable* rules, regulations, and orders … as the President may prescribe," 8 U.S.C. § 1185(a)(1) (emphasis added),

17

while in *Knauff* the Supreme Court reviewed whether an order suspending entry was "*reasonable* in the circumstances of the period for which [it was] authorized," 338 U.S. at 544 (emphasis added).

The Order is not "reasonable" in scope. The Order says that its purpose is to "prevent infiltration by foreign terrorists or criminals." Order § 3(c). But the ban it imposes applies to millions of individuals who could not plausibly be foreign terrorists: hundreds of thousands of students, employees, and family members of citizens who have already been admitted to the United States; thousands of visa-holders who have already passed the Nation's rigorous screening process; and countless peaceful individuals residing or born in the targeted countries. The Order is also under-inclusive with respect to its goal; a number of countries left off the list have a *greater* incidence of terrorist attacks than the seven the Order includes.[17] There is a mismatch between means and ends. *See, e.g.*, *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 396 (1984).

There is no precedent for an order like this one in magnitude or kind. Since section 1182(f) was enacted in 1952, Presidents have invoked the provision dozens of times. But in every prior instance, Presidents issued a targeted restriction on entry—usually limited to dozens or hundreds of individuals—based on the determi-

---

[17] *See* U.S. Dep't of State, National Consortium for the Study of Terrorism and Responses to Terrorism: Annex of Statistical Information 5 (2016) (listing top 10 countries with most terrorist attacks, of which only three are included in the order).

nation that each affected individual had engaged in culpable conduct, such as human trafficking, illegal entry, or corruption. *See* Cong. Research Serv., *Executive Authority to Exclude Aliens: In Brief* 6-10 (Jan. 23, 2017), https://goo.gl/D0bRkS (listing each previous order). No order before this one imposed a categorical ban of hundreds of millions of foreign nationals.

The Order also introduces severe uncertainty into the immigration system. If this approach were upheld, future orders might apply to any nation, and suddenly and unexpectedly bar its nationals from entering or returning to the United States. That severely undermines immigrants' and businesses' ability to make plans, conduct business, or manage any affairs involving non-citizens.

2. The Executive Order vests immigration officials with open-ended discretion to make exceptions to the immigration ban, as to both visa holders (Order § 3(g)) and refugees (*id*. § 5(e)).

These provisions establish precisely the sort of arbitrary enforcement scheme that both the Due Process Clause and the immigration laws prohibit. It is inconceivable that thousands of border patrol and consular officers, adjudicating millions of visa applications and requests for entry around the globe, will agree even in broad terms when admission is "in the national interest."[18]

---

[18]  *Grayned*, 408 U.S. at 108-09 (due process forbids laws that "delegate[] basic policy matters … for resolution on an ad hoc and subjective basis"); *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971) (invalidating ordinance whose enforce-

19

Regrettably, some immigration officers could use their discretion improperly—engaging in profiling or favoritism, for instance, or in "arbitrary and discriminatory enforcement." *Grayned*, 408 U.S. at 108. Yet the Order provides no system to police such inconsistency or abuse; to the contrary, it states that every exercise of discretion be "case-by-case," and purports to block judicial review of officers' decisions entirely. *See* Order § 11(c) (stating that the Order "does not … create any right or benefit, substantive or procedural, enforceable at law or in equity by any person").

For any immigrant ensnared in this system, the prospect of entry becomes a "sport of chance." *Rosenberg*, 374 U.S. at 460. Immigrants, family members, and businesses deserve much better—and Congress and the Constitution entitle them to an immigration system that is administered reasonably, non-arbitrarily, and in accord with statutory requirements. The Order contravenes that bedrock guarantee.

## CONCLUSION

The Court should deny Appellants' motion.

---

ment "entirely depend[ed] upon whether or not a policeman is annoyed").

Respectfully submitted.

/s/ Andrew J. Pincus
Andrew J. Pincus
Paul W. Hughes
MAYER BROWN LLP
1999 K Street, N.W.
Washington, D.C. 20006
(202) 263-3000
apincus@mayerbrown.com
phughes@mayerbrown.com

*Counsel for* Amici Curiae

Dated: February 5, 2017

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), the under-signed counsel certifies that this brief:

(i)      complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word 2007 and is set in Times New Roman font in a size equivalent to 14 points or larger and,

(ii)     *amici* have requested leave to file a 20-page brief.

Dated: February 5, 2017      /s/ Paul W. Hughes
                                    Paul W. Hughes
                                    MAYER BROWN LLP

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of February 2017, I filed the foregoing

Brief of Technology Companies and Other Businesses As *Amici Curiae* in Support

of Appellees via the CM/ECF system and served the foregoing via the CM/ECF

system on all counsel who are registered CM/ECF users.


Dated: February 5, 2017         /s/ Paul W. Hughes
                                Paul W. Hughes
                                MAYER BROWN LLP

**APPENDIX A**

**LIST OF *AMICI CURIAE***

1.    AdRoll, Inc.

2.    Aeris Communications, Inc.

3.    Airbnb, Inc.

4.    AltSchool, PBC

5.    Ancestry.com, LLC

6.    Appboy, Inc.

7.    Apple Inc.

8.    AppNexus Inc.

9.    Asana, Inc.

10.    Atlassian Corp Plc

11.    Autodesk, Inc.

12.    Automattic Inc.

13.    Box, Inc.

14.    Brightcove Inc.

15.    Brit + Co

16.    CareZone Inc.

17.    Castlight Health

18.    Checkr, Inc.

19.    Chobani, LLC

20.    Citrix Systems, Inc.

21.    Cloudera, Inc.

22.    Cloudflare, Inc.

23.    Copia Institute

24.    DocuSign, Inc.

25.    DoorDash, Inc.

26.    Dropbox, Inc.

27.    Dynatrace LLC

28.    eBay Inc.

29.    Engine Advocacy

30.    Etsy Inc.

31.    Facebook, Inc.

32.    Fastly, Inc.

33.    Flipboard, Inc.

34.    Foursquare Labs, Inc.

35.    Fuze, Inc.

36.    General Assembly

37.    GitHub

38.    Glassdoor, Inc.

39.    Google Inc.

40.    GoPro, Inc.

41.    Harmonic Inc.

42.    Hipmunk, Inc.

43.    Indiegogo, Inc.

44.    Intel Corporation

45.    JAND, Inc. d/b/a Warby Parker

46.    Kargo Global, Inc.

47.    Kickstarter, PBC

48.    KIND, LLC

49.    Knotel

50.    Levi Strauss & Co.

51.    LinkedIn Corporation

52.    Lithium Technologies, Inc.

53.    Lyft, Inc.

54.    Mapbox, Inc.

55.    Maplebear Inc. d/b/a Instacart

56.    Marin Software Incorporated

57.    Medallia, Inc.

58.    A Medium Corporation

59. Meetup, Inc.

60. Microsoft Corporation

61. Motivate International Inc.

62. Mozilla Corporation

63. Netflix, Inc.

64. NETGEAR, Inc.

65. NewsCred, Inc.

66. Patreon, Inc.

67. PayPal Holdings, Inc.

68. Pinterest, Inc.

69. Quora, Inc.

70. Reddit, Inc.

71. Rocket Fuel Inc.

72. SaaStr Inc.

73. Salesforce.com, Inc.

74. Scopely, Inc.

75. Shutterstock, Inc.

76. Snap Inc.

77. Spokeo, Inc.

78. Spotify USA Inc.

79.  Square, Inc.

80.  Squarespace, Inc.

81.  Strava, Inc.

82.  Stripe, Inc.

83.  SurveyMonkey Inc.

84.  TaskRabbit, Inc

85.  Tech:NYC

86.  Thumbtack, Inc.

87.  Turn Inc.

88.  Twilio Inc.

89.  Twitter Inc.

90.  Turn Inc.

91.  Uber Technologies, Inc.

92.  Via

93.  Wikimedia Foundation, Inc.

94.  Workday

95.  Y Combinator Management, LLC

96.  Yelp Inc.

97.  Zynga Inc.

## APPENDIX B

## CORPORATE DISCLOSURES FOR *AMICI CURIAE*

1.      AdRoll, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

2.      Aeris Communications, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

3.      Airbnb, Inc. has no parent corporation and no publicly held corporation owns 10% or more of Airbnb's stock.

4.      AltSchool, PBC has no parent corporation and no publicly held corporation owns 10% or more of its stock.

5.      Ancestry.com, LLC has no parent corporation and no publicly held corporation owns 10% or more of its stock.

6.      Appboy, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

7.      Apple Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

8.      AppNexus Inc. has no parent corporation and the following publicly held corporations own 10% or more of its stock: Microsoft Corporation and WPP Luxembourg Gamma Three S.à r.l.

9.     Asana, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

10.     Atlassian Corp. Plc has no parent corporation and no publicly held corporation owns 10% or more of its stock.

11.     Autodesk, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

12.     Automattic Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

13.     Box, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

14.     Brightcove Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

15.     Brit Media, Inc. d/b/a Brit + Co has no parent corporation and no publicly held corporation owns 10% or more of its stock.

16.     CareZone Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

17.     Castlight Health has no parent corporation and no publicly held corporation owns 10% or more of its stock.

18.     Checkr, Inc. has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

19.     Chobani Global Holdings, LLC is the sole member of Chobani, LLC and no publicly held corporation owns 10% or more of the membership interest in either entity.

20.     Citrix Systems, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

21.     Cloudera, Inc. has no parent corporation and the following publicly held corporation own 10% or more of its stock: Intel Corporation.

22.     Cloudflare, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

23.     Copia Institute has no parent corporation and no publicly held corporation owns 10% or more of its stock.

24.     DocuSign, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

25.     DoorDash has no parent corporation and no publicly held corporation owns 10% or more of its stock.

26.     Dropbox, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

27.     Dynatrace LLC's parent corporation is Compuware Parent, LLC and no publicly held corporation owns 10% or more of its stock.

28.     eBay Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

29.     Engine Advocacy has no parent corporation and no publicly held corporation owns 10% or more of its stock.

30.     Etsy Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

31.     Facebook, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

32.     Fastly, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

33.     Flipboard, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

34.     Foursquare Labs, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

35.      Fuze, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

36.     General Assembly Space, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

37.     GitHub, Inc. ("GitHub") has no parent corporation and no publicly held corporation owns 10% or more of its stock.

9a

38.    Glassdoor, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

39.    Google Inc. is a wholly owned subsidiary of Alphabet Inc.; accordingly, Alphabet Inc. has more than 10% ownership of Google Inc.

40.    GoPro, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

41.    Harmonic Inc. has no parent corporation and the following publicly helds corporation own 10% or more of its stock: investment funds affiliated with BlackRock hold more than 10% of Harmonic common stock; investment funds affiliated with T Rowe Price hold more than 10% of Harmonic common stock.

42.    Hipmunk's parent corporation is Concur (a division of SAP), and the following publicly held corporation own 10% or more of its stock: SAP.

43.    Indiegogo, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

44.    Intel Corporation has no parent corporation and no publicly held corporation owns 10% or more of its stock.

45.    JAND, Inc. d/b/a Warby Parker has no parent corporation and no publicly held corporation owns 10% or more of its stock.

46.    Kargo Global, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

47.    Kickstarter, PBC has no parent corporation and no publicly held corporation owns 10% or more of its stock.

48.    KIND, LLC's parent corporation is KIND, Inc., no publicly held corporation owns 10% or more of KIND, Inc.

49.    Knotel has no parent corporation and no publicly held corporation owns 10% or more of its stock.

50.    Levi Strauss & Co. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

51.    LinkedIn Corporation's parent corporation is Microsoft Corporation, and the following publicly held corporation owns 10% or more of its stock: Microsoft Corporation.

52.    Lithium Technologies, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

53.     Lyft, Inc. has no parent corporation and the following publicly held corporation own 10% or more of its stock: Rakuten, Inc., a publicly held corporation traded on the Tokyo Stock Exchange, and General Motors Company, a publicly held corporation traded on the New York Stock Exchange, each own more than ten percent of Lyft's outstanding stock, in each case through a subsidiary.

54.    Mapbox, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

55. Maplebear Inc. d/b/a Instacart has no parent corporation and no publicly held corporation owns 10% or more of its stock.

56. Marin Software Incorporated has no parent corporation and no publicly held corporation owns 10% or more of its stock.

57. Medallia, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

58. A Medium Corporation has no parent corporation and no publicly held corporation owns 10% or more of its stock.

59. Meetup, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

60. Microsoft Corporation has no parent corporation and no publicly held corporation owns 10% or more of its stock.

61. Motivate International Inc.'s parent corporation is Bikeshare Holdings, LLC and no publicly held corporation owns 10% or more of its stock.

62. Mozilla Corporation's parent corporation is Mozilla Foundation and no publicly held corporation owns 10% or more of its stock.

63. Netflix, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

64. NETGEAR, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

12a

65. NewsCred, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

66. Patreon, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

67. PayPal Holdings, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

68. Pinterest, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

69. Quora, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

70. Reddit, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

71. Rocket Fuel Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

72. SaaStr Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

73. Salesforce.com, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

74. Scopely, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

75.    Shutterstock, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

76.    Snap Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

77.    Spokeo, Inc. has no parent corporation and there are no publicly-held corporations that own 10% or more of Spokeo, Inc.'s stock.

78.    Spotify USA Inc. is a wholly-owned subsidiary of Spotify AB, a company organized under the laws of Sweden. Spotify AB is a wholly-owned subsidiary of Spotify Technology S.A., a company organized under the laws of the Grand Duchy of Luxembourg. Spotify Technology S.A. does not have a parent corporation and no publicly held corporation owns 10% or more of its stock.

79.    Square, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

80.    Squarespace, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

81.    Strava, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

82.    Stripe, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

83. SurveyMonkey Inc.'s parent corporation is SUMK Inc. and no publicly held corporation owns 10% or more of its stock.

84. TaskRabbit, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

85. Tech:NYC has no parent corporation and no publicly held corporation owns 10% or more of its stock.

86. Thumbtack, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

87. Turn Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

88. Twilio Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

89. Twitter Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

90. Turn Inc. has no parent entity and no publicly held corporation holds 10% or more of its stock.

91. Uber Technologies, Inc. has no parent entity and no publicly held corporation holds 10% or more of its stock.

92. Via Transportation, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

93.     Wikimedia Foundation, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

94.     Workday has no parent entity and no publicly held corporation holds 10% or more of its stock.

95.     Y Combinator Management, LLC has no parent corporation and no publicly held corporation owns 10% or more of its stock.

96.     Yelp Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

97.     Zynga Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.