No. 17-35105

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

STATE OF WASHINGTON, *et al.*

*Plaintiffs-Appellees*,

v.

DONALD TRUMP, *et al.*,

*Defendants-Appellants.*

On Motion for a Stay Pending Appeal of a
Temporary Restraining Order Issued by the
United States District Court for the Western District of Washington
Case No. 2:17-cv-141, Hon. James L. Robart

BRIEF OF AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE
AND THE SOUTHERN POVERTY LAW CENTER AS *AMICI CURIAE*
SUPPORTING APPELLEE AND DENIAL OF A STAY

KRISTI L. GRAUNKE
MICHELLE R. LAPOINTE
  *Southern Poverty Law Center*
  *1989 College Avenue NE*
  *Atlanta, GA 30317*
  *(404) 521-6700*

ANGELO J. CALFO
KRISTIN W. SILVERMAN
  *Calfo Eakes & Ostrovsky PLLC*
  *1301 Second Avenue Suite 2800*
  *Seattle, WA 98101*
  *(206) 407-2200*

RICHARD B. KATSKEE
ERIC ROTHSCHILD*
ANDREW L. NELLIS**
BRADLEY GIRARD
KELLY M. PERCIVAL***
  *Americans United for Separation of Church and State*
  *1310 L Street, NW, Suite 200*
  *Washington, DC 20005*
  *(202) 466-3234*

* Admitted in Pennsylvania only.
  Supervised by Richard B. Katskee,
  a member of the D.C. bar.
** Admitted in New York only.
  Supervised by Richard B. Katskee,
  a member of the D.C. bar.
*** Admitted in California only.
  Supervised by Richard B. Katskee,
  a member of the D.C. bar.

*Counsel for* Amici Curiae

## CORPORATE DISCLOSURE STATEMENT

*Amici* are nonprofit corporations. They have no parent corporations, and no publicly held corporation owns any portion of either of them.

# TABLE OF CONTENTS

Interests of the *Amici Curiae*................................................................1

Introduction ................................................................................1

Argument ..................................................................................2

The Temporary Restraining Order Was Warranted; A Stay Is Not.................2

    A.   Plaintiffs Are Likely To Succeed On The Merits Of Their
        Establishment Clause Claim.........................................2

        1.   The Executive Order Fails The Larson Test. ...............3

        2.   The Executive Order fails the Lemon Test....................6

    B.   The Balance Of Harms And The Public Interest Favor The
        TRO And Denial Of A Stay.......................................11

Conclusion.................................................................................13

# TABLE OF AUTHORITIES

## Cases

*Awad v. Ziriax,*
   670 F.3d 1111 (10th Cir. 2012) .................................................. 3

*Connection Distrib. Co. v. Reno,*
   154 F.3d 281 (6th Cir. 2002) ................................................... 11

*Edwards v. Aguillard,*
   482 U.S. 578 (1987) ................................................................ 6

*Elrod v. Burns,*
   427 U.S. 347 (1976) .......................................................... 11, 12

*Epperson v. Arkansas,*
   393 U.S. 97 (1968) ................................................................. 2

*Holt v. Hobbs,*
   135 S. Ct. 853 (2015) ............................................................. 5

*Joelner v. Vill. of Wash. Park,*
   378 F.3d 613 (7th Cir. 2004) ................................................. 11

*KH Outdoor, LLC v. City of Trussville,*
   458 F.3d 1261 (11th Cir. 2006) ............................................. 12

*Larson v. Valente,*
   456 U.S. 228 (1982) ....................................................... 2, 3, 4

*Lemon v. Kurtzman,*
   403 U.S. 602 (1971) ................................................................ 6

*Lynch v. Donnelly,*
   465 U.S. 668 (1984) ....................................................... 6, 7, 10

*McCreary County, Ky. v. ACLU of Ky.,*
   545 U.S. 844 (2005) .................................................... 2, 6, 7, 10

*Melendres v. Arpaio,*
   695 F.3d 990 (9th Cir. 2012) ........................................... 11, 12

*New Motor Vehicle Bd. v. Orrin W. Fox Co.,*
   434 U.S. 1345 (1977) ............................................................ 12

## TABLE OF AUTHORITIES—continued

*Santa Fe Indep. Sch. Dist. v. Doe*,
  530 U.S. 290 (2000) .......................................................... 7, 8, 10

*Trunk v. City of San Diego*,
  629 F.3d 1099 (9th Cir. 2011) .................................................. 8

*United States v. Oakland Cannabis Buyers' Co-op.*,
  532 U.S. 483 (2001) ................................................................ 12

*Vernon v. City of L.A.*,
  27 F.3d 1385 (9th Cir. 1994) .................................................... 6

*Wallace v. Jaffree*,
  472 U.S. 38 (1985) .................................................................... 7

**Statutes, Rules, and Regulations**

Exec. Order No. 13,769,
  82 Fed. Reg. 8977 (Jan. 27, 2017) ................................... 3, 4, 8, 9

Religious Freedom Restoration Act,
  42 U.S.C. § 2000bb-1 (2015) .................................................... 5

**Other Authorities**

*Figures at a Glance*, UNHCR, http://bit.ly/2cmTBiF .................................. 9

Diaa Hadid, *What Muslims Do on Hajj, and Why*,
  N.Y. TIMES (Sept. 8, 2016), http://nyti.ms/2kYGovS ............................. 5

Michael Edison Hayden & Maia Davis, *World's Airlines Are
  Told It's Back to Business as Usual for US-bound Travelers
  in Wake of Judge's Order*, ABC NEWS (Feb. 4, 2017),
  http://abcn.ws/2l8PYvy ........................................................ 11

Jens Manuel Krogstad & Jynnah Radford, *Key Facts About
  Refugees to the U.S.*, PEW RES. CTR. (Jan. 30, 2017),
  http://pewrsr.ch/2kk7ro8 ....................................................... 8

*Message from U.S. Embassy Tel Aviv Consular Section*,
  U.S. EMBASSY IN ISRAEL, http://bit.ly/2l0KWB8 .................................. 10

## TABLE OF AUTHORITIES—continued

Ellen Nakashima, *Domestic Extremists Have Killed More Americans than Jihadists Since 9/11. How the Government Is Responding*, WASH. POST (Oct. 15, 2015), http://wapo.st/1Qh8Kft.................................................................. 5

Alex Nowrasteh, *Where Do Terrorists Come From? Not the Nations Named in Trump Ban*, NEWSWEEK (Jan. 31, 2017), http://bit.ly/2kWoddx.................................................................. 5

PEW RES. CTR., THE GLOBAL RELIGIOUS LANDSCAPE (2012), http://bit.ly/2k4Us8B.................................................................. 8

## INTERESTS OF THE *AMICI CURIAE*[1]

As detailed in the accompanying motion, *amici curiae* are nonprofit public-interest organizations committed to preserving religious freedom. Because the Executive Order under challenge discriminates against Muslims based solely on their faith, and because constitutional injuries will accrue immediately if the temporary restraining order is stayed, *amici* have a strong interest in ensuring that the TRO remains in place.

## INTRODUCTION

Executive Order 13,769 makes good on President Trump's promise to ban Muslims from entering the country. *See* First Am. Compl. ¶¶ 42–61. The Executive Order is unsupported by fact and is instead motivated by religious animus. It has already harmed scores of people; if reinstated, it will harm millions more. Accordingly, the district court issued a temporary restraining order and directed the parties to propose a briefing schedule on the State of Washington's motion for a preliminary injunction.

Instead of having the preliminary-injunction motion resolved with dispatch, the government appeals an unappealable order and seeks the extraordinary relief of an emergency stay, contending that being

---

[1]   No counsel for a party authored this brief in whole or in part, and no person other than *amici*, their members, or their counsel made a monetary contribution intended to fund the brief's preparation or submission. As the motion details, the parties appear to have consented to this filing.

1

prevented from deporting and refusing entry to people based on their religion makes it, *the government*, the injured party. Nonsense.

The Executive Order harms the State, its institutions, and its citizens. And because the Executive Order on its face violates the Establishment Clause—among other constitutional provisions—it is indefensible as a matter of law. If it goes into effect, it will do immediate and irreparable damage to individuals, families, and entire communities. Should this Court consider the merits of this impermissible appeal, therefore, it should conclude as the district court did: The Executive Order cannot stand—even for a day. The request for a stay should be denied.

## ARGUMENT

### THE TEMPORARY RESTRAINING ORDER WAS WARRANTED; A STAY IS NOT.

### A. Plaintiffs Are Likely To Succeed On The Merits Of Their Establishment Clause Claim.

"[T]he First Amendment mandates governmental neutrality" with respect to religion, forbidding official discrimination. *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968); *accord, e.g.*, *McCreary County, Ky. v. ACLU of Ky.*, 545 U.S. 844, 860 (2005); *Larson v. Valente*, 456 U.S. 228, 246 (1982). Ignoring this clear constitutional command, the government has singled out one religious group—Muslims—for official disfavor and maltreatment. By instituting a wide-ranging, punishing ban on Muslim immigrants, the government runs roughshod over core First Amendment

protections. The district court therefore correctly concluded that the State is likely to succeed on the merits of its claims.

### 1. *The Executive Order Fails The* Larson *Test.*

"The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson*, 456 U.S. at 244. Thus, when the government designates one denomination for different treatment—favorable or unfavorable—its action is subject to strict scrutiny under *Larson v. Valente*, *supra. See, e.g.*, *Awad v. Ziriax*, 670 F.3d 1111, 1128 (10th Cir. 2012) (applying strict scrutiny to and invalidating state law disfavoring Islam).

The Executive Order singles out countries that are almost entirely Muslim and subjects those who were born in or come from those countries—i.e., Muslims—to harsh legal disabilities and punishments, including exclusion, detention, and expulsion. Exec. Order No. 13,769, 82 Fed. Reg. 8977 (Jan. 27, 2017). Even legal U.S. residents are targeted and put at severe risk of detention and deportation because of their officially disfavored Muslim faith. First Am. Compl. Ex. 10.

The Executive Order also favors refugees who are "religious minorit[ies]" in their home countries, again assigning legal rights based on religious denomination. *See* Exec. Order No. 13,769 § 5(b), (e). To be sure, affording refuge to victims of religious persecution would be

constitutionally permissible. But merely being "a minority religion in the individual's country of nationality" (*id.* § 5(b)) does not automatically make one a victim of persecution, so affording preferred status on that basis is "precisely the sort of official denominational preference that the Framers of the First Amendment forbade" (*Larson*, 456 U.S. at 255). And because most refugees worldwide currently come from Muslim countries, the preference will primarily benefit non-Muslims (*see infra* Section A.2), making the preference run against a disfavored minority faith in *this* country.[2] The Executive Order is thus "suspect" and the courts should "apply strict scrutiny in adjudging its constitutionality." *Larson*, 456 U.S. at 246.

The government counters by asserting an interest in "stop[ping] attacks by foreign nationals . . . admitted to the United States." Exec. Order No. 13,769 § 1. To be sure, preventing terrorism is a compelling interest. But the Executive Order must be "closely fitted to further the interest." *Larson*, 456 U.S. at 248. It isn't.

National security is not furthered by a policy of suddenly, flatly, and universally excluding Muslims *whose entry the government has already*

---

[2] The government's suggestion that it merely "recognize[s] that religious minorities are more likely to face persecution" (Emer. Mot. 19) cannot be squared with the Executive Order's text, which makes merely belonging to a minority faith the basis for receiving favorable treatment (Exec. Order No. 13,769 § 5(b)).

*approved*. Much less is the policy closely fitted to that end. People from the seven countries listed in the Executive Order have, collectively, killed *zero* people in terrorist attacks in the United States since 1975. Alex Nowrasteh, *Where Do Terrorists Come From? Not the Nations Named in Trump Ban*, NEWSWEEK (Jan. 31, 2017), http://bit.ly/2kWoddx. None of the top five countries of origin for foreign-born perpetrators of terrorism in the United States are listed in or covered by the Executive Order. *See id.* And homegrown terrorism—by non-Muslims—is a far greater (and unaddressed) threat. *See, e.g.*, Ellen Nakashima, *Domestic Extremists Have Killed More Americans than Jihadists Since 9/11. How the Government Is Responding*, WASH. POST (Oct. 15, 2015), http://wapo.st/1Qh8Kft. Hence, the policy's fit with the defendants' asserted interest is not merely loose; it is nonexistent. As the district court stated from the bench, the Executive Order would not survive even rational-basis review—much less strict scrutiny.[3]

---

[3] Because the Executive Order cannot withstand strict scrutiny, it also violates the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1 (2015). RFRA applies strict scrutiny to substantial government-imposed burdens on religion. *See Holt v. Hobbs*, 135 S. Ct. 853, 859 (2015). Under the Executive Order, visa-holding Muslim residents of the United States cannot make a pilgrimage to Mecca—a mandatory religious obligation to be fulfilled at least once in a practicing Muslim's lifetime (Diaa Hadid, *What Muslims Do on Hajj, and Why*, N.Y. TIMES (Sept. 8, 2016), http://nyti.ms/2kYGovS). For if they leave the country and then try to return, they will be detained and deported. Being jailed and then expelled

### 2. *The Executive Order fails the* Lemon *Test.*

The Executive Order also violates the *Lemon* Test, which requires that governmental action have a preeminently secular purpose (*McCreary*, 545 U.S. at 864) and a "principal or primary effect . . . that neither advances nor inhibits religion" (*Lemon v. Kurtzman*, 403 U.S. 602, 612 (1971)).

a. The secular-purpose requirement is violated if the "government's actual purpose is to endorse or disapprove of religion." *Edwards v. Aguillard*, 482 U.S. 578, 585 (1987) (quoting *Lynch v. Donnelly*, 465 U.S. 668, 690 (1984) (O'Connor, J., concurring)). The government's articulated "secular purpose . . . has to be genuine, not a sham, and not merely secondary to a religious objective." *McCreary*, 545 U.S. at 864.

The secular-effect requirement is violated whenever "it would be objectively reasonable for the government action to be construed as sending primarily a message of either endorsement or disapproval of religion." *Vernon v. City of L.A.*, 27 F.3d 1385, 1398 (9th Cir. 1994). "[T]he government may not favor one religion over another" by appearing to endorse the one or condemn the other. *McCreary*, 545 U.S. at 875.

---

because of religious exercise surely meets any definition of a substantial burden.

b. Taking these requirements together, the constitutional question is "'whether an objective observer . . . would perceive" the government to have placed its stamp of approval or disapproval on religion or a particular faith. *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 308 (2000) (quoting *Wallace v. Jaffree*, 472 U.S. 38, 76 (1985) (O'Connor, J., concurring)); *accord, e.g.*, *McCreary*, 545 U.S. at 862 (purpose determined from same perspective). This Court must therefore consider whether a hypothetical reasonable, objective observer would understand the government either (i) to have intended to mark Muslims as "outsiders, not full members of the political community" or (ii) to have actually conveyed that message. *Santa Fe*, 530 U.S. at 309 (quoting *Lynch*, 465 U.S. at 688 (O'Connor, J., concurring).

Because "reasonable observers have reasonable memories," the Court must not "turn a blind eye to the context" but must "look to the record of evidence showing the progression leading up to" the challenged policy. *McCreary*, 545 U.S. at 866, 868. For the objective observer is "presumed to be familiar with the history of the government's actions and competent to learn what history has to show" (*id.* at 866), which means that all publicly available information about the genesis, evolution, and implementation of the challenged policy speaks directly to whether it is an unconstitutional religious endorsement. And even officially repudiated

past acts are not "dead and buried" but remain in the reasonable observer's memory, affecting how the final policy is viewed. *Id.* at 870; *accord Trunk v. City of San Diego*, 629 F.3d 1099, 1119 n.19 (9th Cir. 2011). Finally, the Establishment Clause is violated by "both perceived and actual endorsement of religion" (*Santa Fe*, 530 U.S. at 305), so a message of endorsement is unconstitutional even if the government did not intend it.

c. Disapproval of Islam and favoritism toward other faiths is apparent from the bare text of the Executive Order. It singles out for detention, deportation, and exclusion persons from seven overwhelmingly Muslim nations: Iran (99.5% Muslim), Iraq (99.0% Muslim), Libya (96.6% Muslim), Somalia (99.8% Muslim), Sudan (90.7% Muslim), Syria (92.8% Muslim), and Yemen (99.1% Muslim). Exec. Order No. 13,769 § 3(c); PEW RES. CTR., THE GLOBAL RELIGIOUS LANDSCAPE 45–50 (2012), http://bit.ly/2k4Us8B.

It also blocks entry of *all* refugees temporarily and of Syrian refugees indefinitely (Exec. Order No. 13,769 § 5(a), (c)), again disproportionately affecting Muslims. Not only is Syria overwhelmingly Muslim, but Muslims made up a plurality of *all* refugees resettled in the United States last year, the number of Muslim refugees having increased almost every year over the past decade. Jens Manuel Krogstad & Jynnah

8

Radford, *Key Facts About Refugees to the U.S.*, PEW RES. CTR. (Jan. 30, 2017), http://pewrsr.ch/2kk7ro8.

The disfavor toward Islam is compounded by the Executive Order's favoritism toward refugees who belong to minority religions (*see* Exec. Order No. 13,769 § 5(b), (e)), as most refugees worldwide currently come from Muslim-majority countries (*Figures at a Glance*, UNHCR, http://bit.ly/2cmTBiF (last visited Feb. 2, 2017)).

d. While these features of the Executive Order alone communicate official preference against Islam, the objective observer also perceives much more.

First, the precursor to the Executive Order was then-candidate Trump's repeated promise of a "total and complete shutdown of Muslims entering the United States." First Am. Compl. Ex. 1. Second, after public outcry that a Muslim ban would be unconstitutional, candidate Trump explained that he would get around the Constitution by papering over the targeting of Islam: "I'm talking territory instead of Muslim." First Am. Compl. Ex. 4, at 6. Indeed, he publicly described this change not as "a pull-back" but as "an *expansion*" of the Muslim ban. First Am. Compl. Ex. 4, at 1 (emphasis added). Third, after the election, President-elect Trump asked Rudy Giuliani (then being considered for Secretary of State) to figure out how the "Muslim ban" could be implemented "legally." First Am. Compl.

9

Ex 17. Fourth, in an interview with the Christian Broadcasting Network on January 27, 2017—the day he issued the Executive Order—President Trump declared that the government would now expressly give priority to Christians over other refugees. First Am. Compl. Ex. 8. And fifth, he exempted from the ban everyone in the seven listed countries who holds an Israeli passport (and therefore is likely Jewish). *See Message from U.S. Embassy Tel Aviv Consular Section*, U.S. EMBASSY IN ISRAEL, http://bit.ly/2l0KWB8 (last visited Feb. 2, 2017).

Taking all of that into account, an objective observer could hardly help but perceive governmental condemnation of Islam and endorsement of other faiths. Indeed, for more than a year President Trump has bombarded the public with the message that Muslims are "outsiders, not full members of the political community." *Santa Fe*, 530 U.S. at 309 (quoting *Lynch*, 465 U.S. at 688 (O'Connor, J., concurring)). The Executive Order thus communicates that Muslims are a disfavored caste in this country.

That is not a message that the government can or should convey: "When the government associates one set of religious beliefs with the state and identifies nonadherents as outsiders, it encroaches upon the individual's decision about whether and how to worship." *McCreary*, 545

U.S. at 883 (O'Connor, J., concurring). The violation of the Establishment Clause is forthright and flagrant.

**B. The Balance Of Harms And The Public Interest Favor The TRO And Denial Of A Stay.**

The remaining factors likewise favor denial of a stay.

The TRO is necessary, as the district court determined, to protect against imminent and unconstitutional official discrimination against Muslims. Since its issuance on Friday afternoon, the TRO has already resulted in reinstatement of some 60,000 visas revoked under the Executive Order from people whom the government had previously screened and approved for entry. Michael Edison Hayden & Maia Davis, *World's Airlines Are Told It's Back to Business as Usual for US-bound Travelers in Wake of Judge's Order*, ABC NEWS (Feb. 4, 2017), http://abcn.ws/2l8PYvy. There can be little doubt that the government would immediately reinstate the mass revocation if the TRO were stayed. For those whose visas are in jeopardy, there would then be no adequate remedy for the harms.

What is more, "it is always in the public interest to protect First Amendment liberties." *Joelner v. Vill. of Wash. Park*, 378 F.3d 613, 620 (7th Cir. 2004) (quoting *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 2002)); *accord Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir.

2012). Because the Executive Order violates First Amendment rights, the injuries that it inflicts are irreparable as a matter of law. *Elrod v. Burns*, 427 U.S. 347, 373 (1976). And, of course, "[t]he public has no interest in enforcing an unconstitutional" law. *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272–73 (11th Cir. 2006). Quite the contrary.

On the other side of the equation, the government asserts unfettered discretion to exclude an entire "class of aliens" whenever it makes "the predictive judgment" that the "class" threatens national security; and it argues that judicial review of those decisions offends the public interest. Emer. Mot. 21–22. But the government has no legitimate interest, much less a weighty one, in enforcing unconstitutional policies. *See Melendres*, 695 F.3d at 1002. It has no legitimate interest in discriminating on the basis of religion. It has made no showing that there is any serious risk from the people whom it has already vetted and granted the right to be in the United States. And it has made no showing that judicial review of unconstitutional conduct undermines governmental authority.[4] Rather, judicial review is the principled constitutional bulwark against naked abuse of political power that confers legitimacy on all governmental action.

---

[4] The cases on which the government purports to rely (*United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483 (2001); *New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345 (1977)) implicate no constitutional rights.

The harms to Plaintiffs and the public from a stay are imminent and extreme; the purported harms to the government are not legally cognizable. All factors favor the TRO and denial of a stay.

\*          \*          \*

The Executive Order is what President Trump promised all along: a "Muslim ban." No amount of rebranding can change that. People are excluded, detained, and deported for no reason other than their deity and preferred holy book. The Executive Order is an insult to the fundamental principles of religious freedom enshrined in our Constitution. It cannot stand—even for a day.

## CONCLUSION

The temporary restraining order was warranted. The stay request should be denied.

Respectfully submitted,

/s/ *Richard B. Katskee*

KRISTI L. GRAUNKE
MICHELLE R. LAPOINTE
*Southern Poverty Law Center*
  *1989 College Avenue NE*
  *Atlanta, GA 30317*
  *(404) 521-6700*


ANGELO J. CALFO
KRISTIN W. SILVERMAN
*Calfo Eakes & Ostrovsky PLLC*
  *1301 Second Avenue*
  *Suite 2800*
  *Seattle, WA 98101*
  *(206) 407-2200*

RICHARD B. KATSKEE
ERIC ROTHSCHILD*
ANDREW L. NELLIS**
BRADLEY GIRARD
KELLY M. PERCIVAL***
  *Americans United for*
  *Separation of Church*
  *and State*
  *1310 L Street, NW*
  *Washington, DC 20005*
  *(202) 466-3234*

* Admitted in Pennsylvania only. Supervised by Richard B. Katskee, a member of the D.C. bar.
** Admitted in New York only. Supervised by Richard B. Katskee, a member of the D.C. bar.
*** Admitted in California only. Supervised by Richard B. Katskee, a member of the D.C. bar.

*Counsel for* Amici Curiae

Date:     February 6, 2017

14

## CERTIFICATE OF COMPLIANCE

The undersigned counsel for *amici curiae* certifies that:

(i) Pursuant to Federal Rule of Appellate Procedure 29(a)(5), this brief can be no longer than one-half the maximum length of the party briefs; and

(ii) under Circuit Rule 32-3(2), a proportionally spaced brief with the word count divided by 280 cannot not exceed the maximum page limit of ten pages, half of the pages allowed by Circuit Rule 27-1(1)(d), making the maximum word count 2800.

(iii) This brief complies with the type-volume limitation of Circuit Rule 27-1(1)(d) and Circuit Rule 32-3(2) because it contains 2759 words including footnotes and excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii); and

(iv) complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word 2010 and is set in proportionally sized Century Schoolbook font in a size equivalent to 14 points or larger.

/s/ *Richard B. Katskee*

## CERTIFICATE OF SERVICE

I certify that on February 6, 2017, this brief was filed using the Court's CM/ECF system. All participants in the case are registered CM/ECF users and will be served electronically via that system.

/s/ *Richard B. Katskee*