NO. 17-35105

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

STATES OF WASHINGTON AND MINNESOTA,

Plaintiffs-Appellees,

v.

DONALD TRUMP, President of the United States, et al.,

Defendants-Appellants.

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

No. 2:17-cv-00141
The Honorable JAMES L. ROBART
United States District Court Judge

## STATES' RESPONSE TO EMERGENCY MOTION UNDER
## CIRCUIT RULE 27-3 FOR ADMINISTRATIVE STAY
## AND MOTION FOR STAY PENDING APPEAL

ROBERT W. FERGUSON, WSBA 26004
Attorney General

NOAH G. PURCELL, WSBA 43492
Solicitor General

ANNE E. EGELER, WSBA 20258
Deputy Solicitor General

COLLEEN M. MELODY, WSBA 42275
Civil Rights Unit Chief

MARSHA CHIEN WSBA 47020
PATRICIO A. MARQUEZ WSBA 47693
Assistant Attorneys General

Washington State
Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

LORI SWANSON
Attorney General of Minnesota
ALAN I. GILBERT, MN #0034678
Solicitor General
JACOB CAMPION, MN #0391274
Assistant Attorney General

Office of the Attorney General
445 Minnesota Street, Suite 1100
St. Paul, MN 55101
(651) 757-1450

# TABLE OF CONTENTS

I.   INTRODUCTION ...................................................................1

II.  BACKGROUND ...................................................................1

III. ARGUMENT .......................................................................5

    A.  Defendants' Appeal is Procedurally Improper .....................5

    B.  If the Court Considers the Appeal, Defendants' Burden is High
       and the Standard of Review Deferential...............................6

    C.  Defendants Cannot Show Irreparable Harm from the TRO When
       it Simply Reinstates the Status Quo.....................................7

    D.  Defendants Are Unlikely to Succeed on Appeal Because the
       District Court Acted Within its Discretion ..........................8

       1.  Courts can review the legality of executive action and the
          executive's true motives..............................................9

       2.  The States have standing............................................11

          a.  Proprietary standing..........................................11

          b.  *Parens Patriae* standing ...................................13

       3.  The States' claims have merit ....................................14

          a.  Defendants are unlikely to prevail against the States'
             Due Process claim ............................................14

          b.  Defendants are unlikely to prevail against the States'
             Establishment Clause claim ...............................18

          c.  Defendants are unlikely to prevail against the States'
             Equal Protection claim ......................................20

         d.   Defendants are unlikely to prevail against the States' INA claim ...........................................................................21

     4.  A nationwide TRO was appropriate..........................................23

   E.  A Stay Would Harm the States and the Public Interest........................24

IV.  CONCLUSION ........................................................................25

## I.    INTRODUCTION

On January 27, President Trump unleashed chaos by signing the Executive Order at issue here. Within 72 hours, the State of Washington (quickly joined by Minnesota) had filed a complaint and motion for temporary restraining order (TRO), detailing the extraordinary and irreparable harms the Order was inflicting on our States and our people. After hearing from Defendants, the district court entered the TRO, finding that the States had met their burden to obtain that relief. The effects of the TRO were positive and immediate, as immigration procedures began to return to normal, families reunited, stranded students and faculty began returning to our States, and longtime State residents were able to return to their homes.

Defendants now ask this Court to unleash chaos again by staying the district court order. The Court should decline. Defendants' appeal is improper, their burden to obtain a stay is high and unmet, and their arguments fail.

## II.    BACKGROUND

Donald Trump campaigned on the promise to impose "a total and complete shutdown of Muslims entering the United States." ECF 18 ¶ 42-43.[1] He repeatedly defended and reiterated this promise. ECF 18 ¶¶ 44-46.

---

[1] All ECF citations are to the district court docket numbers.

Shortly after taking office, President Trump signed an Executive Order entitled "Protecting the Nation from Foreign Terrorist Entry into the United States" ("the Order"). ECF 18 ¶ 49. The Order radically changes U.S. immigration policy, imposing a 120-day moratorium on the refugee resettlement program; indefinitely suspending entry of Syrian refugees; and suspending for 90 days entry of anyone from seven majority-Muslim countries: Iran, Iraq, Libya, Somalia, Sudan, Syria, and Yemen. ECF 18 ¶¶ 49-52. President Trump subsequently stated his intent to prioritize Christians in the Middle East for admission as refugees. ECF 18 ¶ 53.

The Order had immediate and significant effects in Washington. Over 7,000 noncitizen immigrants from the affected countries reside in Washington. ECF 18 ¶ 11; ECF 4 ¶ 7, Ex. A. Those who were abroad were blocked from returning home. ECF 33 ¶¶ 7-8. Husbands were separated from wives, brothers from sisters, and parents from their children. ECF 18 ¶¶ 21-23; ECF 33 ¶ 5, 9. Some who had waited decades to see family members had that reunion taken away without warning or reason. ECF 18 ¶ 21; *see also e.g.*, ECF 8 ¶¶ 11-13; ECF 33 ¶¶ 5-9; ECF 43 ¶¶ 5-9.

Washington's economy was also immediately impacted. Washington receives substantial sales tax revenue every year from travelers from the

countries covered by the Order's travel ban, and immediately began losing some of that revenue. *See* ECF 17 ¶¶ 3-11. Washington-based travel company Expedia began incurring costs assisting its customers who were suddenly banned from travel to the United States. ECF 7 ¶¶ 12-14, 20. Washington companies Amazon, Expedia, and Microsoft depend on skilled immigrants, and the Order diminished their ability to recruit. ECF 18 ¶¶ 12-17; ECF 6 ¶¶ 3-4, 11; ECF 7 ¶¶ 7, 9, 21. As a result of the order, many employees were unable to travel internationally, impairing business operations. ECF 7 ¶¶ 15-20; ECF 6 ¶¶ 7-11; ECF 18 ¶¶ 14-15.

The Order also caused immediate harm to Washington's public universities, which are state agencies. Hundreds of their faculty, staff, and students are from the affected countries. ECF 18 ¶ 28; ECF 9 ¶ 5; ECF 5 ¶ 5; ECF 17-3 ¶¶ 4, 6; ECF 17-2 ¶ 10; ECF 17-4 ¶ 5. The Order instantly stranded some faculty and students overseas, prevented others from traveling for research and scholarship, and harmed the universities' missions. ECF 9 ¶¶ 6-8; ECF 5 ¶¶ 6-9. ECF 17-4 ¶¶ 6-7.

Due to these immediate and serious harms, Washington filed a complaint and motion for TRO. ECF 3. Minnesota soon joined, alleging similar harms. ECF 18 ¶¶ 30-36.

On February 3, the district court held a hearing on the States' motion. The Court granted the motion and entered a TRO barring Defendants from enforcing several sections of the Order. ECF 52. The Court stated its intent to promptly hold a hearing on the States' forthcoming motion for preliminary injunction and ordered the parties to propose a briefing schedule by the next business day. ECF 52 at 6. The State proposed a briefing schedule to Defendants. Decl. of N. Purcell In Support of State of Washington's Response to Emergency Motion for Stay Pending Appeal, Ex. K.

Following entry of the TRO, the State Department declared that it was restoring visas that had been revoked under the Executive Order. *Id.* Exs. A, B. It also stated that refugees could begin arriving as soon as Monday. *Id.* Exs. C, D. The Department of Homeland Security started processing travelers with visas as normal and resumed standard inspection procedures. *Id.* Exs. E, B, F. Customs and Border Protection directed that nationals of the seven affected countries and all refugees presenting a valid visa or green card be permitted to travel to the United States. *Id.* Ex. G. Airlines announced that they will allow travelers from the seven nations to board flights. *Id.* Exs. G, H, I, J, B, D. On February 4, travelers from the previously banned countries began arriving at

U.S. airports. *Id.* Ex. B. More travelers are expected in the coming days. *Id.* Ex. B.

On February 4, Defendants filed a notice of appeal and motion for stay pending appeal.

## III.   ARGUMENT

The Court should deny Defendants' Motion to Stay as procedurally improper and wrong on the merits.

### A.   Defendants' Appeal is Procedurally Improper

Defendants acknowledge that TROs are generally non-appealable. Motion at 8. But they claim a right to appeal here because the order, in their view, is akin to a preliminary injunction. *Id.* Not so.

In cases where this Court has treated a TRO as a preliminary injunction, the parties had a full opportunity to brief issues and often put on evidence, and the order extended for lengthy periods. *See, e.g.*, *SEIU v. Nat'l Union of Healthcare Workers*, 598 F.3d 1061, 1067 (9th Cir. 2010) (months passed between complaint and TRO, and TRO was entered after 2-day evidentiary hearing). Here, by contrast, Washington filed its complaint and motion simultaneously, the TRO expressly ends when "the court can hear and decide the States' request for a preliminary injunction," ECF 52 at 5, and the States

have proposed a schedule that would allow a hearing within 15 days of the TRO's entry. Purcell Dec. Ex. K. The Court should wait to review an order at that time, not prematurely take up this one.

## B. If the Court Considers the Appeal, Defendants' Burden is High and the Standard of Review Deferential

If the Court deems this order reviewable, Defendants bear the heavy burden of showing (1) a strong likelihood of success on the merits, (2) the likelihood of irreparable injury if relief is not granted, (3) a balance of hardships favoring Defendants, and (4) that reinstating the Executive Order is in the public interest. *See Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). In assessing these factors, this Court reviews the district court order for abuse of discretion. *American Hotel and Lodging Assoc. v. Los Angeles*, 834 F.3d 958, 962 (9th Cir. 2016). The review is "limited and deferential, and does not extend to the underlying merits of the case." *Southwest Voter Registration Ed. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc). "If the underlying constitutional question is close" the Court "should uphold the injunction and remand for trial on the merits." *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 664-65 (2004).

### C. Defendants Cannot Show Irreparable Harm from the TRO When it Simply Reinstates the Status Quo

Defendants concede that they must show "a likelihood that [they] will be irreparably harmed absent a stay." Motion at 8 (quoting *Hilton*, 481 U.S. at 776). But they offer no evidence that the time-limited TRO will cause irreparable harm. In purporting to identify "facts" showing "the existence and nature of the emergency" justifying their motion, Defendants resort to high-level references to "separation of powers," "harms [to] the public by thwarting Enforcement of an Executive Order," and the so-called harm of "second-guess[ing] the President's national security judgment." Motion at ii. These purported harms fail to justify a stay.

First, separation-of-powers concerns do not automatically establish irreparable harm. *See, e.g.*, *Lopez v. Heckler*, 713 F.2d 1432, 1434 (9th Cir. 1983) (declining to stay district court order "restrain[ing]" the Secretary of Health and Human Services from implementing an announced policy where "separation of powers" was at issue). And Defendants cannot plausibly allege that they suffer harm from being required to comply with the law, even where they assert national security concerns. *See, e.g.*, *Holder v. Humanitarian Law Proj.*, 561 U.S. 1, 34 (2010) ("Our precedents . . . make clear that national security and foreign relations do not warrant abdication of the judicial role.").

7

Second, Defendants' argument amounts to claiming that returning to the pre-Executive Order status quo would inflict irreparable harm. But that would mean that until the Order was issued, Defendants were suffering some unspecified, ongoing irreparable harm. That makes no sense. As this court has held, preserving the status quo against sudden disruption is often in the interest of all parties. *See Feldman v. Ariz. Sec'y of State's Office*, 843 F.3d 366, 369-370 (9th Cir. 2016) (en banc) ("preserv[ing] the *status quo*" to avoid the "disruption" of a change in law pending review). That is precisely what the TRO accomplishes here, stopping implementation of portions of the Order until the district court determines whether they are lawful. While the Order is reviewed, refugees and immigrants from the banned countries will continue to undergo the rigorous screening processes that already existed prior to the Order. Decl. of Nat'l Sec. Officials ¶ 6. Defendants nowhere explain how reinstating a total ban is necessary to avoid irreparable injury. *Id.* ¶¶ 3-5 (concluding the Executive Order is likely to weaken, not strengthen, national security).

## D.    Defendants Are Unlikely to Succeed on Appeal Because the District Court Acted Within its Discretion

Defendants concede that to justify a stay they must also prove "a strong likelihood of success on appeal." Motion at 8 (quoting *Hilton*, 481 U.S. at 776).

8

They cannot. The district court correctly concluded that the States "have shown that they are likely to succeed on the merits of the claims that would entitle them to relief." ECF 52 at 4.[2]

### 1. Courts can review the legality of executive action and the executive's true motives

Defendants offer two threshold arguments to limit this Court's review, claiming that invoking national security prohibits meaningful judicial review and that courts cannot examine the Executive's motives. Both arguments fail.

First, courts routinely review executive decisions with far greater security implications than this Order. Even "in matters relating to the actual prosecution of a war," the courts "exercise their own time-honored and constitutionally mandated roles of reviewing and resolving claims." *Hamdi v. Rumsfeld*, 542 U.S. 507, 535 (2004) (plurality opinion); *see also id.* at 545 (Souter, J., concurring in the judgment); *Boumediene v. Bush*, 553 U.S. 723 (2008); *Korematsu v. United States*, 323 U.S. 214, 234 (1944) (Murphy, J.,

---

[2] Defendants repeatedly assert that the States bring a "facial" challenge to the Order and thus must demonstrate its invalidity in every possible application. Motion at 2, 9, 18. But the States' claim is as-applied because the States challenge only portions of the Executive Order. *See, e.g.*, *Hoye v. City of Oakland*, 653 F.3d 835, 857 (9th Cir. 2011) ("[T]he difference between an as-applied and a facial challenge lies only in whether all or only some of the statute's subrules (or fact-specific applications) are being challenged.").

dissenting) ("Individuals must not be left impoverished of their constitutional rights on a plea of military necessity that has neither substance nor support.").

Second, Defendants cite *Kleindienst v. Mandel*, 408 U.S. 753 (1972), and *Kerry v. Din*, 135 S. Ct. 2128 (2015), for the proposition that so long as the President gives a facially legitimate reason for excluding an alien, the courts will not look behind that reason. But those cases dealt with the President's power to exclude "an unadmitted and nonresident alien," i.e., someone who had no legal right to be here. *Mandel*, 408 U.S. at 762; *Din*, 135 S. Ct. at 2131. This case, by contrast, involves longtime residents who are here and have constitutional rights. Moreover, Justice Kennedy's controlling opinion in *Din* held that courts *should* look behind the stated motives for exclusion even as to a nonresident alien if the plaintiff "plausibly alleged with sufficient particularity" "an affirmative showing of bad faith." *Id.* at 2141. *See also Cardenas v. United States*, 826 F.3d 1164, 1171 (9th Cir. 2016) (same). Here, the State has plausibly alleged with sufficient particularity that the President acted in bad faith in an effort to target Muslims. ECF 18 ¶¶ 42-61. Thus, courts have both the right and the duty to examine Defendants' true motives.

### 2. The States have standing

In establishing standing, states "are not normal litigants," but instead receive "special solicitude." *Massachusetts v. EPA*, 549 U.S. 497, 518, 520 (2007). The States established two independent grounds for Article III standing: (1) harms to their proprietary interests; and (2) harms to their quasi-sovereign interests. ECF 17 at 2-5. Defendants fail to overcome either basis.

Crucially, because this case is at the pleading stage, the States need only "state a plausible claim that [they have] suffered an injury in fact fairly traceable to the actions of the defendant[s] that is likely to be redressed by a favorable decision on the merits." *Humane Soc'y v. Vilsack*, 797 F.3d 4, 8 (D.C. Cir. 2015). "[G]eneral factual allegations of injury resulting from the defendant's conduct may suffice," and the Court "presumes that general allegations embrace those specific facts that are necessary to support the claim." *Bennett v. Spear*, 520 U.S. 154, 168 (1997).

### a. Proprietary standing

The States alleged and submitted evidence that that the Order is harming us by stranding our university students and faculty overseas, preventing university-sponsored faculty and staff from coming here, preventing students and faculty who are here currently from making pre-planned trips for research

or scholarship, and decreasing state tax revenue. *See infra* at 2-3. On this evidence, the district court correctly found that "the States themselves are harmed" by the damage to "their public universities and other institutions of higher learning, as well as injury to the States' operations, tax bases, and public funds." ECF 52 at 5. Defendants show no likelihood that this finding is incorrect.

Defendants first argue that the harms to state universities are speculative, claiming that the Order's waiver provisions *may* allow students and faculty to travel or return. Motion at 10. But in the face of evidence that faculty and students have actually been prevented from travelling, ECF 17-4, Defendants offer no evidence that such waivers will be granted, and concede that some may be denied. Motion at 10. Defendants' speculative remedies cannot undo the States' real harms.

As to the States' evidence of lost tax revenue, ECF 17 at 2-3, Defendants never dispute the evidence, instead claiming that lost tax revenue can never establish state standing. But the case law does not support that claim. While *Florida v. Mellon*, 273 U.S. 12 (1927), determined that the particular tax revenues at issue there were speculative, courts have repeatedly found lost tax revenues sufficient to establish proprietary standing. *See, e.g.*, *Sausalito v.*

*Oneill*, 386 F.3d 1186, 1198 (9th Cir. 2004) (holding that lost property and sales tax revenues caused by increased traffic established standing without any numeric quantification of the harm). And in *Texas v. United States*, 787 F.3d 733 (5th Cir. 2015), the court found that a change in immigration policy that would increase state expenditures created standing. If increased expenditures create standing, there is no logical reason why decreased revenues should not.

### b. *Parens Patriae* standing

The States also alleged and offered evidence that the Order is inflicting grievous harms on our residents. ECF 17 at 4 (citing ECF 8 ¶¶ 6-14; ECF 18 ¶¶ 18-23, 31-36). Based on this evidence, the district court correctly concluded that: "The Executive Order adversely affects the States' residents in areas of employment, education, business, family relations, and freedom to travel. These harms extend to the States by virtue of their roles as *parens patriae*." ECF 52 at 4-5. Defendants never meaningfully dispute these harms, instead arguing that *parens patriae* suits against the federal government are never permitted under *Massachusetts v. Mellon*, 262 U.S. 447 (1923). Not so.

*Mellon* expressly recognized that it did not prohibit state actions—such as this one—seeking to protect quasi-sovereign interests. *See id.* at 481-82, 485; *see also Massachusetts*, 549 U.S. at 520 n.17 (same). *Mellon* also pointed

13

out that it did not bar all *parens* suits challenging the United States'
unconstitutional acts. *Mellon*, 262 U.S. at 487.

More recent Supreme Court decisions confirm the States' *parens*
standing. In *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592 (1982),
the Court found that states have standing to sue based on discrimination against
their residents: "This Court has had too much experience with the political,
social, and moral damage of discrimination not to recognize that a State has a
substantial interest in assuring its residents that it will act to protect them from
these evils." *Id.* at 609. And in *Massachusetts v. EPA*, the Court cemented
states' standing to protect their quasi-sovereign interests, including in actions
against the federal government. 549 U.S. at 516-21. The Court rejected the
broad reading of *Mellon* advocated by Defendants, *id.* at 520 n.17, confirming
that a state can assert standing to protect its citizens when the federal
government violates federal law.

> 3. **The States' claims have merit**
>
> > a. **Defendants are unlikely to prevail against the States' Due Process claim**

The Order violates due process in several ways and the States' claim is
very likely to succeed.

First, the Order denies entry to the United States of all persons from the seven countries, regardless of whether they have lived legally in this country for years.[3] Thus, our States' residents from these countries who travel abroad will be deported if they attempt to re-enter this county, and those who remain will be forced to forego international travel to avoid that devastating result. This draconian restriction violates due process.

The Fifth Amendment protects all persons in the United States "from deprivation of life, liberty, or property without due process of law," regardless of immigration status. *Mathews v. Diaz,* 426 U.S. 67, 69, 77 (1976); *Zadvydas v. Davis,* 533 U.S. 678, 693 (2001). A temporary absence from the country does not deprive longtime residents of their right to due process. *See, e.g.*, *Landon v. Plasencia*, 459 U.S. 21, 33 (1982) ("[T]he returning resident alien is entitled as a matter of due process to a hearing on the charges underlying any attempt to exclude him.") (internal citation omitted); *Kwong Hai Chew v. Colding*, 344 U.S. 590, 601 (1953).

_____

[3] After taking a dizzying number of positions, Defendants landed on the view that the travel ban "does *not* apply to lawful permanent residents." *See* Mot. at 6. Nonetheless, the text of the Order remains unchanged, and the States' challenge to that portion of Section 3(c) is not moot. *See White v. Lee*, 227 F.3d 1214, 1243 (9th Cir. 2000) (mootness based on voluntary cessation is a "stringent" standard).

Due process requires that lawful permanent residents and visaholders not be denied re-entry to the United States without "at a minimum, notice and an opportunity to respond." *United States v. Raya-Vaca*, 771 F.3d 1195, 1204 (9th Cir. 2014). A resident denied re-entry must receive a "full and fair hearing of his claims" and "a reasonable opportunity to present evidence on his behalf." *Colmenar v. I.N.S.*, 210 F.3d 967, 971 (9th Cir. 2000); *Gutierrez v. Holder*, 662 F.3d 1083, 1091 (9th Cir. 2011).

The Order's denial of re-entry to all visaholders and lawful permanent residents from the impacted countries, without an opportunity to be heard, violates these principles. The Order also deprives noncitizen residents of our States of the right to travel, a constitutionally protected liberty interest. *Kent v. Dulles*, 357 U.S. 116, 125-26 (1958) (holding that Secretary of State could not deny passports to Communists on the basis that the right to travel abroad is a constitutionally protected liberty interest).

Defendants never contest these principles. Instead, they argue that the Order will not really affect our States' residents, and that states cannot raise due process claims, citing *South Carolina v. Katzenbach*, 383 U.S. 301 (1966). But the States have alleged and offered evidence that many state residents,

16

including students and faculty at public universities, are being harmed by the Order. Defendants cannot wish that away.

Moreover, unlike in *Katzenbach*, the States here assert proprietary harms. Where, as here, a state asserts harms to students and faculty at its institutions, the State should be allowed—just like any other proprietor of educational institutions—to raise due process claims on their behalf. *See, e.g.*, *Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925); *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1487 (9th Cir. 1995) (holding that school had standing to challenge harm to students that impacted school); *Ohio Ass'n of Indep. Schs. v. Goff*, 92 F.3d 419, 422 (6th Cir. 1996) (same); *see also Bd. of Nat. Res. of State of Wash. v. Brown*, 992 F.2d 937, 943 (9th Cir. 1993).

Even as to the States' *parens* claims, *Katzenbach* does not control. *Katzenbach* cited *Mellon* in holding that South Carolina could not use its *parens* authority to challenge a federal statute. 383 U.S. at 323-24. But in *Massachusetts v. EPA*, the Court clarified that "there is a critical difference between allowing a State to protect her citizens from the operation of federal statutes (which is what *Mellon* prohibits) and allowing a State to assert its rights under federal law (which it has standing to do)." 549 U.S. at 520 n.17. Here, the States seek not to protect our residents from federal statutes, but to

protect our residents against Defendants' violations of federal law. This is what States "ha[ve] standing to do." *Id.*

### b. Defendants are unlikely to prevail against the States' Establishment Clause claim

The State has alleged and offered substantial evidence even before discovery that the Executive Order violates the Establishment Clause because its purpose and effect are to favor one religion. "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982). In *Larson*, the law at issue did not mention any religious denomination, but drew a distinction between religious groups based on facially neutral criteria. *Id.* at 231-32. The Court nonetheless applied strict scrutiny because the law was focused on religious entities and had the effect of favoring some. *Id.* at 246-47.

*Larson* applies here. The Order's refugee provisions explicitly distinguish between members of religious faiths. President Trump has made clear that one purpose of the Order is to favor Christian refugees at the expense of Muslims. ECF 18 ¶ 53, Ex. 8. And the States have plausibly alleged that the countries chosen for the travel ban were chosen in part to disfavor Muslims.

ECF 18 ¶ 61, Ex. 17. This case thus involves just the sort of discrimination among denominations that failed strict scrutiny in *Larson*, and must fail here.[4]

Defendants claim that the Order "is neutral with respect to religion." Motion at 19. "But it is . . . the duty of the courts to distinguish a sham secular purpose from a sincere one." *Sante Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 308 (2000); *McCreary County, Ky. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 864 (2005) (citing *Lemon v. Kurtzman*, 403 U.S. 602, 612 (1971)). Here, the sham of a secular purpose is exposed by both the language of the Order and Defendants' expressions of anti-Muslim intent. *See, e.g.*, *McCreary*, 545 U.S. at 866 (courts consider the "historical context" of the government act and "the specific sequence of events leading to [its] passage").

Unable to respond on the merits, Defendants claim that States cannot raise Establishment Clause claims themselves or as *parens patriae*. Motion at 11 n.4. But they cite no authority for these propositions. And one purpose of the Establishment Clause was to protect States against the federal government

---

[4] Even under the less demanding *Lemon* test, the Order is unconstitutional. *See* ECF 19-1 at 12-14.

adopting a national religion.[5] There is no reason to bar States from enforcing that right, whether on their own behalf or as *parens patriae*.

      **c.**     **Defendants are unlikely to prevail against the States' Equal Protection claim**

The States are likely to prevail on our equal protection claim because the Executive Order is motivated by discriminatory animus and cannot survive any level of review.

Classifications based on religion are inherently suspect and subject to strict scrutiny. *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976). The Order specifies that Defendants will give priority to refugee claims "on the basis of religious-based persecution," but only if "the religion of the individual is a minority religion in the individual's country of nationality." Sec. 5(b). The State has plausibly alleged and offered evidence that this policy change and the list of countries targeted by the Order were intended to disfavor Muslims. The States need not show that intent to discriminate against Muslims "was the sole purpose of the challenged action, but only that it was a 'motivating factor." *Arce v. Douglas*, 793 F.3d 968, 977 (9th Cir. 2015).

---

[5] *See, e.g.*, Richard Albert, *The Constitutional Politics of the Establishment Clause*, 87 CHI.-KENT L. REV. 867, 874 (2012); *Separation of Church & State Comm. v. City of Eugene*, 93 F.3d 617, 621 (9th Cir. 1996) (O'Scannlain, J., concurring) ("[C]oncerns about federalism . . . motivated ratification of the Establishment Clause.").

Even if the Order did not make suspect classifications, it would be illegal because "its sheer breadth is so discontinuous with the reasons offered for it that the [Order] seems inexplicable by anything but animus toward the class it affects." *Romer v. Evans*, 517 U.S. 620, 632 (1996). For several months it bans all travelers from the listed countries and all refugees, whether they be infants, schoolchildren, or grandparents. And though it cites the attacks of September 11, 2001, as a rationale, it imposes no restrictions on people from the countries whose nationals carried out those attacks. "It is at once too narrow and too broad," *id.* at 633, and cannot withstand any level of scrutiny. *See, e.g.*, *United States v. Windsor*, 133 S. Ct. 2675, 2693 (2013) ("The Constitution's guarantee of equality must at the very least mean that a bare [legislative] desire to harm a politically unpopular group cannot justify disparate treatment of that group.").

> ### d. Defendants are unlikely to prevail against the States' INA claim

8 U.S.C. § 1152(a)(1)(A) states: "no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of race, nationality, place of birth, or place of residence." Defendants argue that the national origin discrimination embodied in the Executive Order is nonetheless justified under Section 1182(f), which allows the President to suspend entry of aliens detrimental to the interests of the United States, and

that such immigration decisions are "generally shielded from administrative or judicial review." Mot. at 12. Neither argument is persuasive.

Section 1152 was enacted in 1965, thirteen years *after* Section 1182(f), and it enumerates specific exceptions that do not include Section 1182(f). Congress specified exactly when federal officials could take nationality into account: "as specifically provided in paragraph (2) and in sections 1101(a)(27), 1151(b)(2)(A)(i), and 1153 of this title." 8 U.S.C. § 1152(a)(1)(A). None of these narrow exceptions apply here; and by enumerating those few exemptions, Congress made clear it did not intend to authorize others.[6] *See, e.g.*, *United Dominion Indus. v. United States*, 532 U.S. 822, 836 (2001) (describing *expressio unius* canon).

Further, despite Defendants' references to "plenary" power over immigration, Motion at 4—which actually resides with Congress, *see* U.S. Const., Article I, § 8—the President's authority under Section 1182(f) is judicially reviewable. *See Zadvydas*, 533 U.S. at 698 (holding the political branches' power "is subject to important constitutional limitations"); *Diouf v.*

---

[6] Although Defendants argue that "courts have repeatedly affirmed" the President's authority to make distinctions based on nationality, Motion at 13, none of the cases Defendants cite raised Section 1152.

*Napolitano*, 634 F.3d 1081, 1091 (9th Cir. 2011) (refusing to defer to DHS's regulations because the regulations "raise[d] serious constitutional concerns").

Before now, no President has invoked 1182(f) to impose a *categorical* bar on admission based on a *generalized* (and unsupported) claim that *some* members of a class *might* engage in misconduct. *Cf.* Pres. Procl. 5517, 1986 WL 796773 (Aug. 22, 1986) (barring entry of certain Cuban nationals, with many categorical exceptions). The Order flouts Congress's clear command prohibiting nationality-based discrimination.

### 4.    A nationwide TRO was appropriate

Defendants offer a halfhearted argument that a nationwide injunction was inappropriate, but they offer no plausible narrower order that would have provided the relief the States sought. In any event, nationwide relief was well within the district court's discretion given that (1) Congress and the courts have emphasized the importance of uniformity in immigration policies; and (2) nationwide relief was necessary to ensure that the States' residents were not stopped at other ports of entry around the country on their way to Washington or Minnesota. *See, e.g.*, *Texas*, 787 F.3d at 768-69 (affirming nationwide injunction to ensure uniformity and provide full relief).

**E.    A Stay Would Harm the States and the Public Interest**

The States have detailed at length the harms we suffered under the Order. Staying the district court's ruling would reinstitute those harms, separating families, stranding our university students and faculty, and barring travel. Defendants claim that national security requires these harms, but the Court need not and should not allow constitutional violations merely based on Defendant's unsupported invocation of national security concerns. *See* Decl. of Nat'l Sec. Officials ¶ 4; *Hassan v. City of New York*, 804 F.3d 277, 306-07 (3d Cir. 2015) ("[I]t is often where the asserted interest appears most compelling that we must be most vigilant in protecting constitutional rights."). In any event, the balance of equities and public interest always favor "prevent[ing] the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012).


/ / /

/ / /

/ / /

## IV.   CONCLUSION

For the reasons above, the Court should deny Defendants' request for stay.

RESPECTFULLY SUBMITTED this 6th day of February 2017.

ROBERT W. FERGUSON, WSBA 26004
Attorney General
NOAH G. PURCELL, WSBA 43492
Solicitor General
ANNE E. EGELER, WSBA 20258
Deputy Solicitor General
COLLEEN M. MELODY, WSBA 42275
Civil Rights Unit Chief
MARSHA CHIEN WSBA 47020
PATRICIO MARQUEZ WSBA 47693
Assistant Attorneys General

Washington State
Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

LORI SWANSON
Attorney General of Minnesota
ALAN I. GILBERT, MN #0034678
Solicitor General
JACOB CAMPION, MN #0391274
Assistant Attorney General

Office of the Attorney General
445 Minnesota Street, Suite 1100
St. Paul, MN 55101
(651) 757-1450

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6(c) the Appellees state that there are no related cases.

## CERTIFICATE OF COMPLIANCE (FRAP 32(a)(7))

I certify that pursuant to Fed. R. App. P. 27, the attached answering brief is proportionately spaced, has a typeface of 14 points or more and contains 5,110 words.

February 6, 2017                          s/ Noah G. Purcell
                                          NOAH G. PURCELL, WSBA 43492

## CERTIFICATE OF SERVICE

I hereby certify that on February 6, 2017, I electronically filed the foregoing with the Clerk of the Court of the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

February 6, 2017                          s/ Noah G. Purcell
                                         NOAH G. PURCELL, WSBA 43492