No. 17-35105

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

STATE OF WASHINGTON, et al.,
Plaintiffs-Appellees,

v.

DONALD TRUMP, President of the United States, et al.
Defendants-Appellants.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

**REPLY IN SUPPORT OF EMERGENCY
MOTION FOR STAY PENDING APPEAL**

EDWIN S. KNEEDLER*
*Deputy Solicitor General*

AUGUST E. FLENTJE
  *Special Counsel to the Assistant
   Attorney General*
DOUGLAS N. LETTER
SHARON SWINGLE
H. THOMAS BYRON III
LOWELL V. STURGILL JR.
CATHERINE DORSEY
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7241*
  *U.S. Department of Justice*
  *950 Pennsylvania Ave., NW*
  *Washington, DC 20530*

* The Acting Solicitor General and Acting Assistant Attorney General have refrained from signing this brief, out of an abundance of caution, in light of a last-minute filing of an amicus brief by their former law firm.

The Executive Order is a lawful exercise of the President's authority over the entry of aliens into the United States and the admission of refugees. Relying on his express statutory authority to suspend entry of any class of aliens to protect the national interest, the President has directed a temporary suspension of entries through the refugee program and from countries that have a previously identified link to an increased risk of terrorist activity, *see* 8 U.S.C. § 1187(a)(12). The purpose of that temporary suspension is to permit an orderly review and revision of screening procedures to ensure that adequate standards are in place to protect against terrorist attacks. As a different district court recently concluded, that objective provides a "facially legitimate and bona fide" justification that satisfies any constitutional scrutiny that applies. *Louhghalam v. Trump*, Civ. Action No. 17-10154-NMG, Order 18-19 (D. Mass. Feb. 3, 2017); *see id.* at 10-11, 15-16.

The district court therefore erred in entering an injunction barring enforcement of the order. But even if some relief were appropriate, the court's sweeping nationwide injunction is vastly overbroad, extending far beyond the State's legal claims to encompass numerous applications of the Order that the State does not even attempt to argue are unlawful.

1. As an initial matter, the State cannot challenge the denial of entry or visas to third-party aliens. It is well-settled that a State lacks authority to sue "as the representative of its citizens" to protect them from the operation of federal law.

*Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923); *South Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966). The State invokes the "special solicitude" for States referred to in *Massachusetts v. EPA*, but there, Massachusetts sought to enforce a congressionally created "procedural right" to protect a loss of "sovereign territory." 549 U.S. 497, 519-20, 522-23 (2007). Here, by contrast, the State's interest in protecting its own territory is not at issue. Instead, the Constitution vests the federal government with exclusive power over immigration for the Nation as a whole, and Congress did not create any "procedural right" for States to sue the federal government to challenge its decisions to deny the entry of (or revoke visas held by) third-party aliens.

To the contrary, an alien outside the United States has no substantive right or basis for judicial review in the denial of a visa at all. *See Brownell v. Tom We Shung*, 352 U.S. 180, 184 n.3, 185 n.6 (1956). Moreover, Congress has been clear that the issuance of a visa to an alien does not confer upon that alien any right of admission into the United States, 8 U.S.C. § 1201(h), and that the Secretary of State "may, at any time, in his discretion, revoke such visa or other documentation." *Id.* § 1201(i). If a visa is revoked, even the alien himself has no right of judicial review "except in the context of a removal proceeding," and only if the visa revocation "provides the sole ground for removal." *Id.* And even an alien who has been admitted to and developed significant ties with this country, who has as a result come within the

2

protection of the Fifth Amendment's Due Process Clause, has no protected property or liberty interest in the retention of his visa. *Knoetze v. U.S. Dep't of State*, 634 F.2d 207, 212 (5th Cir. 1981). A fortiori, the State cannot challenge the revocation of third-party aliens' visas here. The State likewise cannot challenge the Executive's decision not to admit a refugee.

The Supreme Court's decisions in *Kerry v. Din*, 135 S. Ct. 2128 (2015), and *Kleindienst v. Mandel*, 408 U.S. 753 (1972), also do not support even limited judicial review of the State's claims here. In those cases, U.S. citizens sought review of the denial of a third-party visa on the ground that the citizens had an independent constitutionally-protected interest in the third-party's admission to the country— either a marital relationship or a First Amendment interest. The State, in contrast, has no independent constitutional rights to invoke with respect to the denial of admission of aliens affected by the Order.

2. Even if it could establish standing and a right of judicial review, the State would be unlikely to succeed on the merits of its claims.

a. Congress has granted the President broad discretion under 8 U.S.C. § 1182(f) to suspend the entry of "any class of aliens" into the United States, and independently broad discretion over the refugee program under 8 U.S.C. § 1157. The exclusion of aliens is also "a fundamental act of sovereignty * * * inherent in the executive power to control the foreign affairs of the nation." *United States ex*

3

*rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950). The State does not address the text of § 1182(f), or the extensive caselaw relating to the exclusion of aliens from the United States. And although the State suggests (Response 23) that it is somehow impermissible for the President to rely on § 1182(f) "to impose a *categorical* ban on admission," the statute's broad grant of authority to suspend the entry "of any class of aliens," "for such period as [the President] shall deem necessary," whenever the President finds that it would be "detrimental to the interests of the United States," clearly authorizes the categorical, temporary suspension the President has adopted here.

  b. The State continues to argue that Section 3(c)'s temporary suspension of the entry of aliens from seven countries contravenes the restriction on nationality-based distinctions in 8 U.S.C. § 1152(a)(1)(A). But that restriction applies only to "the issuance of an immigrant visa," *Id.*, not to the President's restrictions on the right of entry. It also has no application at all to aliens who hold or seek *non-immigrant* visas, such as student visas or work visas. And § 1152(a)(1)(B) permits, as here, a temporary suspension of entry pending completion of a review and revision of procedures for processing visa applications.

  Furthermore, even if it applied, § 1152(a)(1)(A) would not restrict § 1182(f)'s broad grant of discretionary authority. A court should, whenever possible, "interpret two seemingly inconsistent statutes to avoid a potential conflict," *California ex rel.*

4

*Sacramento Metro. Air Quality Mgmt. Dist. v. United States*, 215 F.3d 1005, 1012 (9th Cir. 2000), and should interpret "the specific [to] govern[] the general." *RadLAX Gateway Hotel v. Amalgamated Bank*, 132 S. Ct. 2065, 2070-71 (2012). Here, § 1152(a)(1)(A) establishes a general rule governing the issuance of immigrant visas, whereas § 1182(f) governs the specific instance in which the President determines that entry of a "class of aliens" would be "detrimental to the interests of the United States." The State's assertion that § 1152(a)(1)(A) limits that authority would mean that the President would be statutorily disabled from barring the entry of nationals of a country with which the United States was at war—a result that would raise serious constitutional questions, which is itself a sufficient reason to reject the State's reading. *See Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Constr. Trades Council*, 485 U.S. 568, 575 (1988).

    c.    The State asserts that the Order violates the constitutional rights of lawful permanent residents (LPRs). Response at 10, 15 & n.3, 16. But the Order does not apply to LPRs. Exhibit D. It applies only to aliens who lack LPR status. And most of those aliens are outside the United States and have never been admitted to this country. The Supreme Court "has long held that an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application." *Landon v. Plasencia*, 459 U.S. 21, 32 (1982).

The State argues (Response 9) that "courts routinely review executive decisions with far greater security implications than this Order." In those cases, however, the courts were reviewing government actions taken against individuals who had rights under the U.S. Constitution or federal statutes with respect to the adverse actions they faced. *See, e.g., Hamdi v. Rumsfeld*, 542 U.S. 507, 535 (2004) (plurality op.) (reviewing indefinite detention of U.S. citizen); *Boumediene v. Bush*, 553 U.S. 723 (2008) (reviewing detention of aliens held to have constitutionally protected interest in habeas corpus review). Those cases do not override the longstanding rule that aliens outside the United States have no right or interest in their admission to the United States protected by the Due Process Clause, *Knauff*, 338 U.S. at 543, or the rule that non-immigrants do not have a liberty or property interest in the retention of a visa.

  d. The State's constitutional challenges lack merit.

    i. The State first asserts that the Order violates the Establishment Clause and equal protection principles because it was assertedly based on animus against Muslims. That is incorrect. There are two separate aspects of the Order challenged here, and both are neutral with respect to religion.

First, Section 3(c) temporarily suspends entry of aliens from seven countries previously identified under 8 U.S.C. § 1187(a)(12). Those countries were identified by Congress and the Executive Branch as being associated with a heightened risk of

6

terrorism. Congress itself identified Iraq and Syria, where "the Islamic State of Iraq and the Levant (ISIL) * * * maintain[s] a formidable force." U.S. Department of State, *Country Reports on Terrorism 2015* 6 (June 2016). See 8 U.S.C. § 1187(a)(12)(A)(i)(I), (ii)(I). Congress also incorporated countries designated as state sponsors of terrorism: Iran, Sudan, and Syria. *Id.* § 1187(a)(12)(A)(i)(II) and (ii)(II). And in 2016, the Executive Branch added Libya, Somalia, and Yemen after a review that considered "whether the country or area is a safe haven for terrorists" and "whether the presence of an alien in the country or area increases the likelihood that the alien is a credible threat to the national security of the United States." 8 U.S.C. § 1187(a)(12)(D)(iii); https://www.dhs.gov/news/20016/02/18/dhs-announces-further-travel-restrictions-visa-waiver-program.

Second, Section 5(a) temporarily suspends the refugee program as to refugees from *all* countries, not just the seven countries identified in Section 3(c). Section 5(b) further provides that, when the refugee program resumes, the Secretary of State shall "make changes, to the extent permitted by law, to prioritize refugee claims" by members of persecuted minority religions. Laws that "give relief to a religious minority" "are in tune with the Bill of Rights," *Kong v. Scully*, 341 F.3d 1132, 1141 (9th Cir. 2003), and Section 5(b) of the Order applies equally to *all* religious minorities seeking refugee status "on the basis of religious-based persecution." As the district court recognized in *Louhghalam*, Section 5(b) "could be invoked to give

7

preferred refugee status to a Muslim individual in a country that is predominantly Christian." Order 13.[2]

Accordingly, as the district court held in *Louhghalam*, Order 13, the Executive Order is "neutral with respect to religion." And under *Mandel*, the Order's national-security basis for the temporary suspension amply establishes its constitutionality. *See also Louhghalam*, Order 18-19. The State asserts (Response 10) that the Court should "look behind" the stated basis for the Order to probe its subjective motivations because the State claims to have made "an affirmative showing of bad faith." *Din*, 135 S. Ct. at 2141 (Kennedy, J., concurring). But the State's allegations of bad faith are not meaningfully different from the allegations deemed insufficient in *Mandel*, where the plaintiff asserted that the visa was denied because of the alien's advocacy of revolutionary Marxism and world communism, rather than his failure to comply with the terms of prior visas. 408 U.S. at 756; *see Din*, 135 S. Ct. at 2141-2142 (Kennedy, J., concurring) (endorsing *Mandel*). And here, the State asks the courts to take the extraordinary step of second-guessing a formal national-security judgment made by the President himself pursuant to broad grants of statutory authority.

---

[2] Washington relies on *Larson v. Valente*, 456 U.S. 228 (1982), but that holding is limited to cases where a government statute or practice "explicitly discriminates against a certain religious group." *Sep. of Church & State Comm. v. City of Eugene*, 93 F.3d 617, 623 (9th Cir. 1996) (O'Scannlain, J., concurring).

ii. The State also argues (Response 14-18) that the order violates aliens' procedural due process rights. But as explained above, aliens outside the United States have no due process rights with respect to their attempt to gain entry into this country. And regardless, "notice and an opportunity to respond" is not required where, as here, the challenged rule reflects a categorical judgment. *Cf. Bi-Metallic Inv. Co. v. State Bd. Of Equalization*, 239 U.S. 441, 445 (1915) ("[w]here a rule of conduct applies to more than a few people," individuals affected do not "have a constitutional right to be heard before a matter can be decided"); *see also Din*, 135 S. Ct. at 2144 (Breyer, J., dissenting) (citing *Bi-Metallic*).

3. The State argues (Response 7-8) that the injunction does not impose any irreparable harm. But the injunction reinstates procedures that the President determined should be temporarily suspended in the interest of national security. Order § 1; *see also id.* § 2. The Order temporarily suspends entry of aliens from seven countries previously identified by Congress and the Executive Branch as raising heightened terrorism-related concerns. The suspension terminates in 90 days, once concerns relating to screening practices can be addressed, as necessary "to prevent infiltration [into this Nation] by foreign terrorists or criminals," Order § 3(c). Similarly, the temporary suspension of the U.S. refugee program will be lifted after 120 days, once the Secretaries of State and Homeland Security, in consultation with the Director of National Intelligence, determine "what additional

9

procedures should be taken to ensure that those approved for refugee admission do not pose a threat to the security and welfare of the United States." Order § 5(a). The potential national-security risks and harms resulting from the compelled application of procedures that the President has determined must be reexamined, for the purpose of ensuring an adequate measure of protection for the Nation, cannot be undone. Nor can the effect on our constitutional separation of powers.

    4.    Regardless of the plaintiff's likelihood of success, the injunction court is, at a minimum, vastly overbroad. The State has made clear that it is seeking to protect LPRs and other nationals from the seven identified countries who were previously admitted to the United States and are either temporarily abroad or are here now and wish to travel outside this country—*not* aliens who are attempting to enter the country for the first time. *See* Response 11-12, 15-16; Transcript 7-8, 15-16. That makes sense because the latter class of aliens have no constitutional rights with respect to entry into the country—a point the State largely conceded below. *See* Transcript 7, 15. The injunction, however, bars *all* applications of Section 3(c)—even as to aliens who have never previously visited this country, and have not yet begun the process of obtaining a visa. It also bars all applications of Section 5, even though there is no indication that any of the aliens affected by the temporary

suspension of the refugee program have been previously admitted to this country.[3] That is plainly impermissible. At most, the injunction should be limited to the class of individuals on whom the State's claims rest—previously admitted aliens who are temporarily abroad now or who wish to travel and return to the United States in the future.

---

[3] Indeed, the district court even enjoined a provision that will not go into effect for 120 days, a provision as to which even plaintiffs conceded that their challenge is not ripe for review. Transcript 15 (Section 5(b) claim "does not necessarily require immediate injunction").

## CONCLUSION

For the foregoing reasons, defendants respectfully request a stay pending appeal of the district court's February 3, 2017 injunctive order.

Respectfully submitted,

/s/ Edwin S. Kneedler
EDWIN S. KNEEDLER*
*Deputy Solicitor General*

AUGUST E. FLENTJE
 *Special Counsel to the Assistant
  Attorney General*
DOUGLAS N. LETTER
SHARON SWINGLE
H. THOMAS BYRON III
LOWELL V. STURGILL JR.
CATHERINE DORSEY
 *Attorneys, Appellate Staff
 Civil Division, Room 7241
 U.S. Department of Justice
 950 Pennsylvania Ave., NW
 Washington, DC 20530*

12

---

* The Acting Solicitor General and Acting Assistant Attorney General have refrained from signing this brief, out of an abundance of caution, in light of a last-minute filing of an amicus brief by their former law firm.

## CERTIFICATE OF SERVICE

I hereby certify that on February 6, 2017, I filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. All participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

                                                 s/ Lowell V. Sturgill Jr.
                                                 Lowell V. Sturgill Jr.

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Reply in Support of Emergency Motion for Stay Pending Appeal complies with the type-volume limitation of Fed. R. App. P. 27 because it contains 2,599 words. This Motion complies with the typeface and the type style requirements of Fed. R. App. P. 27 because this brief has been prepared in a proportionally spaced typeface using Word 14-point Times New Roman typeface.

s/ Lowell V. Sturgill Jr.
Lowell V. Sturgill Jr.
