CASE NO. 17-35105

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

STATE OF WASHINGTON, *et al.*,
Appellants

v.

DONALD J. TRUMP, PRESIDENT, *et al.,*
Appellees

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON,
CASE NO. 2:17-cv-00141-JLR

**BRIEF OF AMICUS CURIAE FREEDOM WATCH, INC., IN
SUPPORT OF EN BANC REVIEW OF APPELLANTS-DEFENDANTS'
EMERGENCY MOTION FOR STAY PENDING APPEAL**

ORAL ARGUMENT REQUESTED

Larry Klayman, Esq.
FREEDOM WATCH, INC.
2020 Pennsylvania Ave. NW, Suite 345
Washington, DC 20006
Telephone: (561) 997-9956
Email: leklayman@gmail.com

Attorney for Amicus Curiae
February 14, 2017

## TABLE OF CONTENTS

TABLE OF CONTENTS      ii

TABLE OF AUTHORITIES      iii

FRAP RULE 26.1 AND FRAP 29(a)(4)(E) DISCLOSURE STATEMENT    v

STATEMENT OF INTEREST OF AMICUS CURIAE      vi

     SUMMARY OF ARGUMENT      1

     ARGUMENT      5

         Appellee States Will Not Prevail on the Merits      5

         Standing      6

         The 1952 Statute Ignored.  President's Power To Regulate
Entry Into The United States Is Clear And Almost Unlimited      9

         Straw-Man Argument Of Religious Discrimination      10

         Court Usurping Presidential Role:  Executive Order Targets
"Failed states" Plus Terrorist Sponsor, Hostile Iran, Not Islam    11

         Non-Justiciable Political Question      14

         Severability of the Executive Order      16

         8 U.S.C. § 1152(a)(1)(A) Did Not Repeal 8 U.S.C. § 1182(f)      18

         Appellees Reliance on 8 U.S.C. § 1152(A)(1)(A) Misplaced      19

         Irreparable Harm Supports The Executive Order,
Not The Appellees      20

         Court Should Consolidate Multi-District Litigation:  Forum
Non Conveniens And Judge Shopping      22

     CONCLUSION      23

# TABLE OF AUTHORITIES

**Cases**

*Abrego Abrego v. The Dow Chemical Co.*, 443 F.3d 676, 687-686 (9th Cir., 2006) .................. 19

*Alaska Airlines, Inc v. Brock*, 480 U.S. 678, 684-685, 107 S.Ct. 1476, 94 L.Ed.2d 661 (1987).. 17

*Alexander v. Americans United Inc.*, 416 U.S. 752, 761-762, 94 S.Ct. 2053, 40 L.Ed.2d 518 (1974) ................................................................................................................................... 20

*Beacon Theaters, Inc v. Westover*, 359 U.S. 500, 507, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959) ....... 20

*Cannon v. Univ. of Chicago.*, 441 U.S. 677, 696-97, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979)...... 18

*Commonwealth of Massachusetts v. Laird*, 400 U.S. 886, 887, 91 S.Ct. 128, 27 L.Ed.2d 140 (1970) ..................................................................................................................................... 7

*Harisiades v. Shaughnessy*, 342 U.S. 580, 588 (1952) .................................................................. 9

*L. Snapp & Son v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 610 n.16 (1982) ............................. 7

*Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923) ............................................................... 7

*Mohamad v. Palestinian Auth.*, 132 S. Ct. 1702, 182 L.Ed.2d 720 (2012) ................................. 19

Piper Aircraft Co. v. Reyno, 454 U.S. 235 (1981)........................................................................ 22

Piper Aircraft Co. v. Reyno, 454 U.S. 235 (1981)........................................................................ 22

*Powell v. Cormack*, 395 U.S. 486, 518-519, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969) .................. 15

*Pulliam v. Allen*, 466 U.S. 522, 537, 104 S.Ct. 1970, 80 L.Ed.2d 565 (1984) ........................... 20

*Reno v. Am.-Arab Anti-Discrimination Comm. ("AAADC")*, 525 U.S. 471, 483-85 (1999) ......... 7

*Rodriguez v. United States*, 480 U.S. 522, 107 S.Ct. 1391, 94 L.Ed.2d 533 (1987) ................... 18

*Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953) .... 8

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n. 7 (9th Cir. 2001)........... 6

*Texas v. United States of America*, 809 F.3d 134 (5th Cir. November 9, 2015) (Appeal No. 15-40238) ................................................................................................................................... 8

*U.S. v. Alvarez-Hernandez*, 478 F.3d 1060, 1065-1066 (9th Cir. 2007). ................................... 19

*United States v. LeCoe*, 936 F.2d 398, 403 (9th Cir.1991)......................................................... 18

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008) 6

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24, 129 S.Ct. 365, 172 L.Ed.2d 249, 555 U.S. 7, 77 USLW 4001 (2008) ............................................................................................... 6

*Zadvydas v. Davis Et Al.*, 533 U.S. 678 (2001) .......................................................................... 8

*Zivotofsky v. Kerry*, 576 U.S. ___, 135 S. Ct. 2076, 2083-84 (2015)........................................... 9

**Statutes**

28 U.S. Code § 1391 .................................................................................................................... 22

8 U.S. Code § 1182(f) ........................................................................... 9, 19

8 U.S.C. § 1152(a)(1)(A) ................................................................ ii, 18, 19

8 U.S.C. § 1182(f) ...................................................................... 18, 19, 20

8 U.S.C. § 1187(a)(12) .............................................................................. 12

Article II ................................................................................................... 23

Section 212(f) of the Immigration and Naturalization Act ........................ 9

**Rules**

Fed. R. Civ. P. 65(b)(1) ............................................................................. 6

FRAP 29(a)(4)(E) ...................................................................................... v

FRAP RULE 26.1 ....................................................................................... v

**FRAP RULE 26.1 AND FRAP 29(a)(4)(E)) DISCLOSURE STATEMENT**

Freedom Watch, Inc. is a 501(c)(3) not-for-profit organization, with no parent corporation and no publicly traded stock.

In compliance with Federal Rules of Appellate Procedure ("FRAP") Rule 29(a)(4)(E), Freedom Watch, Inc. further states that this brief was authored by counsel for Freedom Watch, without the involvement of counsel for any party in this matter. No party or counsel for such party contributed money that was intended to fund preparing or submitting this brief. No person other than the Amicus or its counsel contributed money that was intended to fund preparing or submitting this brief.


Dated: February 13, 2017                              */s/ Larry Klayman*
                                                      Larry Klayman
                                                      Counsel for Amicus Curiae
                                                      FREEDOM WATCH, INC.

v

## STATEMENT OF INTEREST OF AMICUS CURIAE

*Amicus Curiae* Freedom Watch, Inc. hereby respectfully submits this brief to assist the Court and the ends of justice pursuant to the FRAP Rule 29.  Counsel for the Appellants and Appellees have graciously offered their consent to this filing and therefore pursuant to FRAP Rule 29 and Circuit Rule 29, on the direction of this rule, a separate motion for leave to file this brief is not required.

Freedom Watch is a public interest group dedicated to preserving freedom, pursuing individual rights and civil liberties, preserving the rule of law and public confidence in the courts, and fighting for ethics in government and the judicial system, as well as investigating and prosecuting government corruption and abuse. As part of its goal to remain constant to the principles of the Founding Fathers, Freedom Watch is dedicated to ensuring the rights of all citizens through action, frequently with legal cases and other means.

Previously, Freedom Watch filed an Amicus Curiae brief before the U.S. Supreme Court in a related case, *Arizona v. United States,* 567 U.S. __, 132 S.Ct. 2492 (2012) which addressed some of the legal issues and considerations implicated here.  Similarly, Freedom Watch filed Amicus Curiae briefs before the U.S. Supreme Court and the U.S. District Court for the Southern District of Texas in *Texas v. United States*, 787 F.3d 733 (5th Cir. 2015), and brought a parallel case *Arpaio v. Obama* , in a petition before the U.S. Supreme Court as Case No.

15-643, including a petition for writ of certiorari in the U.S. Supreme Court concerning somewhat similar issues regarding President Barack Obama's authority to disregard federal law on immigration by Executive Order.

With the majority of the country's citizens demanding the integrity of the rule of law, enforcement of our nation's immigration laws, protection of the country's borders, and defense of their families, communities, and nation against terrorist threats, Freedom Watch is required to speak on behalf of those unable to do so. As such, consistent with its mission, Freedom Watch seeks to provide the means and mechanism to protect American citizens' rights in this matter of great public interest and to uphold our constitutional system of separation of powers and the rule of law.

## I.    SUMMARY OF ARGUMENT

> "*[W]hile the Constitution protects against invasions of individual rights, it is not a suicide pact.*" *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 160, 83 S.Ct. 554, 563, 9 L.Ed.2d 644 (1963). *The Constitution's due process guarantees call for no more than what has been accorded here: a statement of reasons and an opportunity for a prompt postrevocation hearing.*

*Haig v. Agee*, 453 U.S. 280, 310, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981) (emphases added); *Accord, Kennedy v. Rusk v. Cort*, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963).

This Court and the nation have been dragged into a constitutional crisis at break-neck speed, while leaving the nation unprotected from infiltration by terrorists.  On January 27, 2017, President Donald Trump issued an Executive Order **"Protecting the Nation from Foreign Terrorist Entry into the United States,"** ("Executive Order"), 82 Fed. Reg. 8,977, attached as Exhibit A.

> **"We want to ensure that we are not admitting into our country the very threats our soldiers are fighting overseas."**

-- Verbal statement by the President Trump, upon signing the Executive Order officially announcing its purpose.[1]

*Amicus Curiae* Freedom Watch respectfully offers its analysis for the benefit of this Court pursuant to FRAP Rule 29.  As other aspects of the case come before

---

[1]    Ken Thomas, "Trump Orders Strict New Refugee Screening, Citing Terrorists," Associated Press, January 27, 2017, accessible at: http://bigstory.ap.org/article/889887c9c328423b955920f4d7465e54/trump-expected-sign-directive-halting-refugee-flows-us

the Court, it is likely that Freedom Watch may offer further analysis separately.

Now before the Court is Appellants' motion for a stay of the Temporary Restraining Order ("TRO") from the U.S. District Court for the District of Washington ("District Court.")  Appellants seek a stay of a stay.  But defects in the TRO demonstrate that the TRO should be stayed, being deficient on the merits.

*En Banc* review is warranted of the Per Curiam Order on February 9, 2017, of a three-judge panel ("Panel") of the U.S. Court of Appeals for the Ninth Circuit ("Ninth Circuit").  The Panel has restrained the core, constitutionally-established role of the President of the United States as head of the nation's foreign policy, international relations, national security, national defense, commander-in-chief, and head of the executive branch.

First, the Appellees do not have standing under *parens patriae*.  Despite claiming that public universities are agencies of their States, the universities are claiming temporary inconvenience *by others*, not themselves.  Further, as the Panel admits, the Executive Order provides for a waiver.  Anyone affected who is not a threat to the country may receive a waiver.  According to news reports, everyone detained in transit has already received such a waiver and has already entered.

Also, in this constitutional crisis, unfolding at astonishing and dangerous speed, the courts have substituted their own national security judgments and factual analyses in place of the President's and the Congress' unique authority

under the Constitution. Specifically, to balance the harms for the TRO, the Honorable James L. Robart and the Panel decided for themselves that seven failed states -- hot beds of terrorism and lacking trustworthy records -- do not represent any real danger to U.S. families and communities. Such military, foreign policy, and national security analysis is not within the capabilities of the courts. The President is briefed by an extensive system of intelligence agencies.[2] This Court does not have regular access to those intelligence resources.

Moreover, the District Court and Panel were in error: Judge Robart inaccurately argued in the hearing that no terrorist attack had -- so far -- resulted from aliens entering from the seven failed states and Iran.[3] First, this demonstrates the lack of expertise of the courts. So-called "homegrown terrorists" born or naturalized in the United States are typically radicalized *by someone*. Aliens from the world's seven most dangerous countries may recruit for, train, incite, finance, organize, support, plan, and help implement terrorist attacks regardless of whether they personally deliver the bomb. The Panel erroneously assumed that terrorist threats are presented only by those who push the button.[4]

---

[2]     Justin Fishel and John Santucci, "Trump Receives 1st Presidential Daily Brief," ABC News, November 15, 2016, accessible at: http://abcnews.go.com/Politics/trump-receives-presidential-daily/story?id=43554271

[3]     Regrettably, Appellants' counsel stated he was unprepared to address the question on short notice. A slower, more-circumspect examination of these issues is necessary.

[4]     Jessica Vaughn, "Study Reveals 72 Terrorists Came From Countries Covered by Trump Vetting Order," Center for Immigration Studies, February 11, 2017, accessible at: http://cis.org/vaughan/study-reveals-72-terrorists-came-countries-covered-trump-vetting-order

Second, the claim is false:

> Since 9/11, 72 individuals from the seven mostly Muslim countries
> covered by President Trump's "extreme vetting" executive order
> have been convicted of terrorism, bolstering the administration's
> immigration ban. According to a report out Saturday, at least 17
> claimed to be refugees from those nations, three came in as
> "students," and 25 eventually became U.S. citizens.[5]

Thus, the balance of the equities and harms cannot sustain a TRO.

Moreover, the Ninth Circuit *en banc* should dismiss the case by the
Appellees as a non-justiciable "political question." Under that doctrine, the
District Court lacks Article III jurisdiction, and dismissal is mandatory. The
question is textually committed under our nation's Constitution to the President and
the Congress, and there are no legally-cognizable standards available for a court to
apply in substituting a court's judgment on national security threats in place of the
Commander-in-Chief's judgment.

Moreover, neither the Appellees-Plaintiffs nor the foreign college students
they complain for will suffer irreparable harm. Financial loss is, by definition,
recoverable. However, loss of life from a terrorist attack is the very essence of
irreparable harm. The Panel ignored the irreparable harm from terrorist attacks and
erroneously found irreparable harm that is compensable by money damages.

---

[5]     Paul Bedard, "Report: 72 convicted of terrorism from 'Trump 7' mostly Muslim
countries," The Washington Examiner, February 11, 2017, accessible at:
http://www.washingtonexaminer.com/report-72-terrorists-came-from-7-muslim-countries-trump-targeted/article/2614582

As the Panel admits on Page 10 of the Per Curiam Order: "The University of Washington has already incurred the costs of visa applications for those interns and will lose its investment if they are not admitted." The loss of an "investment" or "costs" are not irreparable harm. Therefore, the TRO must fail.

## II.   ARGUMENT

### A. APPELLEE STATES WILL NOT PREVAIL ON THE MERITS

Here, of course, the Appellants-Defendants seek *a stay of a stay* (TRO).[6] Appellants' request for a stay of the TRO must meet the well-known requirements for an injunction, stay, or TRO. Thus the Appellants must show that they have a substantial likelihood of success in vacating the TRO.

But where the February 3, 2017, TRO is fatally flawed, which it is, the Appellants are likely to prevail in vacating it, because of its flaws. Flaws in the TRO establish that the Appellants are entitled to a stay of the deficient TRO.

The TRO is fatally flawed because it does not even attempt to show that the Plaintiff State have any chance of succeeding in their lawsuit in the end. This is a central requirement. To obtain a temporary restraining order, the Appellees must have established (1) a likelihood of success on the merits; (2) that irreparable harm is likely in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and 4) that an injunction is in the public interest. *Winter v. Nat.*

---

[6]      The TRO should be vacated instead.

*Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008);

Fed. R. Civ. P. 65(b)(1); *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240

F.3d 832, 839 n. 7 (9th Cir. 2001).

> A preliminary injunction is an extraordinary remedy never awarded as of right. *Munaf,* 553 U.S., at 689-690, 128 S.Ct., at 2218–2219. In each case, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Production Co.,* 480 U.S., at 542, 107 S.Ct. 1396. "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Romero–Barcelo,* 456 U.S., at 312, 102 S.Ct. 1798; see also *Railroad Comm'n of Tex. v. Pullman Co.,* 312 U.S. 496, 500, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

*Winter v. Natural Res. Def. Council, Inc*., 555 U.S. at 24.

## B. STANDING

As the Panel stated in its Per Curiam Order page 8:

> We have an independent obligation to ascertain our jurisdiction, *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006), and we consider the Government's argument de novo, *see, e.g., Hajro v. U.S. Citizenship & Immigration Servs.*, 811 F.3d 1086, 1098 (9th Cir. 2016). We conclude that the States have made a sufficient showing to support standing, at least at this preliminary stage of the proceedings.

First, even though the Appellees argue that public universities are agencies

of the Plaintiff States, nevertheless they are still claiming the interests of others

inconvenienced in traveling to the universities.

> In *Massachusetts v. Mellon*, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078, the Court held a State lacked standing to challenge, as *parens patriae*, a federal grant-in-aid program under which the Federal Government was allegedly usurping powers reserved to the States. It

was said in Mellon:

> '[T]he citizens of Massachusetts are also citizens of the United States. It cannot be conceded that a State, as *parens patriae*, may institute judicial proceedings to protect citizens of the United States from the operation of the statutes thereof. While the State, under some circumstances, may sue in that capacity for the protection of its citizens (*Missouri v. Illinois*, 180 U.S. 208, 241, 21 S.Ct. 331, 45 L.Ed. 497), it is no part of its duty or power to enforce their rights in respect of their relations with the Federal Government.

*Commonwealth of Massachusetts v. Laird*, 400 U.S. 886, 887, 91 S.Ct. 128, 27 L.Ed.2d 140 (1970) (dissenting opinion).

A "State does not have standing as *parens patriae* to bring an action against the Federal Government" on behalf of its citizens. *Alfred L. Snapp & Son v. Puerto Rico ex rel. Barez,* 458 U.S. 592, 610 n.16 (1982); *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923). Nor does *Massachusetts v. EPA*, 549 U.S. 497 (2007), independently authorize the States to litigate on behalf of their citizens. *Massachusetts* involved an allegation that Massachusetts was losing land along its coastline to rising oceans, 549 U.S. at 522, and the Court further deemed it "of critical importance" that Congress had authorized the exact type of challenge the State brought, *id.* at 516. Indeed, 8 U.S.C. 1252(g) expressly forecloses suits by aliens themselves for denial of a visa. *Reno v. Am.-Arab Anti-Discrimination Comm. ("AAADC")*, 525 U.S. 471, 483-85 (1999).

Those affected are the United States' citizens as well as the States'. Even a noted case on amnesty for illegal aliens, *Texas v. United States,* agrees:

7

> The court also considered but ultimately did not accept the
> notions that Texas could sue as *parens patriae* on behalf of
> citizens facing economic competition from DAPA
> beneficiaries and that the state had standing based on the
> losses it suffers generally from illegal immigration.

*Texas v. United States of America*, 809 F.3d 134 (5th Cir. November 9, 2015)
(Appeal No. 15-40238).

Second, aliens cannot have standing in U.S. courts for the denial of rights

they do not have. Since no one has a right to enter the United States who is not a

U.S. citizen, *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 73 S.Ct.

625, 97 L.Ed. 956 (1953); *Zadvydas v. Davis Et Al.*, 533 U.S. 678 (2001), even

those aliens kept out have no standing because they have no right of entry. Foreign

university teachers and students had no legal right or expectancy to displace U.S.

teachers and students with foreigners.

Third, any alien who is not a terrorist threat is eligible for a waiver. As the

Per Curiam Order admits on page 4:

> Sections 3(g) and 5(e) of the Executive Order allow the Secretaries of
> State and Homeland Security to make case-by-case exceptions to
> these provisions "when in the national interest." 82 Fed. Reg. 8,978-
> 80. Section 5(e) states that situations that would be in the national
> interest include "when the person is a religious minority in his country
> of nationality facing religious persecution." 82 Fed. Reg. 8,979. The
> Executive Order requires the Secretaries of State and Homeland
> Security and the Director of National Intelligence to evaluate the
> United States' visa, admission, and refugee programs during the
> periods in which entry is suspended. 82 Fed. Reg. 8,977-80.

Therefore, anyone who is not found to be a terrorist threat is not harmed

because they can receive a waiver.

## C. THE 1952 STATUTE IGNORED. PRESIDENT'S POWER TO REGULATE ENTRY INTO THE UNITED STATES IS CLEAR AND ALMOST UNLIMITED

As is now well-known by almost every U.S. citizen who consumes news, we start with the congressional legislation that confirms the President's authority in 8 U.S. Code § 1182(f), Section 212(f) of the Immigration and Naturalization Act:

> (f) Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

And, of course, even without the benefit of legislation, the President has inherent constitutional authority over foreign policy. *See, e.g., Zivotofsky v. Kerry*, 576 U.S. ___, 135 S. Ct. 2076, 2083-84 (2015). Of course that power is at its zenith when Congress by statute has agreed by legislation, as is true here. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U. S. 579 (1952). *see also, e.g., Harisiades v. Shaughnessy*, 342 U.S. 580, 588 (1952) (recognizing that control over immigration is an integral part of Article II authorities "in regard to the conduct of foreign relations [and] the war power").

Yet the Panel completely ignored the statute that gives the President the clear and unfettered authority to issue the Executive Order under 8 U.S.C. §

1182(f).   In fact, the President's role in proclaiming a suspension under 8 U.S.C. § 1182(f) is a statutory role (as well as constitutional authority).   Therefore, the Panel was effectively trying to enjoin the statute, not the Executive Order.

### D. STRAW-MAN ARGUMENT OF RELIGIOUS DISCRIMINATION

The Muslim nation of Kuwait has also banned entry into Kuwait from five (5) of the same seven (7) countries.[7]   The issue is the risk of terrorism, not religion.

Most Muslim-majority countries in the Middle East have accepted ***zero*** -- none -- of these affected refugees.[8] Even fabulously-wealthy Muslim-majority nations like Saudi Arabia and the United Arab Emirates refuse to trust these Muslim refugees into their own countries,[9] where they share common languages, cultures, social structures, familiar social support institutions, food, methods, and religions, because of the risk of letting terrorists into their countries.

As now-President Trump stated on the campaign trail, as reported by CNN:

**"I LOVE THE MUSLIMS. I THINK THEY'RE GREAT PEOPLE,"** [10]

---

[7]     "After Trump, Now Kuwait Bans 5 Muslim-Majority Countries, Including Pakistan," NDTV, February 2, 2017, accessible at:  http://www.ndtv.com/world-news/kuwait-bans-5-muslim-majority-countries-including-pakistan-1655311

[8]     Richard Pollock, "Persian Gulf Muslim States Have Accepted No Syrian Refugees," Daily Caller, November 24, 2015, accessible at:  http://dailycaller.com/2015/11/24/persian-gulf-muslim-states-have-accepted-no-syrian-refugees/

[9]     Ishaan Tharoor, "The Arab World's Wealthiest Nations Are Doing Next to Nothing for Syria's Refugees," The Washington Post, September 4, 2015, accessible at:  https://www.washingtonpost.com/news/worldviews/wp/2015/09/04/the-arab-worlds-wealthiest-nations-are-doing-next-to-nothing-for-syrias-refugees/?utm_term=.b13685bd30b6

[10]     MJ Lee and Noah Gray, "**Trump to CNN: 'I love the Muslims**,'" CNN, September 20, 2015, accessible at:  http://www.cnn.com/2015/09/19/politics/donald-trump-muslims-controversy/index.html

proclaimed candidate Donald Trump.   Further:  "They [townhall attendees] asked whether the billionaire businessman would consider putting a Muslim in his Cabinet or on his ticket.  **'Oh, absolutely, no problem with that.'** Trump responded. **'Would I consider putting a Muslim-American in my Cabinet? Absolutely no problem with that.'**"[11]  Thus, Appellees ripped Trump's campaign statements out of context.  Clearly, Trump was referring, if very imprecisely, to Syrian refugees who where the topic under which Trump made his comments.

Appellees would have us believe that the Trump Administration seeks to discriminate against Muslims -- *but only for 90 days* -- and then only from the world's seven most dangerous countries in terms of terrorism. Of the world's 49 [12] Muslim-majority countries,[13] the Executive Order leaves 42 unaffected. The fiction that the Executive Order targets religion is untenable and absurd.  Nowhere does it mention Muslims or Islam, Christians, Jews nor mention religion at all.

### E. COURT USURPING PRESIDENTIAL ROLE:  EXECUTIVE ORDER TARGETS "FAILED STATES" PLUS TERRORIST SPONSOR, HOSTILE IRAN, NOT ISLAM

The Executive Order suspended entry into the country of aliens from Iran, Libya, Somalia, Sudan, Yemen, ***Iraq, and Syria***.  Of course, terrorist ISIS stands

---

[11]     *Id.*
[12]     Counts vary from 49 to 51 or 52 Muslim-majority nations by various reports.
[13]     "Muslim-Majority Countries Comprising the Islamic World," Center for the Education of Women, University of Michigan, accessible at: http://www.cew.umich.edu/muslim_majority ; The Pew Research Center identifies 49 countries:  "The Future of the Global Muslim Population: Muslim-Majority Countries," Pew Research Center, January 27, 2011, accessible at: http://www.pewforum.org/2011/01/27/future-of-the-global-muslim-population-muslim-majority/

for "the Islamic State *of Iraq and Syria*."  Thus, 2 of the 7 are nations in which the

United States is actively in a hot war with ISIS right now.  As the Panel admits at

pages 3-4 of its Per Curiam Order:

> It asserts, "Deteriorating conditions in certain countries due to war,
> strife, disaster, and civil unrest increase the likelihood that terrorists
> will use any means possible to enter the United States.  The United
> States must be vigilant during the visa-issuance process to ensure that
> those approved for admission do not intend to harm Americans and
> that they have no ties to terrorism." *Id.*

The Executive Order covers only those countries identified, during the

Obama Administration, pursuant to  8 U.S.C. § 1187(a)(12).  Trump ordered

(emphasis added):

> I hereby proclaim that the immigrant and nonimmigrant
> entry into the United States of aliens *from countries
> referred to in section 217(a)(12) of the INA, 8 U.S.C.
> 1187(a)(12)*, would be detrimental to the interests of the
> United States, and I hereby suspend entry into the United
> States, as immigrants and nonimmigrants, of such persons
> for 90 days from the date of this order (excluding those
> foreign nationals traveling on diplomatic visas, North
> Atlantic Treaty Organization visas, C-2 visas for travel to
> the United Nations, and G-1, G-2, G-3, and G-4 visas).

The Appellees misrepresent this case as being about religion, and even if it

were this is irrelevant, as there is not right for foreign aliens of any race, religion,

ethnicity, national origin or sexual preference to enter the United States, if he or

she is not a citizen or permanent resident.  And, that bogus argument cannot

survive the clear text of the Executive Order.

The seven countries are selected not because they are Muslim, but because those "failed states" are in chaos (and Iran is implacably hostile and a state sponsor of terrorism), such that documents and records related to a person seeking entry into the United States cannot be trusted. Records about potential entrants necessary to investigate and screen entrants for national security purposes are either non-existent or incomplete or worse commonly forged or falsified due to rampant corruption of officials, poverty-stricken bureaucrats, threats of violence or intimidation against bureaucrats, or terrorist infiltration of governments. [14]

Governmental records, police reports, identity papers, etc., from the seven nations are easily forged or official governmental records falsified. [15] Even the starting point of a refugee's actual identity is unreliable. A terrorist could present

---

[14] Testimony of Secretary of Homeland Security John Kelly, Homeland Security Committee, U.S. House of Representatives, April 7, 2017, accessible on C-SPAN at: https://www.c-span.org/video/?423321-1/homeland-security-secretary-john-kelly-testifies-us-border-security&live

[15] Chuck Ross, " FBI Director Admits US Can't Vet All Syrian Refugees For Terror Ties [VIDEO]," The Daily Caller, accessible at: http://dailycaller.com/2015/10/21/fbi-director-admits-us-cant-vet-all-syrian-refugees-for-terror-ties-video/; Jerry Markon, "Senior Obama officials have warned of challenges in screening refugees from Syria," The Washington Post, November 17, 2015, accessible at: https://www.washingtonpost.com/news/federal-eye/wp/2015/11/17/senior-obama-officials-have-warned-of-challenges-in-screening-refugees-from-syria/?utm_term=.bc0746040762

himself *under a false name* as a refugee, with no record on the false name. [16]

## F. NONJUSTICIABLE POLITICAL QUESTION

Several ingredients necessary to the TRO analysis are political questions which are non-justiciable: Whether there is irreparable harm, the balance of equities (harm), the supposed motivation for issuing the Executive Order, whether the threats of terrorism justify the temporary inconvenience to aliens and other discrete components of the analysis depend upon whether the courts should usurp the authority of the President and the Congress over international relations, foreign policy, national security, and the President's role as Commander-in-Chief.

> It is well established that the federal courts will not adjudicate political questions. *See, e.g., Coleman v. Miller*, 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939); *Oetjen v. Central Leather Co.*, 246 U.S. 297, 38 S.Ct. 309, 62 L.Ed. 726 (1918). In *Baker v. Carr, supra,* we noted that political questions are not justiciable primarily because of the separation of powers within the Federal Government. After reviewing our decisions in this area, we concluded that on the surface of any case held to involve a political question was at least one of the following formulations:
>
> > 'a textually demonstrable constitutional commitment of the issue to a co-ordinate political

---

[16] *Id.;* Director of the Federal Bureau of Investigation James Comey stated: "We can query our databases until the cows come home, but nothing will show up because we have no record of that person…You can only query what you have collected." And: FBI Assistant Director Michael Steinbach said that "the concern in Syria is that we don't have the systems in places on the ground to collect the information… All of the data sets, the police, the intel services that normally you would go and seek that information [from], don't exist." Kelly Riddell, "FBI director warns of coming "terrorist diaspora," as Democrats push for more Syrian refugees," The Washington Times, September 28, 2016, accessible at: http://www.washingtontimes.com/news/2016/sep/28/james-comey-warns-coming-terrorist-diaspora-democr/

department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due co-ordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.' 369 U.S., at 217, 82 S.Ct., at 710.

*Powell v. Cormack*, 395 U.S. 486, 518-519, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969)

Under the political question doctrine, the District Court lacks Article III jurisdiction, and dismissal is mandatory. The question is textually committed under our nation's Constitution to the President and the Congress, and there are no legally-cognizable standards available for a court to apply in substituting a court's judgment on national security threats in place of the Commander-in-Chief's judgment. The courts are not a forum in which competing litigants can present their preferred excerpts from classified intelligence briefings and the court can render a decision on whether a threat of terrorism does or does not rise to the level of constituting irreparable harm by entrants from this or that country.

Beyond all question, the Panel's decision is "expressing lack of the respect due co-ordinate branches of government", *id.*, and "embarrassment from multifarious pronouncements by various departments on one question," *id.* The TRO directly cripples the President's core constitutional roles as Commander-in-

Chief, head of the nation's international relations and foreign policy, national security, national defense, and defense of the nation's borders in areas and in ways that courts are not qualified to second guess by debates over classified intelligence.

## G. SEVERABILITY OF THE EXECUTIVE ORDER

The Panel was concerned about the role of the Judiciary in rewriting the Executive Order. However, the concern is misplaced here.

Arguably, as the Appellants contend, the Executive Order does not apply on its terms to so-called green card owners or lawful permanent residents. Therefore, the Ninth Circuit can rule that the Executive Order either does not or should not restrict green card holders. Since it is doubtful that the Executive Order was ever intended to apply to those persons at all, it is possible to sever consideration of those persons from the rest of the Executive Order. The remainder can function as intended for other persons.

Similarly, can application to holders of existing visas be severed from the remainder? By way of analogy to statutes, where there are few precedents in this area, the Executive Order is severable because:

> "[A] court should refrain from invalidating more of the statute than is necessary. . . . '[W]henever an act of Congress contains unobjectionable provisions separable from those found to be unconstitutional, it is the duty of this court to so declare, and to maintain the act in so far as it is valid.' " *Regan v. Time, Inc.*, 468 U.S. 641, 652, 104 S.Ct. 3262 3268, 82 L.Ed.2d 487 (1984) (plurality opinion), quoting *El Paso & Northeastern R. Co. v. Gutierrez*, 215 U.S. 87, 96, 30 S.Ct. 21, 24, 54 L.Ed. 106 (1909). The standard for

determining the severability of an unconstitutional provision is well established: " 'Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law.' " *Buckley v. Valeo*, 424 U.S. 1, 108, 96 S.Ct. 612, 677, 46 L.Ed.2d 659 (1976) (per curiam ), quoting *Champlin Refining Co. v. Corporation Comm'n of Oklahoma*, 286 U.S. 210, 234, 52 S.Ct. 559, 564, 76 L.Ed. 1062 (1932). *Accord: Regan v. Time, Inc.*, 468 U.S., at 653, 104 S.Ct., at 3269; *INS v. Chadha*, 462 U.S., at 931-932, 103 S.Ct., at 2773-2774; *United States v. Jackson*, 390 U.S. 570, 585, 88 S.Ct. 1209 1218, 20 L.Ed.2d 138 (1968).

Congress could not have intended a constitutionally flawed provision to be severed from the remainder of the statute if the balance of the legislation is incapable of functioning independently. *See, e.g., Hill v. Wallace*, 259 U.S. 44, 70-72, 42 S.Ct. 453, 458-459, 66 L.Ed. 822 (1922) ....

The more relevant inquiry in evaluating severability is whether the statute will function in a manner consistent with the intent of Congress.

*Alaska Airlines, Inc v. Brock*, 480 U.S. 678, 684-685, 107 S.Ct. 1476, 94 L.Ed.2d 661 (1987).

The Panel admits that it was reviewing only isolated sections of the

Executive Order:

Three days later, on January 30, 2017, the State of Washington filed suit in the United States District Court for the Western District of Washington, challenging sections 3(c), 5(a)-(c), and 5(e) of the Executive Order, naming as defendants the President, the Secretary of the Department of Homeland Security, the Secretary of State, and the United States (collectively, "the Government").

Per Curiam Order, page 5.

## H. 8 U.S.C. § 1152(a)(1)(A) DID NOT REPEAL 8 U.S.C. § 1182(f)

The Appellees-Plaintiffs hang their case on seeking to undercut 8 U.S.C. § 1182(f) by setting up a conflict with 8 U.S.C. § 1152(a)(1)(A), as tying the President's hands.[17]  Whereas 8 U.S.C. § 1182(f) explicitly names the President as having authority, 8 U.S.C. § 1152(a)(1)(A) does not address the President's authority. However, a repeal or partial repeal should not be lightly assumed.

> It is well settled, however, that repeals by implication are not favored, see, e.g., *TVA v. Hill*, 437 U.S. 153, 189, 98 S.Ct. 2279 2299, 57 L.Ed.2d 117 (1978), and will not be found unless an intent to repeal is " 'clear and manifest.' " *United States v. Borden Co.*, 308 U.S. 188, 198, 60 S.Ct. 182, 188, 84 L.Ed. 181 (1939) (quoting *Red Rock v. Henry*, 106 U.S. 596, 602, 1 S.Ct. 434, 439, 27 L.Ed. 251 (1883)). Nothing in the language of these two provisions suggests the existence of the " ' "irreconcilable conflict," ' " *Kremer v. Chemical Construction Corp.*, 456 U.S. 461, 468, 102 S.Ct. 1883 1890, 72 L.Ed.2d 262 (1982) (citations omitted), from which an intent to repeal may be inferred.

*Rodriguez v. United States*, 480 U.S. 522, 107 S.Ct. 1391, 94 L.Ed.2d 533 (1987)

Moreover, the federal courts recognize well-established rules harmonizing interpretation of amendments or subsequent enactments.

> [W]e presume that Congress is aware of the legal context in which it is legislating. See *Cannon v. Univ. of Chicago.*, 441 U.S. 677, 696-97, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) ("It is always appropriate to assume that our elected representatives, like other citizens, know the law. . . ."); *United States v. LeCoe*, 936 F.2d 398, 403 (9th Cir.1991) ("Congress is, of course, presumed to

---

[17]    Amicus Curiae has not found appellate precedents interpreting 18 U.S.C. § 1182(f) -- only unrelated cases involving § 1182(a).

know existing law pertinent to any new legislation it enacts.").

*Abrego Abrego v. The Dow Chemical Co.*, 443 F.3d 676, 687-686 (9th Cir., 2006)

> "We also 'presume that when Congress amends a statute, it is knowledgeable about judicial decisions interpreting the prior legislation,' *Porter v. Bd. of Trs. of Manhattan Beach Unified Sch. Dist.*, 307 F.3d 1064, 1072 (9th Cir. 2002) ....

*U.S. v. Alvarez-Hernandez*, 478 F.3d 1060, 1065-1066 (9th Cir. 2007).

Therefore, we must interpret the later-enacted 8 U.S.C. § 1152(a)(1)(A) as consistent with the President's authority under 8 U.S. Code § 1182(f). Congress did not intend to retract any authority from the President to conduct foreign policy. At least we must presume so under rules of statutory construction.

## I. APPELLEES' RELIANCE ON 8 U.S.C. § 1152(a)(1)(A) MISPLACED

> Or perhaps, as was the case in *Clinton v. City of New York*, 524 U.S. 417, 429, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998), the statutory context makes that intention clear, because any other reading of "individual" would lead to an " 'absurd' " result Congress could not plausibly have intended.

*Mohamad v. Palestinian Auth.,* 132 S. Ct. 1702, 182 L.Ed.2d 720 (2012)

8 U.S.C. § 1152(a)(1)(A) places both national origin and religion on the same footing. It would lead to an absurd result -- which must be avoided -- to interpret 8 U.S.C. § 1152(a)(1)(A) as prohibiting the President from basing his actions under 8 U.S.C. § 1182(f) on national origin (like religion). So, it would produce an "absurd result" to interpret 8 U.S.C. § 1152(a)(1)(A) as limiting the

President's 8 U.S.C. § 1182(f) authority.

Moreover, subparagraph § 1152(a)(1)(A) concerns the allocation of immigration among various countries, not the power of the President in protecting the country against national security threats.

## J. IRREPARABLE HARM SUPPORTS THE EXECUTIVE ORDER, NOT THE APPELLEES

The Appellees cannot show irreparable harm or even any legally-cognizable harm, including because the Executive Order and surrounding law allows each potential visitor, entrant, or immigrant to obtain an individual, case-by-case waiver, as the Per Curiam Order admits on page 4 (quoted in Section B, *supra*). Apparently 100% of all affected travelers have in fact received waivers allowing them to enter notwithstanding the Executive Order.[18]

The definition of irreparable harm is that there is no adequate remedy at law. *See, generally,* Black's Law Dictionary Free Online Legal Dictionary 2nd Ed ("Irreparable Damage"); *Alexander v. Americans United Inc.*, 416 U.S. 752, 761-762, 94 S.Ct. 2053, 40 L.Ed.2d 518 (1974); *Beacon Theaters, Inc v. Westover*, 359 U.S. 500, 507, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959); *Pulliam v. Allen*, 466 U.S. 522, 537, 104 S.Ct. 1970, 80 L.Ed.2d 565 (1984) (rendered obsolete on a different issue

---

[18]    "Travelers Detained Due To Trump Travel Ban Released, Attorneys Say," January 28, 2017, CBS News Chicago Channel 2, accessible at: http://chicago.cbslocal.com/2017/01/28/travelers-detained-due-to-trump-travel-ban-released-attorneys-say/

not relevant here). That is, even though courts assign monetary damages to intangible losses routinely, irreparable harm must be an injury that cannot be compensated by money damages. Appellees have shown no irreparable harm.

On the other side of the balance of harm, there is irreparable harm to the national security of the United States. Appellees contend that the recent status quo cannot constitute irreparable harm. Yet the Presidential Finding in the Executive Order is that the recent status quo of lax foreign policy, lax enforcement and a careless lack of concern for the safety of the American people has increasingly spawned death, violence, and destruction on U.S. soil in recent years. Actual recent terrorist attacks in San Bernadino, California,[19] Boston, Massachusetts,[20] Orlando, Florida, and Garland, Texas, [21] and Ft. Lauderdale International Airport[22] in addition to earlier incidents such as the first and second terrorist attacks at the World Trade Center on February 26, 1993 and September, 11, 2001.

---

[19]    Michael S. Schmidt and Richard Perez-Pena, "F.B.I. Treating San Bernardino Attack as Terrorism Case," New York Times, December 4, 2015, accessible at: https://www.nytimes.com/2015/12/05/us/tashfeen-malik-islamic-state.html

[20]    "Russia warned U.S. about Boston Marathon bomb suspect Tsarnaev: report," Reuters, March 25, 2014, accessible at: http://www.reuters.com/article/us-usa-explosions-boston-congress-idUSBREA2P02Q20140326

[21]    Jim Sciutto, Pamela Brown, Paul Cruic, "ISIS claims responsibility for Texas shooting but offers no proof," CNN, May 5, 2015, accessible at: http://www.cnn.com/2015/05/05/us/garland-texas-prophet-mohammed-contest-shooting/; Jim Sciutto, Pamela Brown, Paul Cruic, CNN, May 5, 2015, accessible at: http://www.cnn.com/2015/05/05/politics/texas-attack-terror-tweets/index.html

[22]    Greg Pallone, "FBI: Airport gunman traveled to Florida for massacre," Fox News Channel 13 of Orlando, Florida, January 7, 2017, accessible at: http://www.mynews13.com/content/news/cfnews13/news/article.html/content/news/articles/cfn/2017/1/7/fort_lauderdale_airp.html

Thus, the danger to the national security clearly outweighs temporary delays in travel by persons from the world's seven most dangerous countries in terms of terrorist activity directed against the United States. The risk of terrorism against U.S. cities and citizens outweighs travelers' inconvenience.

## K. COURT SHOULD CONSOLIDATE MULTI-DISTRICT LITIGATION: FORUM NON CONVENIENS AND JUDGE SHOPPING

According to news reports, lawsuits have been filed on this exact same topic in many federal circuits.[23] Under the doctrine of forum *non conveniens* and venue rules governed by 28 U.S. Code § 1391, the Appellees-Defendants' case should be dismissed and the case transferred to the District of Columbia. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981). The Appellees engaged in forum-shopping. The Defendants, Appellants here, are all in the District of Columbia. All of the evidence and witnesses are in the District of Columbia or overseas, including the visa processing of potential entrants by the U.S. Department of State. All of the events at issue occurred or are occurring in the District of Columbia.

Moreover, all cases should be consolidated as multi-district litigation for pre-trial proceedings under 28 U.S. Code § 1407 on this Court's initiative.

---

[23] Matt Pearce, "Trump has been sued more than 60 times since becoming president: A partial survey," The New York Times, February 11, 2017, accessible at: http://www.latimes.com/nation/la-na-trump-lawsuits-20170210-story.html

## III.   <u>CONCLUSION</u>

The Appellees, Plaintiff States, have set up a constitutional crisis, crippling the President of the United States as Commander in Chief and head of international relations, from carrying out his Constitutional duties under Article II.  The U.S. Constitution was developed and ratified largely due to our Founders' realization that in international relations and national defense a single national leader must be free to act for the nation.  This is obviously true for the presidency.

Emergency treatment and prompt action on these matters is appropriate. Increasingly-frequent terrorist attacks have been occurring on U.S. soil in response to the spread of radical Islamic terrorism and the rise of the Islamic State of Iraq and Syria (ISIS) styling itself as the re-establishment of an Islamic Caliphate dedicated, in the minds of ISIS, to conquer the entire Earth without exception.

The people who live and work in this circuit, no less than any other large U.S. city as an inviting "soft target," primarily Jews and Christians, are in imminent danger of sworn enemies of the United States of America, enemies who believe in their own minds -- however much we might view things differently ourselves -- that their eternal destiny is contingent upon their murder of Americans to further their "religious beliefs." In the case of Islam, this, according to the Quran, is the elimination of "infidels" in the name of Allah.  The U.S.

23

Government, of course, cares not why people want to kill us, only that they do. The question is not religion but threats to the nation.

Even if the government focused on areas of high-risk concentrated in Islamic affiliation based upon actual facts on the ground, this would obviously be constitutional and legal. Some decades ago, Catholic versus Protestant violence and actual terrorism in Northern Ireland presented a genuine danger.[24] Many would rightly say that the violence and terrorism did not represent either Catholic or Protestant religious traditions, yet the violence was real all the same.

Now, wishing away the actual, fact-based high concentration of violence and terrorism directed against the United States, Christians, and Jews does not transform defending our families and our country against attacks into religious discrimination. Discriminating between visitors who represent threats of violence from those who are benign is one of the core duties of the President and the entire U.S. Government. Terrorists attacking Americans keep insisting that they are doing so in the name of Islam, and our hapless officials keep pretending otherwise. Addressing threats where they are actually found is not religious discrimination.

Terrorist supporters and agents from the seven dangerous countries may not be the gunmen or bombers who end up in the news. They may also be the ones who train, assist, equip, and finance others. Discussion of home-grown terrorists is

---

[24]     Bryan Coll, "Terror Returns to Northern Ireland," <u>TIME Magazine</u>, March 8, 2009, accessible at: <u>http://content.time.com/time/world/article/0,8599,1883723,00.html?iid=sr-link1</u>

used to argue for open borders. But the agent provocateurs who radicalize the home-grown terrorists are flooding into our country by the hundreds of thousands. Thus, all need to be thoroughly vetted before they are permitted to gain entry into the United States. The President's Executive Order merely places a temporary 90 day moratorium on immigration as the new administration develops a truly functional means of this required vetting, in the interests of national security.

Dated: February 14, 2017

Respectfully submitted,

    /s/ Larry Klayman, Esq.
Larry Klayman, Esq.
FREEDOM WATCH, INC.
2020 Pennsylvania Avenue N.W.,
Suite 345
Washington, D.C. 20006
Telephone: (561) 997-9956
leklayman@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that service of the foregoing motion and proposed brief will be delivered electronically on February 14, 2017, to counsel for Plaintiffs and Defendants through the District's Electronic Case Filing system.

     /s/  Larry Klayman, Esq.
Larry Klayman, Esq.
FREEDOM WATCH, INC.

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief is in Times New Roman in 14 point font size, and totals 6,637 words, including the Statement of Interest of Amicus Curiae, in keeping with FRAP 29 and Circuit Rules.

Pursuant to the Court's Supplemental Briefing Order of February 10, 2017,

the briefing on *en banc* review was set at 14,000 words, higher than the normal 4,200 words permitted by the rules typically.  Following the rules direction that an *Amicus Curiae* brief be one-half of the number of words of a principal brief, the *Amicus Curiae* understands that 7,000 words are available for its brief.

 /s/  Larry Klayman, Esq.
Larry Klayman, Esq.
FREEDOM WATCH, INC.

## CERTIFICATE OF FILING BY CONSENT

I hereby certify that counsel for the Appellees and Appellants have given their consent in writing (by email) to the filing of this Amicus Curiae brief.

 /s/  Larry Klayman, Esq.
Larry Klayman, Esq.
FREEDOM WATCH, INC.

# **<u>EXHIBIT A</u>**



*the* WHITE HOUSE   *PRESIDENT DONALD J. TRUMP*

Get in Touch

| BRIEFING ROOM | ISSUES | THE ADMINISTRATION | PARTICIPATE | 1600 PENN |

## Briefing Room

**Speeches & Remarks**

**Press Briefings**

**Statements & Releases**

**Presidential Actions**

  **Executive Orders**

  Presidential Memoranda

  Proclamations

  Related OMB Material
    Budgetary Impact
    Analysis
    Memorandum
    Statements of
    Administration Policy

**Legislation**

**Nominations &
Appointments**

**Disclosures**

**The White House**
Office of the Press Secretary

For Immediate Release                       January 27, 2017

# EXECUTIVE ORDER: PROTECTING THE NATION FROM FOREIGN TERRORIST ENTRY INTO THE UNITED STATES

EXECUTIVE ORDER

- - - - - - -

Protecting the Nation from Foreign Terrorist Entry into the United States

    By the authority vested in me as President by the Constitution and laws of the United States of America, including the Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq*., and section 301 of title 3, United States Code, and to

protect the American people from terrorist attacks by foreign nationals admitted to the United States, it is hereby ordered as follows:

Section 1. Purpose. The visa-issuance process plays a crucial role in detecting individuals with terrorist ties and stopping them from entering the United States. Perhaps in no instance was that more apparent than the terrorist attacks of September 11, 2001, when State Department policy prevented consular officers from properly scrutinizing the visa applications of several of the 19 foreign nationals who went on to murder nearly 3,000 Americans. And while the visa-issuance process was reviewed and amended after the September 11 attacks to better detect would-be terrorists from receiving visas, these measures did not stop attacks by foreign nationals who were admitted to the United States.

Numerous foreign-born individuals have been convicted or implicated in terrorism-related crimes since September 11, 2001, including foreign nationals who entered the United States after receiving visitor, student, or employment visas, or who entered through the United States refugee resettlement program. Deteriorating conditions in certain countries due to war, strife, disaster, and civil unrest increase the likelihood that terrorists will use any means possible to enter the United States. The United States must be vigilant during the visa-issuance process to ensure that those approved for admission do not intend to harm Americans and that they have no ties to terrorism.

In order to protect Americans, the United States must ensure that those admitted to this country do not bear hostile attitudes toward it and its founding principles. The United States cannot, and should not, admit those who do not support the Constitution, or those who would place violent ideologies over American law. In addition, the United States should not admit those who engage in acts of bigotry or hatred (including "honor" killings, other forms of violence against women, or the persecution of those who practice religions

different from their own) or those who would oppress Americans of any race, gender, or sexual orientation.

Sec. 2.  Policy.  It is the policy of the United States to protect its citizens from foreign nationals who intend to commit terrorist attacks in the United States; and to prevent the admission of foreign nationals who intend to exploit United States immigration laws for malevolent purposes.

Sec. 3.  Suspension of Issuance of Visas and Other Immigration Benefits to Nationals of Countries of Particular Concern.  (a)  The Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence, shall immediately conduct a review to determine the information needed from any country to adjudicate any visa, admission, or other benefit under the INA (adjudications) in order to determine that the individual seeking the benefit is who the individual claims to be and is not a security or public-safety threat.

(b)  The Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence, shall submit to the President a report on the results of the review described in subsection (a) of this section, including the Secretary of Homeland Security's determination of the information needed for adjudications and a list of countries that do not provide adequate information, within 30 days of the date of this order.  The Secretary of Homeland Security shall provide a copy of the report to the Secretary of State and the Director of National Intelligence.

(c)  To temporarily reduce investigative burdens on relevant agencies during the review period described in subsection (a) of this section, to ensure the proper review and maximum utilization of available resources for the screening of foreign nationals, and to ensure that adequate standards are established to prevent infiltration by foreign terrorists or criminals, pursuant to section 212(f)

of the INA, 8 U.S.C. 1182(f), I hereby proclaim that the immigrant and
nonimmigrant entry into the United States of aliens from countries referred to
in section 217(a)(12) of the INA, 8 U.S.C. 1187(a)(12), would be detrimental to
the interests of the United States, and I hereby suspend entry into the United
States, as immigrants and nonimmigrants, of such persons for 90 days from the
date of this order (excluding those foreign nationals traveling on diplomatic
visas, North Atlantic Treaty Organization visas, C-2 visas for travel to the United
Nations, and G-1, G-2, G-3, and G-4 visas).

   (d)  Immediately upon receipt of the report described in subsection (b) of this
section regarding the information needed for adjudications, the Secretary of
State shall request all foreign governments that do not supply such information
to start providing such information regarding their nationals within 60 days of
notification.

   (e)  After the 60-day period described in subsection (d) of this section expires,
the Secretary of Homeland Security, in consultation with the Secretary of State,
shall submit to the President a list of countries recommended for inclusion on a
Presidential proclamation that would prohibit the entry of foreign nationals
(excluding those foreign nationals traveling on diplomatic visas, North Atlantic
Treaty Organization visas, C-2 visas for travel to the United Nations, and G-1,
G-2, G-3, and G-4 visas) from countries that do not provide the information
requested pursuant to subsection (d) of this section until compliance occurs.

   (f)  At any point after submitting the list described in subsection (e) of this
section, the Secretary of State or the Secretary of Homeland Security may
submit to the President the names of any additional countries recommended
for similar treatment.

   (g)  Notwithstanding a suspension pursuant to subsection (c) of this section
or pursuant to a Presidential proclamation described in subsection (e) of this

section, the Secretaries of State and Homeland Security may, on a case-by-case basis, and when in the national interest, issue visas or other immigration benefits to nationals of countries for which visas and benefits are otherwise blocked.

(h)  The Secretaries of State and Homeland Security shall submit to the President a joint report on the progress in implementing this order within 30 days of the date of this order, a second report within 60 days of the date of this order, a third report within 90 days of the date of this order, and a fourth report within 120 days of the date of this order.

Sec. 4.  Implementing Uniform Screening Standards for All Immigration Programs.  (a)  The Secretary of State, the Secretary of Homeland Security, the Director of National Intelligence, and the Director of the Federal Bureau of Investigation shall implement a program, as part of the adjudication process for immigration benefits, to identify individuals seeking to enter the United States on a fraudulent basis with the intent to cause harm, or who are at risk of causing harm subsequent to their admission. This program will include the development of a uniform screening standard and procedure, such as in-person interviews; a database of identity documents proffered by applicants to ensure that duplicate documents are not used by multiple applicants; amended application forms that include questions aimed at identifying fraudulent answers and malicious intent; a mechanism to ensure that the applicant is who the applicant claims to be; a process to evaluate the applicant's likelihood of becoming a positively contributing member of society and the applicant's ability to make contributions to the national interest; and a mechanism to assess whether or not the applicant has the intent to commit criminal or terrorist acts after entering the United States.

(b)  The Secretary of Homeland Security, in conjunction with the Secretary of State, the Director of National Intelligence, and the Director of the Federal

Bureau of Investigation, shall submit to the President an initial report on the progress of this directive within 60 days of the date of this order, a second report within 100 days of the date of this order, and a third report within 200 days of the date of this order.

Sec. 5.  Realignment of the U.S. Refugee Admissions Program for Fiscal Year 2017.  (a)  The Secretary of State shall suspend the U.S. Refugee Admissions Program (USRAP) for 120 days.  During the 120-day period, the Secretary of State, in conjunction with the Secretary of Homeland Security and in consultation with the Director of National Intelligence, shall review the USRAP application and adjudication process to determine what additional procedures should be taken to ensure that those approved for refugee admission do not pose a threat to the security and welfare of the United States, and shall implement such additional procedures.  Refugee applicants who are already in the USRAP process may be admitted upon the initiation and completion of these revised procedures.  Upon the date that is 120 days after the date of this order, the Secretary of State shall resume USRAP admissions only for nationals of countries for which the Secretary of State, the Secretary of Homeland Security, and the Director of National Intelligence have jointly determined that such additional procedures are adequate to ensure the security and welfare of the United States.

(b)  Upon the resumption of USRAP admissions, the Secretary of State, in consultation with the Secretary of Homeland Security, is further directed to make changes, to the extent permitted by law, to prioritize refugee claims made by individuals on the basis of religious-based persecution, provided that the religion of the individual is a minority religion in the individual's country of nationality.  Where necessary and appropriate, the Secretaries of State and Homeland Security shall recommend legislation to the President that would assist with such prioritization.

(c)  Pursuant to section 212(f) of the INA, 8 U.S.C. 1182(f), I hereby proclaim that the entry of nationals of Syria as refugees is detrimental to the interests of the United States and thus suspend any such entry until such time as I have determined that sufficient changes have been made to the USRAP to ensure that admission of Syrian refugees is consistent with the national interest.

(d)  Pursuant to section 212(f) of the INA, 8 U.S.C. 1182(f), I hereby proclaim that the entry of more than 50,000 refugees in fiscal year 2017 would be detrimental to the interests of the United States, and thus suspend any such entry until such time as I determine that additional admissions would be in the national interest.

(e)  Notwithstanding the temporary suspension imposed pursuant to subsection (a) of this section, the Secretaries of State and Homeland Security may jointly determine to admit individuals to the United States as refugees on a case-by-case basis, in their discretion, but only so long as they determine that the admission of such individuals as refugees is in the national interest -- including when the person is a religious minority in his country of nationality facing religious persecution, when admitting the person would enable the United States to conform its conduct to a preexisting international agreement, or when the person is already in transit and denying admission would cause undue hardship -- and it would not pose a risk to the security or welfare of the United States.

(f)  The Secretary of State shall submit to the President an initial report on the progress of the directive in subsection (b) of this section regarding prioritization of claims made by individuals on the basis of religious-based persecution within 100 days of the date of this order and shall submit a second report within 200 days of the date of this order.

(g)  It is the policy of the executive branch that, to the extent permitted by

Case: 17-35105, 02/14/2017, ID: 10319752, DktEntry: 145, Page 42 of 46

law and as practicable, State and local jurisdictions be granted a role in the process of determining the placement or settlement in their jurisdictions of aliens eligible to be admitted to the United States as refugees.  To that end, the Secretary of Homeland Security shall examine existing law to determine the extent to which, consistent with applicable law, State and local jurisdictions may have greater involvement in the process of determining the placement or resettlement of refugees in their jurisdictions, and shall devise a proposal to lawfully promote such involvement.

Sec. 6.  Rescission of Exercise of Authority Relating to the Terrorism Grounds of Inadmissibility.  The Secretaries of State and Homeland Security shall, in consultation with the Attorney General, consider rescinding the exercises of authority in section 212 of the INA, 8 U.S.C. 1182, relating to the terrorism grounds of inadmissibility, as well as any related implementing memoranda.

Sec. 7.  Expedited Completion of the Biometric Entry-Exit Tracking System. (a)  The Secretary of Homeland Security shall expedite the completion and implementation of a biometric entry-exit tracking system for all travelers to the United States, as recommended by the National Commission on Terrorist Attacks Upon the United States.

(b)  The Secretary of Homeland Security shall submit to the President periodic reports on the progress of the directive contained in subsection (a) of this section.  The initial report shall be submitted within 100 days of the date of this order, a second report shall be submitted within 200 days of the date of this order, and a third report shall be submitted within 365 days of the date of this order.  Further, the Secretary shall submit a report every 180 days thereafter until the system is fully deployed and operational.

Sec. 8.  Visa Interview Security.  (a)  The Secretary of State shall immediately suspend the Visa Interview Waiver Program and ensure compliance with section

222 of the INA, 8 U.S.C. 1222, which requires that all individuals seeking a nonimmigrant visa undergo an in-person interview, subject to specific statutory exceptions.

(b)  To the extent permitted by law and subject to the availability of appropriations, the Secretary of State shall immediately expand the Consular Fellows Program, including by substantially increasing the number of Fellows, lengthening or making permanent the period of service, and making language training at the Foreign Service Institute available to Fellows for assignment to posts outside of their area of core linguistic ability, to ensure that non-immigrant visa-interview wait times are not unduly affected.

Sec. 9.  Visa Validity Reciprocity.  The Secretary of State shall review all nonimmigrant visa reciprocity agreements to ensure that they are, with respect to each visa classification, truly reciprocal insofar as practicable with respect to validity period and fees, as required by sections 221(c) and 281 of the INA, 8 U.S.C. 1201(c) and 1351, and other treatment.  If a country does not treat United States nationals seeking nonimmigrant visas in a reciprocal manner, the Secretary of State shall adjust the visa validity period, fee schedule, or other treatment to match the treatment of United States nationals by the foreign country, to the extent practicable.

Sec. 10.  Transparency and Data Collection.  (a)  To be more transparent with the American people, and to more effectively implement policies and practices that serve the national interest, the Secretary of Homeland Security, in consultation with the Attorney General, shall, consistent with applicable law and national security, collect and make publicly available within 180 days, and every 180 days thereafter:

(i)   information regarding the number of foreign nationals in the United States who have been charged with terrorism-related offenses while in the United

Case: 17-35105, 02/14/2017, ID: 10319752, DktEntry: 145, Page 44 of 46

States; convicted of terrorism-related offenses while in the United States; or removed from the United States based on terrorism-related activity, affiliation, or material support to a terrorism-related organization, or any other national security reasons since the date of this order or the last reporting period, whichever is later;

(ii)   information regarding the number of foreign nationals in the United States who have been radicalized after entry into the United States and engaged in terrorism-related acts, or who have provided material support to terrorism-related organizations in countries that pose a threat to the United States, since the date of this order or the last reporting period, whichever is later; and

(iii)  information regarding the number and types of acts of gender-based violence against women, including honor killings, in the United States by foreign nationals, since the date of this order or the last reporting period, whichever is later; and

(iv)   any other information relevant to public safety and security as determined by the Secretary of Homeland Security and the Attorney General, including information on the immigration status of foreign nationals charged with major offenses.

(b)  The Secretary of State shall, within one year of the date of this order, provide a report on the estimated long-term costs of the USRAP at the Federal, State, and local levels.

Sec. 11.  General Provisions.  (a)  Nothing in this order shall be construed to impair or otherwise affect:

(i)   the authority granted by law to an executive department or agency, or the head thereof; or

Case: 17-35105, 02/14/2017, ID: 10319752, DktEntry: 145, Page 45 of 46

(ii)  the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b)  This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c)  This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

DONALD J. TRUMP

   

**HOME**

**BRIEFING ROOM**

From the News Room

Latest News

From the Press Office

Speeches & Remarks

Press Briefings

Statements & Releases

Presidential Actions

Legislation

Nominations & Appointments

Disclosures

**ISSUES**

Top Issues

America First Energy Plan

America First Foreign Policy

Bringing Back Jobs And Growth

Making Our Military Strong Again

Standing Up For Our Law Enforcement Community

Trade Deals That Work For All Americans

**THE ADMINISTRATION**

People

President Donald J. Trump

Vice President Mike Pence

First Lady Melania Trump

Mrs. Karen Pence

The Cabinet

Special Events

The 58th Presidential Inauguration

**PARTICIPATE**

Join Us

Tours & Events

Jobs with the Administration

Internships

White House Fellows

Share Your Thoughts

We the People Petitions

Contact the White House

**1600 PENN**

History & Grounds

Presidents

First Ladies

The Vice President's Residence & Office

Eisenhower Executive Office Building

Camp David

Air Force One

Our Government

The Executive Branch

The Legislative Branch

The Judicial Branch

The Constitution

Federal Agencies &

Commissions

Elections & Voting

State & Local Government

USA.gov | Privacy Policy | Copyright Policy