**No. 17-35105**

# In the United States Court of Appeals for the Ninth Circuit

————

STATE OF WASHINGTON; STATE OF MINNESOTA,

Plaintiffs-Appellees,

*v.*

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES; U.S. DEPARTMENT OF HOMELAND SECURITY; REX W. TILLERSON, SECRETARY OF STATE; JOHN F. KELLY, SECRETARY OF THE DEPARTMENT OF HOMELAND SECURITY; UNITED STATES OF AMERICA,

Defendants-Appellants.

————

On Appeal from the United States District Court
for the Western District of Washington

————

## BRIEF FOR THE STATE OF TEXAS AS AMICUS CURIAE IN SUPPORT OF REHEARING EN BANC

————

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697
scott.keller@oag.texas.gov

SCOTT A. KELLER
Solicitor General

J. CAMPBELL BARKER
Deputy Solicitor General

ARI CUENIN
Assistant Solicitor General

# TABLE OF CONTENTS

Page

Interest of amicus curiae ........................................................................ 1

Statement ............................................................................................... 1

    A.  Statutory background ............................................................. 1

    B.  The challenged Executive Order ........................................... 3

        1.  Suspension of entry ....................................................... 4

        2.  Refugee-program directives ........................................... 5

    C.  Procedural history .................................................................. 6

Summary of the argument ...................................................................... 7

Argument ............................................................................................. 10

    I.  The Executive Order falls well within the powers Congress delegated to the Executive, so plaintiffs' claim that the Order violates the INA is baseless. ...................................................... 10

        A.  The Order's suspension of entry conforms with 8 U.S.C. § 1182(f) and does not violate the INA. ............................... 11

        B.  The Order's directives on refugee admission conform with 8 U.S.C. § 1182(f) and do not violate the INA. .................... 13

    II.  Plaintiffs' arguments that the Executive Order violates the Constitution are equally meritless. .............................................. 14

        A.  The Executive acted in an area of maximum authority: *Youngstown*'s first category of Executive action pursuant to congressionally delegated power. ........................................ 14

        B.  The due-process claim fails because nonresident aliens abroad have no constitutionally protected right to seek entry into the United States. .......................................................... 16

        C.  Equal-protection rights are neither implicated nor violated by the Executive Order. ............................................................. 23

        D.  The Executive Order neither triggers nor violates the Establishment Clause. .......................................................... 34

Conclusion ........................................................................................... 35

Certificate of service ........................................................................... 36

Certificate of compliance ..................................................................... 37

i

## Table of Authorities

Page(s)

Cases:

*Al Bahlul v. United States*,
   767 F.3d 1 (D.C. Cir. 2014) ................................................................16

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
   526 U.S. 40 (1999) .......................................................................... 18

*Arizona v. United States*,
   132 S. Ct. 2492 (2012) ................................................................ 1, 15

*Azizi v. Thornburgh*,
   908 F.2d 1130 (2d Cir. 1990) ........................................................ 18

*Boumediene v. Bush*,
   553 U.S. 723 (2008) ....................................................8, 17, 18, 25, 26

*City of New Orleans v. Dukes*,
   427 U.S. 297 (1976) ........................................................................ 33

*Cutter v. Wilkinson*,
   544 U.S. 709 (2005) ........................................................................ 34

*Dames & Moore v. Regan*,
   453 U.S. 654 (1981) ........................................................................ 14

*De Avilia v. Civiletti*,
   643 F.2d 471 (7th Cir. 1981) ........................................................ 18

*Demore v. Kim*,
   538 U.S. 510 (2003) ........................................................................19

*Graham v. Richardson*,
   403 U.S. 365 (1971) ........................................................................ 32

*Haitian Refugee Ctr. v. Smith*,
   676 F.2d 1023 (5th Cir. 1982) ........................................................ 22

*Heller v. Doe*,
   509 U.S. 312 (1993) ........................................................................ 33

*Johnson v. Eisentrager*,
   339 U.S. 763 (1950) ....................................................................17, 23

*Kerry v. Din*,
   135 S. Ct. 2128 (2015) ................................................................ 22, 23

*Kleindienst v. Mandel*,
   408 U.S. 753 (1972) ................................................................ 15, 17, 22

*Knauff v. Shaughnessy*,
    338 U.S. 537 (1950) .................................................... 15

*Knoetze v. U.S. Dep't of State*,
    634 F.2d 207 (5th Cir. 1981) ....................................... 19

*Lamont v. Woods*,
    948 F.2d 825 (2d Cir. 1991) ........................................ 34

*Landon v. Plasencia*,
    459 U.S. 21 (1982) .......................................17, 18, 20, 21

*Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State:*
    45 F.3d 469 (D.C. Cir. 1995) ....................................... 13
    104 F.3d 1349 (D.C. Cir. 1997) .................................... 18

*Louhghalam v. Trump*,
    No. 1:17-cv-10154, 2017 WL 479779 (D. Mass. Feb. 3, 2017) ............... 7, 18, 34

*Malek-Marzban v. INS*,
    653 F.2d 113 (4th Cir. 1981) ....................................... 32

*Mathews v. Diaz*,
    426 U.S. 67 (1976) .................................................16, 32

*McCleskey v. Kemp*,
    481 U.S. 279 (1987) ................................................. 25

*Nademi v. INS*,
    679 F.2d 811 (10th Cir. 1982) ..................................... 32

*Narenji v. Civiletti*,
    617 F.2d 745 (D.C. Cir. 1979) ..................................... 32

*Pers. Adm'r of Mass. v. Feeney*,
    442 U.S. 256 (1979) ...............................................24, 25, 26

*Plyler v. Doe*,
    457 U.S. 202 (1982) ................................................. 26

*Rajah v. Mukasey*,
    544 F.3d 427 (2d Cir. 2008) ........................................ 32

*Republican Party of Minn. v. White*,
    536 U.S. 765 (2002) ................................................. 26

*Rodriguez-Silva v. INS*,
    242 F.3d 243 (5th Cir. 2001) ....................................... 33

*Sale v. Haitian Ctrs. Council, Inc.*,
    509 U.S. 155 (1993)................................................. 11

*Shaughnessy v. United States ex rel. Mezei*,
    345 U.S. 206 (1953) .........................................................1, 2, 20

*Soskin v. Reinertson*,
    353 F.3d 1242 (10th Cir. 2004) ...................................... 32

*Swarthout v. Cooke*,
    562 U.S. 216 (2011) (per curiam)................................... 18

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) ...........................................15

*United States v. Salerno*,
    481 U.S. 739 (1987) .........................................................16

*United States v. Verdugo-Urquidez*,
    494 U.S. 259 (1990) ...................................................17, 23

*Yick Wo v. Hopkins*,
    118 U.S. 356 (1886).......................................................... 23

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ............................................ 8, 14, 15, 25

*Zadvydas v. Davis*,
    533 U.S. 678 (2001) ................................... 19, 20, 23, 33

Constitutional provisions, statutes, and rules:

U.S. Const.:
    art. I ........................................................................... 8
    amend. I.................................................. 6, 8, 15, 23, 34, 35
    amend. V ............................................... 6, 8, 17, 19, 23, 33
    amend. X ...................................................................... 6
    amend. XIV ................................................................ 24

8 U.S.C. § 1735(a) ........................................................... 28

50 U.S.C. § 1541 note ..................................................... 25

Immigration and Nationality Act, 8 U.S.C. §§ 1101 *et seq.*:...........................*passim*
    § 1101(a)(4) .................................................................. 2
    § 1101(a)(13)(A) ...................................................2, 3, 12
    § 1101(a)(15) ............................................................. 12
    § 1101(a)(15)(A)-(V)................................................... 2
    § 1101(a)(15)-(16) ......................................................11
    § 1101(a)(20) ............................................................2, 5
    § 1101(a)(42) ............................................................. 22

§ 1151 ............................................................................................... 2

§ 1151(a)-(b) .................................................................................. 11

§ 1152(a) .......................................................................................... 12

§ 1152(a)(1)(A) ......................................................... 11, 12, 13, 14

§ 1152(a)(1)(B) ............................................................................ 12

§ 1153 ............................................................................................... 2

§ 1153(c) ....................................................................................... 32

§ 1157 ............................................................................................... 2

§ 1157(a) ........................................................................................ 22

§ 1157(a)(2) ................................................................................... 13

§ 1157(a)(3) ................................................................................... 35

§ 1157 note ................................................................................... 35

§ 1158 .......................................................................................2, 22

§ 1158(a) ........................................................................................ 22

§ 1158(c)(1) ................................................................................... 22

§ 1159 ............................................................................................... 2

§ 1181 ............................................................................................... 2

§ 1181(a) ................................................................................. 11, 12

§ 1181(c) ...................................................................................14, 22

§ 1182(a) ...................................................................................2, 12

§ 1182(a)(9)(B) ............................................................................ 20

§ 1182(f) .......................................... 3, 7, 8, 10, 11, 12, 13, 14, 15, 20, 21, 22

§ 1184 ............................................................................................... 2

§ 1184(b) ........................................................................................ 12

§ 1187(a)(12) ..........................................................................4, 5, 25

§ 1187(a)(12)(A) ............................................................................ 4

§ 1187(a)(12)(A)(i)(I) .................................................................... 4

§ 1187(a)(12)(A)(i)(II) ................................................................... 4

§ 1187(a)(12)(A)(ii)(I) ................................................................... 4

§ 1187(a)(12)(A)(ii)(II) .................................................................. 4

§ 1187(a)(12)(D)(ii) ....................................................................... 5

§ 1201(e)-(f) ................................................................................... 12

§ 1201(h) ....................................................................................3, 12

§ 1201(h)-(i) ................................................................................... 19

§ 1201(i) ........................................... 3, 7, 8, 9, 12, 20, 21

§ 1225(a)(1) ..................................................................................... 2

§ 1225(a)(3) ................................................................................... 12

§ 1225(b)(1)(A)(i) ......................................................................... 12

§ 1225(b)(2) ............................................................................... 12

§ 1225(b)(2)(A) .................................................................... 2, 19

§ 1231 note ............................................................................ 21

§ 1254a(a)(1) ........................................................................ 32

§ 1255 note ............................................................................ 32

Administrative Procedure Act,
    5 U.S.C. §§ 551 *et seq.* ...................................................... 6

Authorization for Use of Military Force,
    Pub. L. No. 107-40, 115 Stat. 224 ..................................... 25

Haitian Refugee Immigration Fairness Act of 1998,
    Pub. L. No. 105-277, div. A, § 101(h), tit. IX, 112 Stat. 2681–538 .................. 32

Homeland Security Act of 2002,
    Pub. L. No. 107-296, 116 Stat. 2135 ................................. 27

Intelligence Reform and Terrorism Prevention Act of 2004,
    Pub. L. No. 108-458, 118 Stat. 3638 ................................. 21

National Defense Authorization Act for Fiscal Year 2016,
    Pub. L. No. 114-92, 129 Stat. 726 (2015) ...................... 25-26

Nicaraguan Adjustment and Central American Relief Act,
    Pub. L. No. 105-100, tit. II, 111 Stat. 2160 (1997) ........... 32

Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb *et seq.* ........... 6

22 C.F.R. § 41.122 ................................................................. 12

22 C.F.R. § 42.82 ................................................................... 12

Miscellaneous:

161 Cong. Rec. H9054 (daily ed. Dec. 8, 2015) ................... 31

Exec. Order 13,769, 82 Fed. Reg. 8,977 (Feb. 1, 2017) ............ *passim*

H. Comm. on Homeland Sec., 114th Cong., *Terror Threat Snapshot: The Islamist Terrorist Threat* (Nov. 2015) .......................... 30

H. Comm. on Homeland Sec., 114th Cong., *Final Report of the Task Force on Combating Terrorist and Foreign Fighter Travel* (Sept. 2015) ........ 27, 31

H. Comm. on Homeland Sec., 114th Cong., *Nation's Top Security Officials' Concerns on Refugee Vetting* (Nov. 19, 2015) ............. 29, 30

H. Comm. on Homeland Sec., 114th Cong., *Syrian Refugee Flows: Security Risks and Counterterrorism Challenges* (Nov. 2015) ........... 30

H.R. 5203, 114th Cong. (2016) ............................................. 29

Jack Moore & Conor Gaffey, *What's Behind Donald Trump's Decision to Include Some Muslim-Majority Countries in the Travel Ban—and Not Others?*, Newsweek, Jan. 31, 2017 ................................................... 24

Letter of Bob Goodlatte, Chairman, H. Comm. on the Judiciary, to Barack Obama, President of the United States of America (Oct. 27, 2015) ............... 30

Letter of Edward J. Ramotowski, Deputy Assistant Sec'y, Bureau of Consular Affairs, Dep't of State (Jan. 27, 2017) ................................................ 5

*Overturning 30 Years of Precedent: Is the Administration Ignoring the Dangers of Training Libyan Pilots and Nuclear Scientists?: Joint Hearing Before the Subcomm. on Immigration & Border Sec. of the H. Comm. on the Judiciary and the Subcomm. on Nat'l Sec. of the H. Comm. on Oversight & Gov't Reform*, 113th Cong. (2014) .................................................... 28

Pew Research Ctr., *World's Muslim Population More Widespread Than You Might Think* (Jan. 31, 2017) ............................................................... 24

Press Release, Forbes, Goodlatte, and Gowdy Introduce Bill to Strengthen Visa Security (May 12, 2016) ........................................................... 29

*The Outer Ring of Border Security: DHS's International Security Programs: Hearing Before the Subcomm. on Border & Maritime Sec. of the H. Comm. on Homeland Sec.*, 114th Cong. (2015) ............................................ 27

The White House, *Report on the Legal and Policy Frameworks Guiding the United States' Use of Military Force and Related National Security Operations* (Dec. 2016) ...................................................................... 26

U.S. Dep't of Homeland Sec., *DHS Announces Further Travel Restrictions for the Visa Waiver Program* (Feb. 18, 2016) ....................................... 5

U.S. Dep't of State, *State Sponsors of Terrorism* ........................................ 4

U.S. Gov't Accountability Off., GAO-16-50, *Asylum: Additional Actions Needed to Assess and Address Fraud Risks* (Dec. 2015) ....................... 29

## Interest of Amicus Curiae

Amicus curiae is the State of Texas.[1] Like every other State in the Union, amicus has a significant interest in protecting its residents' safety. But the State itself possesses no authority to set the terms and conditions of entry for aliens seeking to enter the United States, or to restrict the entry of such aliens for foreign-affairs, public-safety, or national-security reasons. Instead, the State relies on the federal Executive Branch to carry out that function, pursuant to the laws of Congress. *See Arizona v. United States*, 132 S. Ct. 2492, 2507 (2012). Congress has delegated to the Executive Branch significant authority to prohibit aliens from entering the country, and the challenged Executive Order is a lawful exercise of that authority. Plaintiffs' lawsuit presents no basis to enjoin the Executive's exercise of the power delegated to it by Congress.

## Statement

### A. Statutory background

1. "Courts have long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210 (1953). Towards that end, Congress has enacted "extensive and complex" statutes governing "immigration and alien status," *Arizona*, 132 S. Ct. at 2499—namely, the Immigration and Nationality Act ("INA"), 8 U.S.C.

---

[1] By separate motion, amicus requests leave to file this brief.

§§ 1101 *et seq.* The INA creates two primary categories of aliens who can be lawfully present in the country:

- Aliens admitted as "nonimmigrant" aliens, who receive temporary permission to be lawfully present in the country according to one of several visa categories. 8 U.S.C. § 1101(a)(15)(A)-(V).

- Aliens admitted for lawful permanent residence, i.e., LPRs, who lawfully entered the country with an "immigrant" visa. *Id.* §§ 1101(a)(20), 1151, 1153, 1181.

Congress also created other avenues to lawful presence, such as admission as a refugee, *id.* §§ 1157, 1159, and asylum, *id.* § 1158.

2. Alien "[a]dmission" means "the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." *Id.* § 1101(a)(13)(A). Mere physical presence on U.S. soil is not enough: "an alien present in the United States who has not been admitted or who arrives in the United States" is considered only an "applicant for admission." *Id.* § 1225(a)(1); *see Mezei*, 345 U.S. at 215 (noting that an alien at a port of entry "is treated as if stopped at the border"). If an alien "is not clearly and beyond a doubt entitled to be admitted," he must generally be placed in removal proceedings. 8 U.S.C. § 1225(b)(2)(A).

Admission and visa-possession are distinct concepts. The INA provides that aliens generally must first obtain a visa before they are allowed to apply for admission. *Id.* §§ 1101(a)(4), 1181, 1184. Obtaining a visa requires avoiding numerous grounds that make aliens "ineligible to receive visas and ineligible to be admitted to the United States." *Id.* § 1182(a). But even if an alien possesses a visa, that does not guarantee an alien's admission into the country: the INA does not "entitle any

alien, to whom a visa or other documentation has been issued, to be admitted [to] the United States, if, upon arrival at a port of entry in the United States, he is found to be inadmissible under this chapter, or any other provision of law." *Id.* § 1201(h).

Besides the minimum prerequisites for admission, the INA separately and specifically vests the President with broad discretion to suspend the entry of aliens:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f). Because aliens covered by such a proclamation—even if they hold a previously issued visa, *see id.* § 1201(h)—are barred from "entry . . . into the United States," *id.* § 1182(f), they are thus ineligible to be "admi[tted]," *id.* § 1101(a)(13)(A).

In addition to the President's delegated power to suspend the entry of aliens in § 1182(f), Congress further provided that the Executive Branch "may at any time, in [its] discretion," revoke a visa. *Id.* § 1201(i). And Congress barred judicial review of the Executive's discretionary visa revocations, except in one narrow circumstance: in a removal proceeding, if the "revocation provides the sole ground for removal." *Id.*

## B. The challenged Executive Order

On January 27, 2017, the President issued an Executive Order "to protect the American people from terrorist attacks by foreign nationals admitted to the United

3

States." Exec. Order 13,769, 82 Fed. Reg. 8,977 (Feb. 1, 2017) ("EO"); *see id.* § 2. The Order directs several national-security measures, including that the Secretary of Homeland Security conduct an immediate review to identify the "information needed from any country . . . to determine that [an] individual seeking [an immigration-related] benefit is who the individual claims to be and is not a security or public-safety threat." *Id.* § 3(a).

### 1.  Suspension of entry

While that review is pending, the Executive Order suspends, for 90 days, the entry of aliens "from countries referred to in section 217(a)(12) of the INA, 8 U.S.C. [§] 1187(a)(12)." EO § 3(c). That statutory cross-reference ultimately covers seven countries: Iraq, Iran, Libya, Somalia, Sudan, Syria, and Yemen.

Congress itself identified Iraq, Iran, Sudan, and Syria as countries whose nationals or recent visitors would be barred from the visa-waiver program under 8 U.S.C. § 1187(a)(12)(A). *See id.* § 1187(a)(12)(A)(i)(I), (ii)(I) (Iraq and Syria); *id.* § 1187(a)(12)(A)(i)(II), (ii)(II) (including countries designated by the Secretary of State as sponsors of terrorism—Iran, Sudan, and Syria[2]). In addition, Congress authorized the Executive to designate, as likewise triggering exclusion from the visa-waiver program, additional "[c]ountries or areas of concern" based on "whether the presence of an alien in the country or area increases the likelihood that the alien is a credible threat to the national security of the United States," "whether a for-

---

[2] *See* U.S. Dep't of State, *State Sponsors of Terrorism*, https://www.state.gov/j/ct/list/c14151.htm.

eign terrorist organization has a significant presence in the country or area," and "whether the country or area is a safe haven for terrorists." *Id.* § 1187(a)(12)(D)(ii). In February 2016, the Obama Administration exercised that authority to add Libya, Somalia, and Yemen as additional "countries of concern" triggering the waiver-program bar under 8 U.S.C. § 1187(a)(12).[3]

The Executive Order provides for case-by-case exceptions to the suspension of entry by aliens from the seven identified countries. EO § 3(g). And the Executive has clarified that "the suspension of entry does not apply to lawful permanent residents of the United States (i.e., an immigrant admitted with the privilege of residing permanently in the United States, 8 U.S.C. § 1101(a)(20))." C.A. Stay Mot. 6 (citing Feb. 1, 2017 Memorandum (Exhibit D)).

Pursuant to the Executive Order, and on the same day, the State Department provisionally revoked "all valid nonimmigrant and immigrant visas of nationals of Iraq, Iran, Libya, Somalia, Sudan, Syria, and Yemen," subject to certain exceptions not at issue here.[4]

### 2. Refugee-program directives

The Executive Order also generally suspends the refugee program for 120 days. EO § 5(a), (e). Once that suspension ends, the Executive Order directs the

---

[3] U.S. Dep't of Homeland Sec., *DHS Announces Further Travel Restrictions for the Visa Waiver Program* (Feb. 18, 2016), https://www.dhs.gov/news/2016/02/18/dhs-announces-further-travel-restrictions-visa-waiver-program.

[4] Letter of Edward J. Ramotowski, Deputy Assistant Sec'y, Bureau of Consular Affairs, Dep't of State (Jan. 27, 2017).

Secretary of State to prioritize applicants on the basis of whether they are seeking refuge from religious persecution, "provided that the religion of the individual is a minority religion in the individual's country of nationality." *Id.* § 5(b). Finally, the Executive Order suspends entry of Syrian nationals as refugees until the President determines that sufficient changes have been made to the refugee program "that admission of Syrian refugees is consistent with the national interest." *Id.* § 5(c).

The Executive Order never mentions Islam or conditions any of its provisions on whether aliens are Muslim.

## C.  Procedural history

The State of Washington sued the United States, the President, the Secretary of State, and the Secretary of Homeland Security, asserting statutory and constitutional challenges to the Executive Order. Washington amended its complaint to add the State of Minnesota as a plaintiff and moved for a temporary restraining order. TRO Mot. (D.E.3); Am. Compl. (D.E.18). Plaintiffs' motion mounted a facial challenge to the Executive Order—arguing that it violates the INA, the Fifth Amendment's Due Process Clause, Fifth Amendment equal-protection jurisprudence, and the First Amendment's Establishment Clause. TRO Mot. (D.E.3) 5-21.[5]

The district court held a hearing and entered an order enjoining the Executive Order on a nationwide basis and in all its applications. TRO (D.E.52). Another district court, however, has rejected a similar challenge to the Order, finding that the

---

[5] Plaintiffs' amended complaint also raised claims that the Executive Order violated the Religious Freedom Restoration Act, the Administrative Procedure Act, and the Tenth Amendment. Am. Compl. (D.E.18) 15-18.

plaintiffs in that case were unlikely to prevail. *Louhghalam v. Trump*, No. 1:17-cv-10154, 2017 WL 479779, at *3-8 (D. Mass. Feb. 3, 2017) (slip op. 6-21).

On February 4, 2017, defendants moved for an emergency stay in this Court. A three-judge panel denied the motion on February 9, 2017. The panel found that defendants had not shown a likelihood of success on the merits of the appeal or that failure to enter a stay would cause irreparable injury. Panel Op. 3. Specifically, the panel ruled that plaintiffs would prevail on their due-process claim. Panel Op. 20-23. Strikingly, the panel never mentioned either the Executive Branch's statutory authority to prohibit the entry of aliens under 8 U.S.C. § 1182(f) or the Executive's virtually unreviewable discretion to revoke visas under § 1201(i).

On February 10, 2017, this Court noted its sua sponte consideration of whether to grant rehearing en banc.

## Summary of the Argument

After multiple federal officials drew public attention to serious flaws in the preexisting vetting scheme for aliens residing abroad who wish to enter this country under visas or as refugees, the Executive Branch made a policy decision entrusted to it expressly by Congress: the Executive temporarily suspended the admission of specified classes of aliens pursuant to its broad delegated authority under 8 U.S.C. § 1182(f). That Executive Order identified a heightened national-security risk attendant to seven "countries of concerns" that Congress and the Obama Administration had previously identified under national-security-risk criteria.

The district court's facial injunction of that Executive Order, and the three-judge panel's refusal to grant a stay, is remarkable. The Order falls within the Ex-

7

ecutive Branch's strongest area of authority—*Youngstown*'s first zone of executive action—because it draws support from not only the President's own foreign-affairs and national-security powers, but also from Congress's delegated authorization pursuant to its Article I powers over the admission of aliens into the country. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635-36 (1952) (Jackson, J., concurring). The Executive Order, especially given its national-security context, should thus enjoy "the strongest of presumptions and the widest latitude of judicial interpretation." *Id.* at 637. After all, "[u]nlike the President and some designated Members of Congress, neither the Members of [the Supreme] Court nor most federal judges begin the day with briefings that may describe new and serious threats to our Nation and its people." *Boumediene v. Bush*, 553 U.S. 723, 797 (2008).

The panel, however, did not even mention the President's statutorily delegated power to suspend the entry of aliens (8 U.S.C. § 1182(f)) or to revoke visas (§ 1201(i)). It therefore failed to recognize that the Executive Order falls within *Youngstown*'s first zone of executive action and should be accorded the strongest presumption of validity.

Rather than accord the Executive's delegated national-security decision the strongest presumption of validity, the panel found an extraordinary extension of constitutional rights to *nonresident aliens* who are *outside this country* and attempting to enter the country. Amicus is aware of no case that extends constitutional rights in anything close to the degree that plaintiffs advocate. The Supreme Court has never held that the Fifth Amendment's Due Process Clause or the First Amendment's Establishment Clause confer rights on nonresident aliens who are in foreign

territory clearly not under the sovereign control of the United States. Nonresident aliens abroad have no constitutional right to seek admission into the country; therefore, no constitutional claims accrue from a suspension of those aliens' ability to enter. And statutorily created visas—generally a threshold requirement for being able simply to apply for admission to the country—are inherently not an entitlement. Rather, they are granted and held on a permissive, discretionary basis. Congress expressly designed visas to be revocable by the Executive without even judicial review in all but one instance. 8 U.S.C. § 1201(i). Thus, entry into the country—or revocation of a visa—does not implicate a constitutionally protected interest in receiving due process or equal "protection" of visa laws that themselves provide for discretionary revocation.

Regardless, even assuming for sake of analysis that these constitutional provisions apply to nonresident aliens abroad seeking entry, the Executive Order triggers only rational-basis review because it classifies aliens according to nationality, not religion. The Order is grounded in national-security concerns, a point with which plaintiffs' pretext argument cannot be squared. The seven countries cross-referenced in the Executive Order were previously identified by Congress and the Obama Administration, under the visa-waiver program, as national-security "countries of concern." Until this lawsuit, amicus is aware of no suggestion that the federal government's selection of those seven countries could be explained only as pretext for religious discrimination and not based on a determination of heightened national-security risks.

9

In fact, before the current presidential Administration took office, multiple federal officials expressed concerns with deficiencies in the country's ability to vet the entrance of aliens under the refugee program. *See infra* pp. 28-32. Those officials include, for example, the FBI Director, the former Assistant Director of the FBI's Counterterrorism Division, and the former Director of National Intelligence. And it is well-known that terror attacks tied to radical Islam have recently occurred around the world and within the United States.

The district court's facial injunction and the panel's stay decision are an intrusion into the national-security, foreign-affairs, and immigration powers possessed by the Executive and delegated by Congress. The injunction is contrary to law, and it threatens amicus's interests by keeping the federal government—under a statutory regime crafted by the States' elected representatives in Congress—from having the latitude necessary to make policy judgments inherent in this country's nature as a sovereign. En banc rehearing should be granted, and the application for a stay of the district court's injunction should be granted.

## Argument

## I. The Executive Order Falls Well Within the Powers Congress Delegated to the Executive, So Plaintiffs' Claim that the Order Violates the INA Is Baseless.

In restricting the entry of aliens into this country, the President acted pursuant to an express delegation of power by Congress, which the three-judge panel failed to even mention: 8 U.S.C. § 1182(f). Plaintiffs do not contest the Executive Order's congressional authorization as to aliens with a nonimmigrant visa. *See* TRO

10

Mot. (D.E.3) 19-21. Nor can plaintiffs claim that the INA compels the President to permit admission of a minimum number of refugees each year. *See id.* Plaintiffs present a statutory argument only as to aliens seeking an immigrant visa. *Id.* That argument relies on a single, inapposite provision about visa issuance (8 U.S.C. § 1152(a)(1)(A))—a provision that does not address the President's separate, expressly delegated authority under § 1182(f) to suspend the entry of aliens into the country.

## A. The Order's suspension of entry conforms with 8 U.S.C. § 1182(f) and does not violate the INA.

The President has ordered the temporary suspension of the entry of aliens from a list of seven countries. EO § 3(c). That suspension is authorized by 8 U.S.C. § 1182(f), which gives the President broad discretion to control the entry of aliens:

> *Whenever* the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, *he may by proclamation*, and *for such period as he shall deem necessary*, *suspend the entry of all aliens or any class of aliens* as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

(emphases added); *see Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 188 (1993) (noting no judicial remedy to challenge President's use of § 1182(f) entry-denial power).

To overcome this unmistakable delegation of authority to the President, plaintiffs cite only a single, inapposite statutory provision: 8 U.S.C. § 1152(a)(1)(A). TRO Mot. (D.E.3) 19-21. That provision provides that immigrant visas—visas issued to aliens who seek lawful admission for permanent residence in the United States, *see* 8 U.S.C. §§ 1101(a)(15)-(16), 1151(a)-(b), 1181(a)—may not issue on cer-

tain prohibited discriminatory bases, *id.* § 1152(a)(1)(A). But an alien's lawful entry into this country is a different and much more consequential event than the preliminary step of the alien's receipt of a visa. An alien generally must have a visa for travel simply to apply for admission to the country. *See id.* §§ 1101(a)(15), 1181(a), 1184(b), 1201(e)-(f), 1225(a)(3), (b)(1)(A)(i), (b)(2). Visa possession does not control or guarantee an alien's entry into the country; the INA provides several ways in which visa-holding aliens can be denied entry. *See supra* pp. 2-3; *see, e.g.*, 8 U.S.C. §§ 1101(a)(13)(A), 1182(a), (f), 1201(h), (i); 22 C.F.R. §§ 41.122, 42.82. One of them is the President's express authority under § 1182(f) to suspend the entry of classes of aliens. Section 1152(a)(1)(A) does not require consular officials to issue visas to aliens who will ultimately be denied entry. To the contrary, the INA provides that nothing in § 1152(a) "shall be construed to limit the authority of the Secretary of State to determine the procedures for the processing of immigrant visa applications." *Id.* § 1152(a)(1)(B).

Plaintiffs thus compare apples and oranges: entry and visa-possession are not the same thing, and the INA treats them differently. Plaintiffs cite a statutory provision about the preliminary step of receiving an immigrant visa, § 1152(a), as somehow limiting the President's § 1182(f) authority concerning the entry of aliens—despite § 1152(a)'s complete silence as to the President's separately delegated authority to suspend alien entry. That novel argument flouts the INA's text and design, and plaintiffs cite no case accepting it. *See* TRO Mot. (D.E.3) 20 (citing one decision on § 1152(a) visa issuance, which the Supreme Court vacated and which

did not concern § 1182(f)); *Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*, 45 F.3d 469 (D.C. Cir. 1995), *vacated by* 519 U.S. 1 (1996) (per curiam).

Even bypassing this threshold defect in plaintiffs' claim, § 1152(a)(1)(A) still could not support the district court's *facial* injunction because it addresses only "immigrant visa" issuance. It does not apply to the issuance of nonimmigrant visas—temporary visas issued to aliens who do not intend to remain in the United States indefinitely. Thus, § 1152(a)(1)(A)—even assuming counterfactually that it addresses entry into the country and not visa issuance—could not possibly show that the Executive Order as applied to nonimmigrant aliens violates the INA. Plaintiffs conceded this point during the stay oral argument in this Court. Stay Mot. Oral Arg. Rec. 56:19-56:43.

## B. The Order's directives on refugee admission conform with 8 U.S.C. § 1182(f) and do not violate the INA.

The President's ability to direct the extent of refugee admission is also well-grounded in the INA. The INA provides that the number of refugees admitted per year is in the President's discretion, set as "such number *as the President determines*," after certain congressional consultation, "is justified by humanitarian concerns *or is otherwise in the national interest*." 8 U.S.C. § 1157(a)(2) (emphasis added). In short, Congress expressly authorized the President to cap the number of refugee admissions.

Moreover, nothing in those statutory provisions regarding refugees negates the President's separate authority under 8 U.S.C. § 1182(f) to temporarily restrict the entry of aliens, regardless of whether the aliens are refugees. Again, plaintiffs' only

statutory attack on the Executive Order's refugee-program directive relies on the § 1152(a)(1)(A) immigrant-visa-issuance provision discussed above. TRO Mot. (D.E.3) 19-21. But that provision makes no reference to refugee admission (or to alien admission generally). *See supra* pp. 11-13. Plus, seeking admission to the country as a refugee does not require securing an immigrant visa. *See* 8 U.S.C. § 1181(c). So refugee admission is outside § 1152(a)(1)(A)'s "immigrant visa" sweep.

## II. Plaintiffs' Arguments that the Executive Order Violates the Constitution Are Equally Meritless.

### A. The Executive acted in an area of maximum authority: *Youngstown*'s first category of Executive action pursuant to congressionally delegated power.

Plaintiffs seek a remarkable use of the judicial power to interfere with the President's national-security decisions in an area of strongest executive authority. Because the Executive Order implements power expressly delegated by Congress, *see supra* Part I, the President's authority is at its maximum and "includes all that he possesses in his own right plus all that Congress can delegate," *Youngstown*, 343 U.S. at 635 (Jackson, J., concurring). Plaintiffs' constitutional claims thus implicitly argue that "the Federal Government as an undivided whole" lacks the authority to proceed as the Executive Order here directs. *Id.* at 636-37.

Executive action in this first *Youngstown* zone is "supported by the strongest of presumptions and the widest latitude of judicial interpretation." *Id.* at 636, *quoted in Dames & Moore v. Regan*, 453 U.S. 654, 674 (1981). That respect attaches here because of not only the explicit congressional grant of authority to deny entry, *see* 8 U.S.C. § 1182(f), but also the INA's complementary approach to allowing entry.

14

Specifically, Congress enacted detailed provisions for over forty classes of nonimmigrants, refugees, and other aliens governing how they can attain lawful presence in the country. *See supra* pp. 1-2; *Arizona*, 132 S. Ct. at 2499; *Texas v. United States*, 809 F.3d 134, 179 (5th Cir. 2015), *aff'd by an equally divided court*, 136 S. Ct. 2271 (2016) (per curiam). But while Congress provided these detailed criteria to significantly restrict the Executive's ability to unilaterally *allow* aliens to be lawfully present in the country, Congress simultaneously delegated the Executive broad discretionary authority to *exclude* aliens from the country, under § 1182(f). Congress knows how to limit executive power in this area, yet the broad delegation of executive power in § 1182(f) underscores the Executive's unique role in protecting the Nation.

The exclusion of aliens is also a core federal prerogative: a power "inherent in sovereignty, necessary for maintaining normal international relations and defending the country against foreign encroachments and dangers—a power to be exercised exclusively by the political branches of government." *Kleindienst v. Mandel*, 408 U.S. 753, 765 (1972) (quotation marks omitted); *accord Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950). The burden of persuasion should thus "rest heavily upon" any party who might attack the Executive's congressionally-authorized action on such a fundamental aspect of sovereignty. *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring).

Plaintiffs level sweeping constitutional challenges in response. Essentially, plaintiffs argue that the United States Constitution grants nonresident aliens located abroad due-process, equal-protection, and Establishment-Clause rights regard-

ing admission into the United States. Amicus is aware of no case extending those rights anywhere close to the extent that plaintiffs assert.

Extending those constitutional rights as envisioned by plaintiffs would have grave implications, such as imposing delay, cost, and risk while courts scrutinize federal officials' concerns with existing procedures for vetting aliens seeking entry into the country. When it comes to deciding the best way to use a sovereign's power over its borders to manage risk, courts have long recognized that the political branches are uniquely well situated. *E.g.*, *Mathews v. Diaz*, 426 U.S. 67, 81 (1976); *Al Bahlul v. United States*, 767 F.3d 1, 75 (D.C. Cir. 2014). In fact, the Executive Order here heeds warnings from federal officials, *see infra* pp. 27-32, and seeks to give the Executive—less than a month into an administration change—additional time to evaluate carefully the Nation's current capabilities to vet aliens entering the country. Plaintiffs' calls for interference with this core executive power should thus be analyzed with intense skepticism. At a minimum, a facial injunction cannot issue unless "no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

## B. The due-process claim fails because nonresident aliens abroad have no constitutionally protected right to seek entry into the United States.

Plaintiffs' due-process challenge rests on the flawed premise that nonresident aliens abroad possess due-process rights under the United States Constitution when seeking admission to the country.

1. It is "clear" that "an unadmitted and nonresident alien" "ha[s] no constitutional right of entry to this country as a nonimmigrant or otherwise." *Mandel*, 408 U.S. at 762. The "power to admit or exclude aliens is a sovereign prerogative" and aliens seeking admission to the United States request a "privilege." *Landon v. Plasencia*, 459 U.S. 21, 32 (1982).

Plaintiffs assert that the Fifth Amendment applies to nonresident aliens not within United States territory, even to aliens abroad who have never been admitted to this country. Amicus is aware of no instance in which the Supreme Court has interpreted the Due Process Clause to extend that far. That view would conflict with the Court's rejection of aliens' claims to "Fifth Amendment rights outside the sovereign territory of the United States." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 269 (1990) (citing *Johnson v. Eisentrager*, 339 U.S. 763, 770 (1950)).

*Boumediene*, 553 U.S. at 732-33, is not to the contrary. That case involved the lengthy detention of alien enemy-combatants at the U.S. Naval Station at Guantanamo Bay and, therefore, implicated habeas corpus and the Suspension Clause, the history of which the Court detailed. *See id.* at 739-52. The federal government here is merely denying entry into the country, not engaging in lengthy detention. *Cf. id.* at 797 ("[F]ew exercises of judicial power are as legitimate or as necessary as the responsibility to hear challenges to the authority of the Executive to imprison a person"). And unlike Guantanamo Bay, the United States lacks "plenary control, or practical sovereignty" over the seven countries in the Executive Order's travel restriction—or from the various countries where the refugee directive would apply.

*Id.* at 754; *cf. id.* at 764 ("The United States has maintained complete and uninterrupted control of the bay for over 100 years.").

Even assuming arguendo that due-process rights extend extraterritorially to nonresident aliens abroad, plaintiffs' claim would still fail. As the Supreme Court has recognized, no process is due if one is not deprived of a constitutionally protected interest in life, liberty, or property. *E.g.*, *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (per curiam); *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999). And nonresident aliens abroad have no constitutionally protected interest in entering the United States.[6] Even apart from the issue of entry into the United States, "[t]here is no constitutionally protected interest in either obtaining or continuing to possess a visa." *Louhghalam*, 2017 WL 479779, at *5 (slip op. 13). Similarly, multiple courts of appeals have rejected due-process claims regarding visa issuance or processing. *See, e.g.*, *Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State, Bureau of Consular Affairs*, 104 F.3d 1349, 1354 (D.C. Cir. 1997); *Azizi v. Thornburgh*, 908 F.2d 1130, 1134 (2d Cir. 1990); *De Avilia v. Civiletti*, 643 F.2d 471, 477 (7th Cir. 1981).

2.    Plaintiffs' due-process arguments rest on a fundamental misunderstanding of the INA. Congress chose to establish an immigration system that, as a baseline,

---

[6] The analysis could be different for certain lawful permanent residents who are returning to the country from abroad, *see Landon*, 459 U.S. at 33-34, but the Executive Order does not apply to LPRs, *see supra* p. 5. Even if the Order did apply to LPRs, analysis of this issue as applied to LPRs could not possibly justify a facial injunction that also applies to non-LPRs.

excludes aliens, and only then creates narrow, targeted exceptions under which the federal government may permit certain aliens to enter the country. *See, e.g.*, 8 U.S.C. § 1225(b)(2)(A). The burden is on the *alien* to convince the government that he is "clearly and beyond a doubt entitled to be admitted." *Id.* And the Executive has numerous grants of authority to deny aliens entry into the country. *See supra* pp. 2-3. This statutory scheme does not suggest that Congress conferred upon nonresident aliens a protected constitutional interest in the ability to obtain process before being denied entry into the country.

Plaintiffs' travel-restriction argument falls short. The INA provides that visas issued to aliens seeking admission to the country confer no entitlement to be admitted, and that visas can be revoked at any time in the Executive's discretion. 8 U.S.C. § 1201(h)-(i). Even as to an alien who was admitted into the country under a visa, "revocation of an entry visa issued to an alien already within our country has no effect upon the alien's liberty or property interests," and thus cannot support a due-process challenge. *Knoetze v. U.S. Dep't of State*, 634 F.2d 207, 212 (5th Cir. 1981).

If *removal proceedings*—which involve the distinct situation of potential detention and forcible removal—were instituted against an alien who is in this country and whose visa was revoked, that alien would enjoy certain due-process protections under the Fifth Amendment. *See Demore v. Kim*, 538 U.S. 510, 523 (2003) (noting that it is "well established" that aliens have due-process rights in deportation hearings); *see also Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) (alien entitled to Fifth Amendment protections once alien is within the country). Accordingly, the INA

19

provides for judicial review of visa revocations only in the limited context of deportation proceedings. 8 U.S.C. § 1201(i). But this case is not about deportation—it is about preventing nonresident aliens abroad from entering the country in the first place (or, at most, a case challenging nonresident alien visa holders' right to return to the United States after traveling internationally). *See* TRO Mot. (D.E.3) 16-17. The Supreme Court has never held that the Fifth Amendment extends to nonresident aliens abroad seeking to enter the country. *Cf. Landon*, 459 U.S. at 32. And because visas can be revoked unilaterally and often without judicial review, *see* 8 U.S.C. § 1201(i), it does not follow that the Constitution requires "'proceedings conforming to . . . due process of law'" for aliens seeking to leave and then re-enter the country. TRO Mot. (D.E.3) 16 (quoting *Mezei*, 345 U.S. at 212).

Thus, the panel erred in holding that plaintiffs "would continue to have potential claims" as to aliens other than LPRs—for at least four reasons. Panel Op. 22. First, the panel referenced aliens "in the United States . . . unlawfully." *Id.* Even if unlawfully-present aliens have due-process rights in *removal proceedings*, *see id.* (citing *Zadvydas*, 533 U.S. at 693), that does not mean that an unlawfully-present alien who leaves the country has a right to process to be admitted to the country upon return. *See, e.g.*, 8 U.S.C. § 1182(a)(9)(B) (inadmissibility based on prior unlawful presence), (f).

Second, *Landon* does not establish that "non-immigrant visaholders" have due-process rights when seeking to return from abroad. *See* Panel Op. 22 (citing 459 U.S. at 33-34). *Landon* involved a *resident* alien, and suggested that any process due must account for the circumstances of an alien's ties to this country. *See* 459

20

U.S. at 32-34 ("[O]nce an alien gains admission to our country and begins to develop the ties that go with permanent residence his constitutional [due-process] status changes accordingly . . . . The constitutional sufficiency of procedures provided in any situation, of course, varies with the circumstances."). Those ties are significantly less in the case of a *nonresident* alien who was temporarily admitted on a nonimmigrant visa. In any event, *Landon* was decided before Congress changed the nature of an alien's interest in visa possession by amending the INA, in 2004, to provide that "[t]here shall be no means of judicial review . . . of a revocation" of a visa, "except in the context of a removal proceeding if such revocation provides the sole ground for removal under" the INA. Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458, § 5304(a), 118 Stat. 3638, 3736 (codified at 8 U.S.C. § 1201(i)).

Third, the panel erred in recognizing due-process rights as to "refugees," who would also be nonresident aliens abroad. Panel Op. 22 (citing "8 U.S.C. § 1231 note [ ]"). The United Nations Convention Against Torture ("CAT") provisions located in the notes to § 1231 merely provide that certain aliens may not be returned to a country in which they fear torture, "regardless of whether the person is physically present in the United States." 8 U.S.C. § 1231 note. The CAT provisions, however, say nothing about overriding the President's statutory authority to restrict alien entry into the United States, even if aliens cannot be returned to a certain other country. *See id.* § 1182(f).

Plaintiffs' other due-process arguments, based on the purported denial of refugees' rights to apply for relief, also fail. *See* TRO Mot. (D.E.3) 18-19. Plaintiffs con-

21

tend that the INA and other provisions confer statutory rights to seek asylum, *see* 8 U.S.C. § 1158, and that this "created, at a minimum, a constitutionally protected right to petition our government for political asylum," *Haitian Refugee Ctr. v. Smith*, 676 F.2d 1023, 1038 (5th Cir. 1982). But asylum and refugee admission are not the same thing. The INA's asylum protection can be sought by individuals who are already "physically present in the United States or who arrive[] in the United States." 8 U.S.C. § 1158(a). Only an alien *outside* the United States may apply to be admitted as a refugee. *See id.* §§ 1101(a)(42), 1157(a), 1158(a), (c)(1), 1181(c). Hence, § 1182(f) independently permits the Executive to deny refugee applicants entry into the United States..

Fourth, the panel incorrectly concluded that plaintiffs had viable due-process arguments based on visa "applicants who have a relationship with a U.S. resident or an institution that might have rights of its own to assert." Panel Op. 22 (citing *Kerry v. Din*, 135 S. Ct. 2128, 2139 (2015) (Kennedy, J., concurring in judgment); *id.* at 2142 (Breyer, J., dissenting); *Mandel*, 408 U.S. at 762-65). *Din* did not hold that such due-process rights exist. To the contrary, the narrowest opinion concurring in the judgment in *Din* expressly did not decide whether a U.S. citizen has a protected liberty interest in the visa application of her alien spouse, such that she was entitled to notice of the reason for the application's denial. *See* 135 S. Ct. at 2139-41 (Kennedy, J., concurring in the judgment). In fact, the concurrence reasoned that, even if due process applied in this context, the only process possibly required was that the Executive give a "facially legitimate and bona fide reason" for denying a visa to an alien abroad—a standard plainly met here. *Id.* at 2141; *see also*

22

*id.* at 2131 (plurality op.) ("[A]n unadmitted and nonresident alien . . . has no right of entry into the United States, and no cause of action to press in furtherance of his claim for admission."). Regardless, the existence of occasional scenarios like that in *Din* could not support a facial injunction.

3.   Lastly, the Fifth Amendment could not possibly extend to those aliens abroad who have *never* entered the country. That point alone is fatal to plaintiffs' facial challenge.

## C. Equal-protection rights are neither implicated nor violated by the Executive Order.

1.   As a threshold matter, the nonresident aliens covered by the Executive Order have no constitutional equal-protection rights against the federal government. The equal-protection principle recognized by courts under the Fifth Amendment's Due Process Clause applies to "person[s]," U.S. Const. amend V, "within the territorial jurisdiction," *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886). But the Supreme Court has recognized a key distinction between aliens inside versus outside the United States. *See Zadvydas*, 533 U.S. at 693. And the Court has "rejected the claim that aliens are entitled to Fifth Amendment rights outside the sovereign territory of the United States." *Verdugo-Urquidez*, 494 U.S. at 269 (citing *Eisentrager*, 339 U.S. at 770).

2.   Even assuming arguendo that some form of equal-protection rights applied to the aliens covered by the Executive Order, plaintiffs' equal-protection argument would fail. Plaintiffs' main equal-protection argument tracks their Establishment Clause argument, but it cannot succeed because it rests on the flawed premise that

the "Executive Order is motivated by discriminatory animus and cannot survive any level of review." C.A. Stay Response 20.

The Executive Order classifies aliens by nationality, not religion, and plaintiffs' pretext argument is wrong. The Executive Order's temporary pause in travel from seven countries and in the refugee program is religion-neutral. It does not mention any religion, and its provisions do not depend on whether affected aliens are Muslim. *See* EO §§ 3(c), 5(a)-(b). These provisions distinguish among aliens only by nationality. *Id.* Thus, the Executive Order is emphatically not a "Muslim ban." Indeed, numerous Muslim-majority countries in the world are not covered by the seven-country list used in the Executive Order.[7] And the Pew Research Center estimates that the Executive Order "would affect only about 12% of the world's Muslims."[8]

a.   Plaintiffs cannot establish that the Order's country-based criteria are an "obvious pretext" for religious discrimination. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979) (addressing Fourteenth Amendment equal protection). On no view can the use of those seven countries "plausibly be explained only as a [reli-

---

[7] Jack Moore & Conor Gaffey, *What's Behind Donald Trump's Decision to Include Some Muslim-Majority Countries in the Travel Ban—and Not Others?*, Newsweek, Jan. 31, 2017, http://www.newsweek.com/muslim-majority-countries-not-included-trump-travel-ban-550141 (listing Muslim-majority countries not covered by the Order's travel restrictions).

[8] Pew Research Ctr., *World's Muslim Population More Widespread Than You Might Think* (Jan. 31, 2017), http://www.pewresearch.org/fact-tank/2017/01/31/worlds-muslim-population-more-widespread-than-you-might-think/.

gious]-based classification." *Id.* at 275. When there are "legitimate reasons" for governmental action, courts "will not infer a discriminatory purpose." *McCleskey v. Kemp*, 481 U.S. 279, 298-99 (1987) (rejecting equal-protection claims). This is especially true here given that the Order is within *Youngstown*'s first zone and should be accorded "the strongest of presumptions and the widest latitude of judicial interpretation." *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring). The Executive Order's nationality-based restrictions have a manifest rational basis, and this forecloses the conclusion that the Order is merely a pretext for imposing entry restrictions because of aliens' religion.

The Executive Order explains its animating national-security goals: to "ensure the proper review and maximum utilization of available resources for the screening of foreign nationals, and to ensure that adequate standards are established to prevent infiltration by foreign terrorists." EO § 3(c). The Order then finds detriment to national interests from permitting "aliens from countries referred to in section 217(a)(12) of the INA, 8 U.S.C. [§] 1187(a)(12)," to enter the country. *Id.* Those seven countries were previously identified by Congress and the Obama Administration, in administering the visa-waiver program, as national-security "countries of concern." *See supra* pp. 4-5.

The Executive Order thus reflects national-security interests implicated by the ongoing War on Terror against radical Islamic terrorists. These national-security interests were recognized in the 2001 Authorization for Use of Military Force (AUMF), Pub. L. No. 107-40, 115 Stat. 224 (codified at 50 U.S.C. § 1541 note). *See, e.g.*, *Boumediene*, 553 U.S. at 733; *see also, e.g.*, National Defense Authorization

Act for Fiscal Year 2016, Pub. L. No. 114-92, § 1035(a), 129 Stat. 726, 971 (2015) (codified at 10 U.S.C. § 801 note); The White House, *Report on the Legal and Policy Frameworks Guiding the United States' Use of Military Force and Related National Security Operations* 4-7 (Dec. 2016), https://www.justsecurity.org/wp-content/uploads/2016/12/framework.Report_Final.pdf.

Plaintiffs' challenge cannot be sustained based on comments the President made during his campaign for office or statements made by non-governmental officials. The Supreme Court has recognized the limited significance of campaign statements. *See Republican Party of Minn. v. White*, 536 U.S. 765, 780 (2002). And comments made by nongovernmental officials are irrelevant for determining whether the decision-makers for the Executive Order held a discriminatory, pretextual purpose. *See Feeney*, 442 U.S. at 279. Moreover, the Executive Order's country-based criteria do not even cover a large percentage of Muslims in the world; its application does not by any measure show a ban based on religion rather than nationality. *See supra* p. 24.

Ample reason exists for courts to leave undisturbed the "delicate policy judgment" inherent in the Executive Order about when a factor indicating a heightened national-security risk warrants a particular course of action regarding the Nation's borders. *Plyler v. Doe*, 457 U.S. 202, 225 (1982). Courts are not comparatively well situated to evaluate competing experts' views about particular national-security-risk-management measures. *See Boumediene*, 553 U.S. at 797.

b.   Yet even were courts tempted to second-guess the Executive's national-security assessments, the Executive Order's travel ban and refugee-program limita-

tions do not lack a national-security rational basis. These provisions may be debated, as a policy matter, but recent governmental sources, including many that predate the current presidential Administration, confirm a rational basis for the Executive to believe that there could be national-security issues with the vetting of aliens entering the country.

The House Homeland Security Committee's Task Force on Combating Terrorist and Foreign Fighter Travel has noted that the "visa issuance process represents a critical stage for law enforcement to detect individuals with terrorist ties and prevent them from entering the United States."[9] Former ICE Homeland Security Investigations International Operations Assistant Director Lev Kubiak similarly explained that "[t]he visa adjudication process often presents the first opportunity to assess whether a potential visitor or immigrant poses a threat to the United States," and that visa-security measures "protect[] the United States against terrorists and criminal organizations by preventing foreign nationals who pose a threat to national security from entering the United States."[10] Congress, too, has provid-

---

[9] H. Comm. on Homeland Sec., 114th Cong., *Final Report of the Task Force on Combating Terrorist and Foreign Fighter Travel* 39 (Sept. 2015), http://homeland.house.gov/wp-content/uploads/2015/09/TaskForceFinalReport.pdf.

[10] *The Outer Ring of Border Security: DHS's International Security Programs: Hearing Before the Subcomm. on Border & Maritime Sec. of the H. Comm. on Homeland Sec.*, 114th Cong. 24 (2015) (written statement of Lev J. Kubiak, Assistant Director, International Operations, Homeland Security Investigations, U.S. ICE, U.S. DHS); *id.* ("[T]he Homeland Security Act [of 2002] directs DHS to assist in the identification of visa applicants who seek to enter the United States for illegitimate purposes, including criminal offenses and terrorism-related activities.").

ed that nonimmigrant visas shall not issue "to any alien from a country that is a state sponsor of international terrorism unless the Secretary of State determines, in consultation with the Attorney General and the heads of other appropriate United States agencies, that such alien does not pose a threat to the safety or national security of the United States." 8 U.S.C. § 1735(a).

Multiple Members of Congress have voiced concerns regarding the Nation's current ability to vet information about aliens from the countries at issue in the Executive Order. Representative Chaffetz explained, for example, "When we go to give somebody a visa, we rely on the host nation to help us identify that person and understand their background. That does not happen in Libya. Let's be realistic. Muammar Qadhafi was ruling there for 40-plus years. They don't have the infrastructure and the ability to deal with this. . . . I want to sponsor a bill that says if you are coming from . . . a state sponsor of terrorists, then you shouldn't be able to get a visa here in the United States."[11]

Accordingly, Representatives Forbes, Goodlatte, and Gowdy introduced legislation in 2016 that would have imposed additional requirements on visa issuance "as part of the comprehensive security check process for nationals from certain countries of concern, including Iran, Iraq, Libya, Somalia, Syria, Sudan, and Yem-

---

[11] *Overturning 30 Years of Precedent: Is the Administration Ignoring the Dangers of Training Libyan Pilots and Nuclear Scientists?: Joint Hearing Before the Subcomm. on Immigration & Border Sec. of the H. Comm. on the Judiciary and the Subcomm. on Nat'l Sec. of the H. Comm. on Oversight & Gov't Reform*, 113th Cong. 33 (2014) (statement of Rep. Chaffetz, Member, H. Comm. on the Judiciary; Chairman, Subcomm. on Nat'l Sec. of the H. Comm. on Oversight & Gov't Reform).

en." Press Release, Forbes, Goodlatte, and Gowdy Introduce Bill to Strengthen Visa Security (May 12, 2016). Under that legislation, Congress would have prevented the Executive from issuing visas to nationals of these seven countries—the same seven countries covered by the Executive Order—without a "Security Advisory Opinion." H.R. 5203, 114th Cong. § 211B(b)(1)(A)(i) (2016).

As to the Executive Order's refugee-program provisions, numerous governmental sources confirm unique national-security challenges posed by prior refugee admissions:

- The Government Accountability Office has expressed concern about the fraud risks associated with screening asylum applicants, a process similar to that for refugees: "Both DHS and DOJ have established dedicated anti-fraud entities—an important leading practice for managing fraud risks— but these agencies have limited capability to detect and prevent asylum fraud and both agencies' efforts to date have focused on case-by-case fraud detection rather than more strategic, risk-based approaches."[12]

- FBI Director James Comey told Congress that gathering information on Syrian migrants posed particular concerns, testifying that "we can query our databases until the cows come home but nothing will show up because we have no record of that person."[13]

---

[12] U.S. Gov't Accountability Off., GAO-16-50, *Asylum: Additional Actions Needed to Assess and Address Fraud Risks* 74 (Dec. 2015), http://www.gao.gov/ assets/680/673941.pdf.

[13] H. Comm. on Homeland Sec., 114th Cong., *Nation's Top Security Officials' Concerns on Refugee Vetting* (Nov. 19, 2015), https://homeland.house.gov/press/ nations-top-security-officials-concerns-on-refugee-vetting/.

- The former Director of National Intelligence explained, "We don't obviously put it past the likes of ISIL to infiltrate operatives among these [Syrian] refugees."[14]

- The former Assistant Director of the FBI's Counterterrorism Division explained his concern about "the lack of our footprint on the ground in Syria," and "that the databases won't have information we need. So it is not that we have a lack of process, it is that there is a lack of information."[15]

- According to a November 2015 House Homeland Security Committee report, a Department of Homeland Security's U.S. Citizenship and Immigration Services official disclosed that the government lacked "access to any database in Syria that can be used to check the backgrounds of incoming refugees against criminal and terrorist records."[16] The report also noted that ISIS and other terrorists "*are determined*" to abuse refugee programs and "focused on deploying operatives to the West."[17] The House Homeland Security Committee has elsewhere noted that "Islamist terrorists have infiltrated the West in the past through refugee programs and groups like ISIS may seek to exploit the current refugee flows."[18]

- Likewise, the House Homeland Security Committee's Task Force on Combating Terrorist and Foreign Fighter Travel found that "[a]gencies

---

[14] *Id.*

[15] Letter of Bob Goodlatte, Chairman, H. Comm. on the Judiciary, to Barack Obama, President of the United States of America (Oct. 27, 2015), http://judiciary. house.gov/_cache/files/20315137-5e84-4948-9f90-344db69d318d/102715-letter-to-president-obama.pdf.

[16] H. Comm. on Homeland Sec., 114th Cong., *Syrian Refugee Flows: Security Risks and Counterterrorism Challenges* 4 (Nov. 2015), https://homeland.house. gov/wp-content/uploads/2015/11/HomelandSecurityCommittee_Syrian_Refugee _Report.pdf.

[17] *Id.* at 2-3.

[18] H. Comm. on Homeland Sec., 114th Cong., *Terror Threat Snapshot: The Islamist Terrorist Threat* (Nov. 2015), https://homeland.house.gov/wp-content/ uploads/2015/11/November-Terror-Threat-Snapshot.pdf.

have made improvements to the refugee security screening process, but more must be done to mitigate potential vulnerabilities."[19] Specifically:

- o "Members of terrorist groups like ISIS have *publicly bragged* they are working to sneak operatives into the West posing as refugees, and European officials are worried this is already the case."[20]

- o "[M]ore than four million people have fled the conflict zone in Syria, offering extremists ample opportunity to blend into migrant groups."[21]

- o "Fighters belonging to ISIS's predecessor, al Qaeda in Iraq, successfully slipped into the United States through the refugee resettlement program in 2009, when two terrorist[s] responsible for killing U.S. troops in Iraq were granted entry and settled in Kentucky," but "[o]nly later did the FBI and DHS discover this error and arrest the suspects after finding their fingerprints matched those found on IEDs in Iraq."[22]

- The Chairman of the House Homeland Security Committee said on the House floor "that serious intelligence gaps preclude us from conducting comprehensive screening to detect all Syrian refugees with terrorist ties, and as a result I have proposed adding additional national security checks to the process before the United States approves any further admissions." 161 Cong. Rec. H9054 (daily ed. Dec. 8, 2015) (statement of Rep. McCaul).

In short, numerous federal government officials have expressed concerns about the country's current capacity for vetting refugees. In light of this reality, the challenge to the Executive Order's refugee provisions cannot withstand plaintiffs' facial attack as a pretext for religious discrimination.

---

[19] *Final Report of the Task Force on Combating Terrorist and Foreign Fighter Travel*, *supra*, at 42 (alteration omitted).

[20] *Id.* at 43 (emphasis added and footnote omitted).

[21] *Id.*

[22] *Id.* (footnote omitted).

3.   Because the Executive Order classifies aliens by nationality, and not religion, any applicable equal-protection analysis subjects the Order to no more than rational-basis review. The rational-basis standard, not strict scrutiny, is how equal-protection law analyzes nationality-based classifications. *See, e.g.*, *Mathews*, 426 U.S. at 83; *Nademi v. INS*, 679 F.2d 811, 814 (10th Cir. 1982); *Malek-Marzban v. INS*, 653 F.2d 113, 116 (4th Cir. 1981); *Narenji v. Civiletti*, 617 F.2d 745, 748 (D.C. Cir. 1979).

Plaintiffs have previously suggested that immigration restrictions classifying aliens by nationality may be subject to strict scrutiny. *See, e.g.*, TRO Mot. (D.E.3) 5 (citing *Graham v. Richardson*, 403 U.S. 365, 372 (1971) (involving *state-law* alienage classifications)). In federal immigration law, however, "the very concept of 'alien' is a nationality-based classification." *Rajah v. Mukasey*, 544 F.3d 427, 435 (2d Cir. 2008). "This discrimination among subclassifications of aliens is not based on a suspect classification." *Soskin v. Reinertson*, 353 F.3d 1242, 1256 (10th Cir. 2004). In fact, nationality-based classifications are found throughout the INA and have existed for decades.[23]

---

[23] For example, Congress has authorized Temporary Protected Status for an "alien who is a national of a foreign state" specified by the Executive. 8 U.S.C. § 1254a(a)(1). Congress has also conferred certain benefits on aliens from particular countries who are applying for LPR status. *See, e.g.*, 8 U.S.C. § 1255 note (listing immigration provisions under the Haitian Refugee Immigration Fairness Act of 1998 and the Nicaraguan Adjustment and Central American Relief Act, among others). And Congress created a special program for "diversity immigrants," which provides a limited number of immigrant visas for aliens from countries with historically low rates of immigration to the United States. *See* 8 U.S.C. § 1153(c).

To be sure, if the Executive Order were hypothetically changed expressly to target "Muslims" for different restrictions, then plaintiffs' argument for strict scrutiny based on a suspect classification would be stronger. *See, e.g.*, *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) (religion is an "inherently suspect distinction"). But the Executive Order does not do that.

This Court should decline plaintiff's invitation to extend Fifth Amendment equal-protection principles to this immigration context at all, as explained above. *See supra* pp. 16-23; *see also Rodriguez-Silva v. INS*, 242 F.3d 243, 248 (5th Cir. 2001) (determining that Congress was not required to establish a rational basis for nationality-based classifications because its power to regulate immigration is plenary).[24] But assuming arguendo that equal-protection jurisprudence applies, the Executive Order's nationality-based classification should be reviewed for a rational basis, and there is an easily identifiable "conceivable state of facts that could provide a rational basis" for this Order. *Heller v. Doe*, 509 U.S. 312, 319-20 (1993) (citation and quotation marks omitted). The same national-security grounds indicating that the Executive Order is not a pretext masking a religious classification confirm the rational basis for the Order's nationality-based classifications. *See supra* pp. 27-32.

---

[24] Plaintiffs themselves concede that "courts generally give more latitude to the political branches in the immigration context." TRO Mot. (D.E.3) 5 (citing *Zadvydas*, 533 U.S. at 695).

### D. The Executive Order neither triggers nor violates the Establishment Clause.

Plaintiffs' Establishment Clause argument fails because the Clause does not vest rights extraterritorially in nonresident aliens abroad—for many of the same reasons that due-process or equal-protection rights would not apply to such aliens. *See supra* p. 23. Amicus is aware of only one court of appeals case to apply Establishment Clause protections extraterritorially in some fashion: *Lamont v. Woods*, 948 F.2d 825, 843 (2d Cir. 1991). But that case dealt with *U.S. citizens'* ability to raise an Establishment Clause challenge to "the appropriation and expenditure of public funds by the United States for the construction, maintenance and operation of foreign religious schools." *Id.* at 827.

Even if the Establishment Clause were so broad as to afford its protections to nonresident aliens abroad, there is no Establishment Clause violation here. The Executive Order is religion-neutral, and the Order is not a pretext for religious discrimination as explained above. *See supra* pp. 24-32. On its face, section 5(b) of the Order regarding refugee admission does not "give preference to Christian refugees while disadvantaging Muslim refugees." TRO Mot. (D.E.3) 7. The Order's directives on the refugee program after it resumes, for instance, "could be invoked to give preferred refugee status to a Muslim individual in a country that is predominantly Christian." *Louhghalam*, 2017 WL 479779, at *5 (slip op. 13).

Nor does the Constitution prohibit government accommodation of religion. *See Cutter v. Wilkinson*, 544 U.S. 709, 713 (2005). The INA provides for allocating admissions among refugees of "special humanitarian concern to the United States,"

8 U.S.C. § 1157(a)(3), a category of aliens that Congress itself has continuously updated to include particular religious groups, such as Soviet Jews, Evangelical Christians, and the Ukrainian Orthodox Church. *Id.* § 1157 note. Plaintiffs' Establishment Clause argument, if accepted, would jeopardize those practices and the government's ability to recognize and respond to religious persecution.

## Conclusion

Rehearing en banc, and the application for a stay, should be granted.

Respectfully submitted.

Ken Paxton
Attorney General of Texas

Jeffrey C. Mateer
First Assistant Attorney General

s/ Scott A. Keller
Scott A. Keller
Solicitor General

J. Campbell Barker
Deputy Solicitor General

Ari Cuenin
Assistant Solicitor General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697
scott.keller@oag.texas.gov

35

## CERTIFICATE OF SERVICE

On February 15, 2017, this brief was served by CM/ECF on the following

counsel for the parties:

Counsel for Plaintiffs-Appellees:
Noah G. Purcell
Office of the Washington Attorney General
P.O. Box 40100
1125 Washington St., SE
Olympia, WA 98504
Noahp@atg.Wa.Gov

Counsel for Defendants-Appellants:
Edwin S. Kneedler
United States Department of Justice
950 Pennsylvania Ave., N.W.
Room 5139
Washington, DC 20530
Edwin.S.Kneedler@usdoj.gov

s/ Scott A. Keller
SCOTT A. KELLER

## Certificate of Compliance

This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it is prepared in a proportionally spaced, 14-point typeface. Consistent with Circuit Rule 32-2(a), a separate motion for leave to file this brief of 8,965 words has been filed.

s/ Scott A. Keller
Scott A. Keller